1

2

3

4        UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
5              AT SEATTLE

6    SEATTLE TIMES COMPANY,

7                    Plaintiff,

8         v.

     LEATHERCARE, INC.; STEVEN RITT;
9    and the marital community composed of
     STEVEN RITT and LAURIE ROSEN-          C15-1901 TSZ
10   RITT,
                                            ORDER
11                   Defendants/Third-Party
                     Plaintiffs,

12        v.

13   TOUCHSTONE SLU LLC; and
     TB TS/RELP LLC,

14                   Third-Party Defendants.

15        THIS MATTER came on for trial on January 9, 2018, before the Court, sitting

16   without a jury.  Seattle Times Company ("Seattle Times") was represented by Jeff Kray

17   and Jessica Ferrell of Marten Law PLLC.  LeatherCare, Inc. ("LeatherCare"), Steven

18   Ritt, and the marital community composed of Steven Ritt and Laurie Rosen-Ritt were

19   represented by Jo Flannery and Kristin Meier of Ryan, Swanson & Cleveland, PLLC.

20   Touchstone SLU LLC and TB TS/RELP LLC (collectively, "Touchstone") were

21   represented by Jeremy (Jake) Larson of Dorsey & Whitney LLP and Kenneth Lederman

22   of Foster Pepper PLLC.

23

Trial proceeded for eighteen (18) days and ended on February 7, 2018, at which time the Court took the matter under advisement. Having considered the testimony of the witnesses,[1] the exhibits admitted into evidence,[2] the documents and PowerPoint slides offered for demonstrative purposes, the facts on which the parties have agreed to the extent they are supported by the record, _see_ Pretrial Order (docket no. 154) [hereinafter "PTO"], and the arguments of counsel, the Court now enters these Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[3]

---

[1] During the course of trial, the Court heard from lay witnesses Alan Fisco, Jeffery Belfiglio, Shawn Campbell Mathewson, Steven Wood, Peter Kingston, Shawn Parry, Riley Conkin, David Clemens, Shannon Testa, John Funderburk, Paul Klansnic, and James O'Hanlon. The Court also read the entire transcripts of the depositions of Steven Ritt, Mark Chose, and Jack Ross, and the designated portions of the transcripts of the depositions of Lawrence Rowley, Thelma Spillers, Douglas Ranes, Eric Rosebrock, Frank Blethen, Carolyn Kelly, Andrew Faas, Robert Hallowell, Elizabeth Sander, Frank Paiva, Mason Sizemore, Nathaniel (Buster) Brown, Martin Brown, Riley Conkin, Thomas Cusack, Shawn Campbell Mathewson, Sunny Becker, Robert Warren, Maura O'Brien, and Douglas Howe. Before each expert testified, the Court reviewed in chambers the expert's declaration and the attached reports. _See_ Dale Decl. (docket nos. 118 & 183); Jewett Decl. (docket nos. 119 & 186-87); Krasnoff Decl. (docket nos. 120 & 188-92); White Decl. (docket nos. 121 & 193-94); Zelikson Decl. (docket nos. 122 & 195-96); Morrill Decl. (docket no. 117); Cook Decl. (docket no. 116). Expert witnesses Peter M. Krasnoff, P.E., Bruce E. Dale, Ph.D., Peter D. Jewett, L.G., L.E.G., Jeffrey Zelikson, P.E., and Richard Lane White were called by Seattle Times. Expert witness Pamela J. Morrill, L.G., L.H.G. was called by LeatherCare, and expert witness Dave Cook, L.G., C.P.G. testified on behalf of Touchstone.

[2] The exhibits Seattle Times offered were numbered 1 through 538. Thirty (30) of these exhibits were provided in electronic form on a compact disc ("CD"). For each exhibit on a CD, Seattle Times also submitted a truncated version in hardcopy form. To the extent that material cited in this Order appears both on the CD and in the printed excerpt, the Court references both exhibit numbers, with the truncated version in parenthesis. For example, the Draft Remedial Investigation Report is cited as "Ex. 115 (493)" and the Interim Action Progress Report is cited as "Ex. 126 (458 & 491)." LeatherCare's exhibits were numbered 1001 through 1201, and Touchstone's exhibits were numbered 2001 through 2026. Over 750 exhibits, contained in more than 17 binders, each at least three inches wide, were admitted into evidence.

[3] Any conclusion of law misidentified as a finding of fact shall be deemed a conclusion of law, and any finding of fact misidentified as a conclusion of law shall be deemed a finding of fact.

**Background**

**A.      Introduction**

This action concerns the remediation costs associated with hazardous substances, including PCE or Perc[4] and various petroleum products, released on real property bounded by Fairview Avenue North, Thomas Street, Boren Avenue North, and Harrison Street in Seattle, Washington (the "Property"). The Property was contaminated as a result of dry-cleaning and other operations conducted by LeatherCare, which previously leased a portion of the Property, and Troy Laundry Co., which became Troy Linen and Uniform Service, Inc. in 1981 ("Troy"), _see_ Ex. 1150, and which owned the Property. Seattle Times purchased the Property from Troy in 1985, and sold it to Touchstone in 2011. After acquiring the Property, Touchstone redeveloped it into a commercial complex. As part of construction efforts, Touchstone's contractors excavated over 100,000 tons of contaminated soil, which was transported to appropriate waste facilities. In addition, Touchstone had a series of injection wells installed at the Property to address groundwater contamination.

In this action, Touchstone seeks to recover over $9.88 million in connection with its remedial activities.[5] Touchstone has already recovered $4,783,434.17 from Seattle

---

[4] PCE and Perc are abbreviations for the organic compound $C_2Cl_4$, which is known as perchloroethylene, perchloroethene, tetrachloroethylene, and/or tetrachloroethene.

[5] Although Touchstone has outlined the costs associated with specific tasks related to remediation, it was not actually billed for each line item, but instead entered into a "guaranteed maximum price" agreement with its general contractor, pursuant to which Touchstone would pay a fixed amount for the development of the Property. _See_ Trial Tr. (Jan. 24, 2018) at 95:22-96:13 (docket no. 264). Under this agreement, the general contractor bore the risk of cleanup expenses exceeding the amounts estimated, _id._ at 96:6-8, but it

Times pursuant to a contract between the parties, and it seeks the balance of almost $5.1 million from Seattle Times or LeatherCare. Touchstone also requests a judgment declaring the parties' respective responsibilities for future response costs. Seattle Times seeks to recover from LeatherCare and/or Mr. Ritt, the current President of LeatherCare, _see_ Ritt Decl. at ¶ 2 (docket no. 61), substantially all of what it has paid, or will be liable to pay, to Touchstone. LeatherCare and Mr. Ritt ask for declaratory relief, as well as contribution, contending that Mr. Ritt cannot be held personally liable and that the Court should equitably apportion the expenses at issue among all of the parties. Seattle Times asserts its claims against LeatherCare and Mr. Ritt under both federal and state statutes relating to environmental cleanup, while Touchstone relies solely on state law.

1. **The Property**

The Property consists of two tax parcels, covering approximately 2.5 acres of land, in a neighborhood of Seattle just south of Lake Union, as shown on the following map.



Fig. 1:
Location of the Property
(SOURCE: Ex. 115 (493)
at Fig. 1 (modified)).

---

would return any "savings" to Touchstone, _id._ at 96:11-13. In this matter, the environmental response costs were less than the "original allowance," and Touchstone paid less than the "guaranteed maximum price" for the entire project. _See id._ at 97:17-20.

Troy acquired a portion of the Property in 1925, and owned the entire block by 1951. When Seattle Times purchased the Property from Troy in 1985, the Property had three improvements, as shown in Figures 2 and 3, namely a vintage warehouse built in 1925, located at 334 Boren Avenue North (Building 1),[6] a vintage industrial facility constructed by 1927 and expanded between 1943 and 1966, bearing an address of 307-311 Fairview Avenue North (Building 2), and a vintage structure erected in 1960, designated as 333 Fairview Avenue North (Building 3).[7] Ex. 107 at 10-11; Ex. 115 at 147-58.



Fig. 2: Ex. 115 (493) at 127 (modified).



Fig. 3: Ex. 115 (493) at Fig. 2 (modified).

---

[6] For the sake of simplicity, the Court has used numerical designations for the structures at the Property, rather than street addresses or the naming conventions used by the parties.

[7] Touchstone's consultant has indicated that Building 3 had an address of 329 Boren Avenue North, Ex. 115 (493) at Fig. 2, as well as an address of 329 Fairview Avenue North, *e.g.*, Ex. 107 at 11; Ex. 115 (493) at 17. King County Assessor records reflect that Building 3 was located at 333 Fairview Avenue North. Ex. 115 at 182-83.

Troy operated in Building 2 both an industrial laundry and a dry-cleaning plant. Troy also fueled and serviced its fleet of vehicles at the Property. In 1957, LeatherCare's predecessor, Seattle Fur Services, began leasing a portion of Building 2 from Troy. In 1981, LeatherCare also became a tenant of Building 3. LeatherCare continued to lease from Troy until March 5, 1985, when Troy sold the Property to Seattle Times for $3.5 million. From March until September 1985, LeatherCare leased space in Building 2 from Seattle Times, and LeatherCare occupied Building 3 until 1999. *See* *infra* p. 33. On June 10, 2011, Seattle Times sold the Property to Touchstone for $18.4 million. As a result of Touchstone's redevelopment efforts, the Property is now occupied by a two-building complex with a five-story, underground parking garage. Figure 4 shows the new office space in the final stages of construction.



Fig. 4: TROY BLOCK , Ex. 2025 at 20 (cropped).

### 2. **The Hazardous Substances**

This matter involves two types of hazardous substances, namely (i) halogenated hydrocarbons,[8] and (ii) petroleum products.

### a. **Halogenated Hydrocarbons**

PCE or Perc, which is a halogenated hydrocarbon, is a synthetic chemical that is not known to occur in nature. *See* Tab 11 to Dale Report (docket no. 183-13 at 19 & 22). During the period when LeatherCare leased Buildings 2 and 3 from Troy, PCE was commonly used as a solvent in the dry-cleaning industry, and it was the dominant synthetic solvent. *See* Dale Report, Ex. 210 at 2 (filed as docket no. 118-1). Because of its tendency to transition from a liquid to a gaseous state at normal temperatures, PCE is considered a volatile organic compound ("VOC"). *See* Tab 11 to Dale Report (docket no. 183-13 at 41 & 47). PCE is also described as a dense non-aqueous phase liquid ("DNAPL"), meaning that it has a higher specific gravity (*i.e.*, it is heavier) than water, and that it will separate from water, in a manner similar to how oil and vinegar, or the fat and juice of roasted meat drippings, will settle into different layers. *See id.* (docket no. 183-13 at 40-41).

PCE can degrade into trichloroethylene or trichloroethene ("TCE"), as well as other compounds, including vinyl chloride ($C_2H_3Cl$). Chronic inhalation exposure to these substances can lead to neurological disorders, kidney or liver disease, and/or reproductive dysfunction. *See* PCE Fact Sheet, Ex. 457; *see also* Toxicological Profiles

---

[8] Halogenated hydrocarbons are chemicals in which a halogen (*e.g.*, fluorine, chlorine, bromine, iodine, or astatine), instead of a hydrogen atom, is bonded to a carbon atom. *See* Tab 11 to Dale Report (docket no. 183-13 at 101).

(available at www.atsdr.cdc.gov).  The United States Environmental Protection Agency ("EPA") has classified PCE as "likely to be carcinogenic" and both TCE and vinyl chloride as "carcinogenic to humans."  *See* https://www.epa.gov/fera/risk-assessment-carcinogenic-effects (Table 1).  In addition to being a degradation product of PCE, TCE is frequently an original component of water and stain repellants, vehicle brake part and carburetor cleaners, sizing materials, spotting and degreasing agents, lubricants, battery terminal protectants, and printing inks like those used by Seattle Times.  Morrill Report at §§ 4.2.1.2.1 & 4.8 and App'x J, Ex. 1141 (filed as docket nos. 117-1 & 117-13); *see also* https://www.epa.gov/sites/production/files/2015-01/documents/printing.pdf.

The Washington Department of Ecology ("Ecology") has established "cleanup" levels for certain chlorinated hydrocarbons, which are the concentrations "in soil, water, air, or sediment" that are "determined to be protective of human health and the environment under specified exposure conditions."  WAC 173-340-200.  The "cleanup" concentrations relevant in this litigation are as follows:

| Substance | In Soil | In Groundwater |
|---|---|---|
| PCE | 0.05 mg/kg | 5 µg/liter |
| TCE | 0.03 mg/kg | 5 µg/liter |
| Vinyl Chloride | N/A | 0.2 µg/liter |

WAC 173-340-900 at Tables 720-1, 740-1, & 745-1.

### b.  Petroleum Products

Other contaminants of concern at the Property were Stoddard solvent, gasoline, and diesel fuel.  Like PCE, Stoddard solvent was once a popular compound in the dry-

ORDER - 8

cleaning industry. Stoddard solvent is a flammable, volatile liquid, which is insoluble in water and smells similar to kerosene or gasoline. It is not generally regarded as carcinogenic, but very few studies have been done on the effects in humans of inhalation exposure to Stoddard solvent. _See_ Toxicological Profile for Stoddard Solvent (June 1995), Ex. 452 at 23. Stoddard solvent is considered a gasoline-range petroleum hydrocarbon ("GRPH"). At the Property, Stoddard solvent was stored in underground tanks. Gasoline for use in Troy's fleet of vehicles and diesel fuel for use presumably as heating oil were also stored underground. Ecology has set a "cleanup" level for GRPH of 100 mg per kg of soil. _See_ WAC 173-340-900 at Tables 740-1 & 745-1.

### 3. PCE Emissions from Dry-Cleaning Operations

In this matter, the parties have stipulated that, as a result of dry-cleaning operations, PCE was released into the subsurface soil and migrated to the groundwater beneath the Property. _See_ Stip. & Order at ¶ 2 (docket no. 41); Stip. & Order at ¶ 2 (docket no. 52). The parties also agree that the contamination occurred primarily in two ways. First, it resulted from placing PCE-saturated materials in the back of a dump truck, which was owned and used by Troy to haul waste to a transfer station, and which was left, uncovered at times, in the partially-unpaved loading dock, thereby allowing rain water to soak through the rubbish and solvent to infiltrate the soil. _See_ PTO at 10, ¶ 22. Second, PCE was discharged into the subsurface soil because of degradation of the drainpipes and side sewers[9] that carried effluent water commingled with solvent to the

_____

[9] The parties have stipulated that at least three separate side sewers were installed at the Property between 1946 and 1966. PTO at 8, ¶ 13. One of these side sewers conveyed waste water from Buildings 2 and 3 to the municipal main under Harrison Street. _Id._ The other side sewers connected areas of Building 2 to the municipal main under Boren Avenue North. _Id._; _see also_ Ex. 115 (493) at § 2.3.1 (indicating that the

ORDER - 9

municipal sewer main running under Boren Avenue North.  *See* PTO at 8-9, ¶¶ 13 & 19; *see also* Krannsoff Report at Op. 1, Ex. 213 at 5-13; Morrill's Rebuttal & Supp. Report at Gen. Op. 4, Ex. 1145 at 21-22 (filed as docket no. 117-15) (opining that the drain and sewer lines at the Property were corroded before LeatherCare began using PCE in its operations).  The parties dispute, however, the extent to which Troy, along with LeatherCare, is responsible for the PCE contamination at the Property, and whether Troy, in addition to LeatherCare, ran a PCE-based dry-cleaning plant at the Property.

### a.   Components of a Dry-Cleaning System

To fully comprehend the parties' stipulations concerning how PCE was released at the Property, knowledge about dry-cleaning operations is required.  The term "dry cleaning" is a misnomer because the clothes still get wet during the process; however, they are immersed in a liquid other than water.  Whether the liquid is PCE, Stoddard, or another non-aqueous solvent, the principal steps are identical to those of laundering in water:  (i) one or more washes (baths) in the solvent; (ii) extraction of the solvent by spinning; and (iii) drying by tumbling in an air stream.[10]  Ex. 270[11] at 14 (filed as Tab 48

---

Property had a total of ten side sewers; seven side sewers, one of which had been abandoned, entered the Property from Boren Avenue North, one side sewer ran to Harrison Street, and the other two side sewers were connected to the municipal main under Fairview Avenue North).

[10] Dry-cleaning systems are categorized as either transfer or dry-to-dry.  Ex. 270 at 15.  In a transfer operation, the washer and dryer are separate units, and the clothes must be moved, in a wet state, from the washer to the dryer.  *Id.*  In a dry-to-dry machine, the clothes are dried in the same tumbler as they are washed; the clothes go in dry and come out dry.  *Id.*  Like the "great majority" of PCE systems that existed during the timeframe at issue in this case, *see id.*, the PCE operations at the Property involved the transfer of clothes from one unit to another.

[11] Exhibit 270 is a report published in 1978 by the EPA titled *Control of Volatile Organic Emissions from Perchloroethylene Dry Cleaning Systems*.  The document set forth the "presumptive norm or reasonably available control technology" for PCE dry-cleaning systems.  Ex. 270 at 7.

to Dale Report, docket no. 183-50). The washing and drying components of a typical dry-cleaning system are shown in yellow in Figure 5.



Fig. 5: Ex. 270 at 16 (Fig. 2-1) (modified with color coding as follows:
■ washer and dryer units;
■ PCE-reclamation components;
■ emission-control elements).

Because PCE is both expensive and toxic, PCE systems include additional equipment designed to capture and reuse the solvent. As illustrated in Figure 5, a basic PCE system has the following extra components (tinted in red): (i) a filter to separate particulates from the used solvent; (ii) a distillation unit (or still), which heats the recycled PCE to vaporize it; (iii) a condenser, which cools the purified gas and converts it

to liquid form; and (iv) a separator to divide from the reclaimed PCE any water that has entered the system. *See id.* at 16 (Fig. 2-1); *see also* Dale Report, Ex. 210 at 3-4; *cf.* Morrill Rebuttal & Supp. Report at Fig. 3-1, Ex. 1145 at 19 (filed as docket no. 117-15) (indicating that an operation using Stoddard solvent would likewise have, in addition to a washer/extractor and dryer, a filter, still, condenser, and separator); Ex. 392 at 17 (Fig. 2-1) (filed as Tab 72 to Krasnoff Report, docket no. 189-20). A PCE plant with emission control would also have a carbon adsorber, sometimes called a sniffer, along with an additional condenser and another separator, to collect solvent fumes from the air. *See* Ex. 270 at 16-17; *see also* Ex. 210 at 3 (Fig. 1). These extra, emission-control elements are highlighted in green in Figure 5.

The parties agree that LeatherCare's PCE dry-cleaning system had reclamation elements (filter, still, condenser, and separator), as well as emission-control components (adsorber and additional condenser and separator). *See* PTO at 9, ¶ 18. For the reasons discussed later, the Court finds that Troy also operated a PCE dry-cleaning plant at the Property, and that Troy's facility was equipped with a reclamation unit, but had no emission control. *See infra* pp. 20-23. PCE-reclamation and emission-control devices generate waste in two forms: (i) PCE-laden solid materials, like filter muck, filter cartridges, and still residue, that was, in connection with Troy's and LeatherCare's operations, deposited into the dump truck parked in the loading dock, and (ii) PCE-contaminated waste water, which in this matter ran through the side sewers before leaving the Property. The parties have offered disparate views concerning the quantity of PCE released at the Property via its disposal with solid waste and/or waste water.

### b.    <u>**Quantifying PCE Releases**</u>

In its 1978 report, a copy of which was admitted as Exhibit 270, the EPA provided estimates concerning typical PCE emissions from dry-cleaning facilities.  The amount of PCE lost each year depends on the quantity of PCE used annually, which correlates with the size of the dry-cleaning operation.  For purposes of its study, the EPA defined three types of dry-cleaning facilities:  (i) independent or franchise stores offering coin-operated, self-service systems, which processed roughly 7,200 kg (16,000 lbs) of clothes per year; (ii) "commercial" operations, including neighborhood shops and specialty cleaners handling leather and other fine goods, which would each handle about 23,000 kg (60,000 lbs) of clothes per year; and (iii) "industrial" plants involved in supplying uniforms or other items to commercial customers, which would typically clean 240,000 to 700,000 kg (600,000 to 1,500,000 lbs) of clothes per year.  Ex. 270 at 13.  The parties agree that LeatherCare's PCE-based system at the Property was a "commercial" dry cleaner.  As explained later, <u>*see*</u> <u>*infra*</u> p. 23, the Court finds that Troy's PCE dry-cleaning operation was also "commercial" in scope.

When the EPA issued its report in 1978, the typical "commercial" PCE plant had a 14-27 kg (30-60 lb) capacity washer/extractor and an equivalent-sized dryer (reclaiming tumbler).  Ex. 270 at 17.  Surveys conducted in the mid-1970s revealed that only 35-to-50% of "commercial" dry cleaners had carbon adsorbers (sniffers).  <u>*Id.*</u>  According to the EPA, a well-operated PCE system without a sniffer (like Troy's) was estimated to lose, through various emissions, between 8 and 21 kg of solvent per 100 kg of clothing laundered, while an adsorber-equipped plant (like LeatherCare's) was believed to

experience less than 5 kg of solvent loss per 100 kg of clothing laundered.  _Id._ at 18-19.

The EPA identified the following primary mechanisms of PCE loss:  (i) evaporation at

the washer and dryer, which is minimal if a sniffer is employed; (ii) retention in the filter

muck, which can be reduced by cooking the muck to reclaim the solvent; (iii) retention in

filter cartridges, which can be reduced by drying them in a cabinet vented to an adsorber;

(iv) retention in the still residue; and (v) leaks from pumps, valves, flanges, seals, and

storage vessels.  _Id._ at 17-18.

The EPA also recognized that carbon adsorbers and muck cookers are not perfect

emission-control technologies.  PCE vapor would still be released through a sniffer's

exhaust, but at an estimated rate of only 0.3 kg per 100 kg of clothing laundered (as

compared to evaporation losses without an adsorber of 4-to-7 kg per 100 kg of clothes in

the aggregate at the washer/extractor and dryer).  _Id._ at 18.  A filter muck cooker could

substantially reduce PCE loss, but not below 1 kg per 100 kg of clothing laundered.  _See_

_id._  Thus, even with the then state-of-the-art control technologies, a "commercial" dry

cleaner operating during the timeframe at issue in this case could expect to lose about

1,150 kg (194.6 gal)[12] of PCE per year through (i) disposal of filter muck, filter

cartridges, and still residue, (ii) adsorber exhaust, and (iii) various leaks.  In addition,

both carbon adsorbers and muck cookers increase the amount of water that comes in

---

[12] Expert Peter Jewett testified that PCE weighs 13 pounds per gallon (lbs/gal).  Trial Tr. (Jan. 16, 2018) at 88:22 (docket no. 260).  Another source indicates that PCE has a density of 13.47 lbs/gal.  _See_ https://drycleancoalition.org/download/solvent_table.pdf.  The Court has used Mr. Jewett's figure in converting from kilograms to gallons, but recognizes that the resulting amount overstates the volume. The calculation was performed as follows:  1,150 kg PCE x (2.2 lbs/kg) x (1 gal PCE÷13 lbs) = 194.6 gal.

contact with PCE, which results in solvent being discharged along with effluent water to the sewer system. *See id.* at 48-51. Based on a figure of 100 ppm of PCE in effluent water, the EPA predicted that "commercial" dry cleaners using sniffers and muck cookers would dispose of at least 1.4 kg (0.24 gal) of PCE per year with their waste water, and that "industrial" dry cleaners with similar equipment would lose 13.4 kg (2.3 gal) of PCE per year down the sewer. *Id.* at 50-51.

Seattle Times contends that LeatherCare experienced much higher losses of PCE than was estimated by the EPA to be typical for "commercial" dry cleaners, relying on the opinion of its expert Bruce E. Dale, Ph.D. Dr. Dale's calculations depended on the assumption that, to replace the PCE lost during dry-cleaning operations, LeatherCare purchased 1,977 gallons of PCE per year; Dr. Dale rounded this figure up to 2,000 gallons of PCE per year. Ex. 210 at 8 & 12 (filed as docket no. 118-1). Of those 2,000 gallons of PCE lost per year, Dr. Dale believes that 30% (600 gallons of PCE per year) was released to the sewer, while the remaining 70% (1,400 gallons of PCE per year) was discharged with filter muck, filter cartridges, and still bottoms. *Id.* at 12.

Dr. Dale's numbers are inconsistent with those of Bernard Tod Delaney, Ph.D., P.E., BCEE, another expert retained by Seattle Times, but in the related insurance coverage dispute, *Seattle Times Co. v. Nat'l Sur. Corp.*, W.D. Wash. Case No. C13-1463 TSZ. The experts in this case discussed Dr. Delaney's opinions in the other case, and his report was admitted into evidence as Exhibit 1140. The Court concludes that Dr. Dale's analysis is flawed because it ignores the amount of PCE released to the air. The Court

further observes that Dr. Delaney's estimates[13] are substantially similar to those of

LeatherCare's expert, Pamela J. Morrill, L.G., L.H.G.,[14] and to the ratios contained in an

EPA report issued in June 1998, <u>see</u> EPA 744-B-98-001 at Ex. 10-9 (filed as App'x A to

Morrill Rebuttal & Supp. Report (docket no. 117-16 at 826)); <u>see also</u> Ex. 1145 at 35

(Table 4-6) (filed as docket no. 117-15).  The following table compares the various

estimates concerning the relative amounts and mechanisms of PCE loss:

|  | Dale | Delaney | Morrill | EPA |
|---|---|---|---|---|
| Gallons of PCE Lost Per Year | 1,977 | 1,977 | 1,681 | 469 |
| Lost in Filter Muck, Filter Cartridges, and Still Bottoms | 70% | 25-27% | 17.4% | 27% |
| Lost in Waste Water | 30% | <1% | <1% | <1% |
| Lost to Air | 0% | 73-74% | 82.55% | 72.9% |

---

[13] Although Dr. Delaney used the same assumption as Dr. Dale, namely that LeatherCare lost 1,977 gallons of PCE per year, he opined that 73-74% of the PCE (8,761.42 gallons over six years, or roughly 1,460 gallons per year) was released to the air, while another 25-27% (3,055.92 gallons over six year or 509 gallons per year) was discharged with filter muck, filter cartridges, and still bottoms, and the remaining less than 1% (42.66 gallons over six years or a little more than 7 gallons per year) was discharged with waste water.  Ex. 1140 at 23.

[14] Ms. Morrill challenges Drs. Dale's and Delaney's assumption that the amount spent by LeatherCare on PCE ($35,580.42) during the period from 1980 through 1985 reflects the purchase of 1,977 gallons of PCE per year; Ms. Morrill notes that PCE rose from $3.00 per gallon in 1979 to $5.00 per gallon in 1985, but that Drs. Dale and Delaney used only the lower price of $3.00 per gallon, thereby overestimating the quantity of PCE purchased.  <u>See</u> Morrill Rebuttal & Supp. Report, Ex. 1145 at 32 (filed as docket no. 117-15).  Ms. Morrill instead estimates that LeatherCare bought 10,084 gallons of PCE over the six-year period at issue (1,680.67 gallons per year), of which 82.55% (1,387 gallons per year) was emitted to the air, 17.4% (292 gallons per year) was discarded with filter muck, filter cartridges, and still bottoms, and only 0.05% (less than 1 gallon per year) was discarded through the sewer system.  <u>Id.</u> at 31-35 & Table 4-7.  The Court finds Ms. Morrill's calculation of the total amount of PCE released annually (1,681 gallons per year) to be more accurate than Dr. Delaney's computation (1,977 gallons per year), but finds that the percentages assigned by Dr. Delaney to each manner of PCE emission track the EPA's estimates more closely and are more reliable than Ms. Morrill's distribution of losses.

**B.     Troy Linen and Uniform Service, Inc. f/k/a Troy Laundry Co.**

To resolve the parties' disputes concerning the extent to which Troy is responsible for the PCE contamination at the Property and whether Troy, in addition to LeatherCare, operated PCE-based equipment at the Property, Troy's history and the nature of its use of the Property must be understood.

**1.     Troy's Development of the Property**

When Troy began to acquire the Property in 1925, it was already developed with perhaps as many as fifteen (15) residences.[15] Ex. 107 at 15; Ex. 115 (493) at 21.  In 1926 and 1927, Troy constructed a laundry facility on the southeast portion of the Property. Ex. 107 at 16.  Between 1943 and 1948, Troy expanded, creating areas to either the west or north of the original plant, including a "fur vault," which was later used by LeatherCare.  *Id.* at 6 & 16; *see* Ex. 115 (493) at 22 (stating that, in 1945, Troy purchased the lot eventually occupied by the fur vault); *see also* Ex. 115 at 217-18.  The fur vault, which was assigned an address of 312 Boren Avenue North, opened for business in April 1948, and it was used by Glacier Fur Co., Troy Fur Company, and North Star Fur Company, before it was leased to Seattle Fur Services, LeatherCare's predecessor.  *See* Ex. 115 (493) at 23; *see also* Ex. 115 at 161 & 214-15.  In 1949, Troy bought the northeast quadrant of the Property.  Ex. 115 (493) at 23.  Troy rented out the remaining dwellings, *see* Ross Dep. (Vol. 1) at 96:22-97:4 (docket no. 226), until they were

---

[15] Building 1, the two-story warehouse previously on the northwest corner of the Property, replaced some of these residences in 1925, was initially owned by Seattle Plumbing Supply Co., and was later occupied by United States Radiator Corporation.  Ex. 115 (493) at 21-22; *see also* Ex. 107 at 16 & 103-06.

demolished between 1957 and 1960, at which time Building 3 was erected, _see_ Ex. 107 at 16; Ex. 115 (493) at 23; _see also_ Ex. 115 at 182-83. King County Assessor records indicate that, in December 1951, Troy acquired the northwest parcel associated with Building 1.[16] _See_ Ex. 115 at 192-93 & 196-200.

In 1964, Troy commenced work on a new two-story structure, in the southwest segment of the Property, which had a parking garage designed to accommodate Troy's fleet of vehicles. To make room for this 1964 addition, Troy removed a concrete laundry-loading shed with a ramp that had been built in 1950, and vacated the southern portion of an alley that ran through the Property, parallel to Boren and Fairview Avenues, and that had been in existence since at least 1893. _See_ Ex. 107 at 16; _see also_ Ex. 115 (493) at 23-24. In 1966, more space was added to the northeast of the existing plant. Ex. 107 at 16; Ex. 115 (493) at 24. Together, Troy's original laundry facility, the four structures built between 1943 and 1948, including the fur vault, and the 1964 and 1966 additions formed what has been designated as Building 2.

The configuration of Buildings 1, 2, and 3 remained generally unchanged from 1966 until 2011, when the Property was purchased by Touchstone. _See_ Ex. 107 at 16. In 1970, City Dry Cleaners Company bought Building 3 for $123,840. _See_ Ex. 115 (493) at 25; Ex. 115 at 183; Ex. 188. City Dry Cleaners Company had previously been associated

---

[16] Touchstone's consultant has stated alternatively that Troy owned Building 1, described as the "David Smith Building," as of 1957, or that Troy purchased Building 1 in 1961. Ex. 115 (493) at 23. These representations are inconsistent with each other and with King County Assessor records. In addition, Touchstone's consultant appears to have confused the folio number relating to Building 1, which is 1957, for a date.

with Troy, but whether it still was, as of the date it purchased Building 3, cannot be determined from the record before the Court. In 1996, Building 2 was designated as a Historical Landmark by the City of Seattle Landmarks Preservation Board. Ex. 107 at 165-90; Ex. 115 (493) at 26. Figure 6 illustrates the progression of improvements on the Property.



Fig. 6: Ex. 107 at 34 (Fig. 2) (modified).

2.    **Troy's Operations on the Property**

a.    **Industrial Laundry**

From 1927 until 1985, Troy operated an industrial laundry at the Property, in Building 2. _See_ PTO at 7, ¶¶ 9 & 12. The parties have stipulated that Troy's industrial

laundry facility used approximately 150,000 gallons of water per day, which it drew from

an on-site well.  PTO at 9, ¶ 17; _see also_ Ex. 115 (493) at 25 (indicating that, in 1971,

Troy obtained a permit to appropriate up to 1,000 gallons of water per minute from the

supply well).  Troy's industrial laundry cleaned linens, like napkins and table cloths, for

hotels, restaurants, and other industrial clients.  PTO at 9, ¶ 17.

### b.    **"Industrial" Dry-Cleaning (Stoddard)**

After the 1964 addition was completed in 1965, Troy also ran an "industrial" dry-

cleaning plant at the Property, which used Stoddard solvent to launder uniforms and other

items for various businesses.  _See id._ at 8, ¶¶ 14 & 15.  According to Jack Ross, who

worked for Troy from 1963 until 1984, _see_ Ross Dep. (Vol. 1) at 15:18 (docket no. 226),

and became its Chief Engineer in the mid-1970s, _id._ at 43:2-5, Troy had two 400-pound

Stoddard machines, through which it would process at least 6,000 pounds of clothing

(roughly eight loads per machine) each day, five days per week, _id._ at 59:3-7, 59:14-15,

& 60:10-15.  These figures indicate that, from 1965 until 1985, Troy's Stoddard

equipment handled roughly 1.5 million pounds of clothing each year, which is consistent

with the EPA's 1978 estimate concerning the quantum of work typically performed by

"industrial" dry cleaners.  _See supra_ p. 13.

### c.    **"Commercial" Dry-Cleaning (PCE)**

Mr. Ross further testified that, between 1965 and about 1972, Troy also operated a

PCE-based dry-cleaning system for retail customers.  During that timeframe, Troy would

send its vans to residences to pick up items to be dry cleaned and then deliver them after

processing.  Ross Dep. (Vol. 1) at 17:2-8.  This part of Troy's business was called the

"family laundry service" or the "family routes."  *See* *id.* at 27:24-28:3.  Troy also received clothing to be dry cleaned at a call center on the Property (in Building 3).  Ross Dep. (Vol. 2) at 243:4-16 & 252:14-22 (docket no. 227).  Mr. Ross recollected that Troy's PCE machines, namely a 30-pound washer, a 60-pound washer, and one or more dryers, had been at Troy's facility known as City Laundry, and that the PCE equipment was moved to the Property when the 1964 addition was finished.  Ross Dep. (Vol. 1) at 19:1-22, 22:17-25, & 24:9-20; Ross Dep. (Vol. 2) at 210:9-24 & 214:4-11.

After the PCE system was relocated to the Property and other consolidation efforts were accomplished, Troy closed both the City Laundry facility and a linen-supply plant in Ballard.  *See* Ross Dep. (Vol. 1) at 24:23-25:9.  At its peak, Troy's family laundry service had approximately 20 routes, involving about 25 vans.  *Id.* at 32:16-33:3.  In the early 1970s, Troy sold the city routes and reduced its retail business.  *Id.* at 47:13-14.  Sometime between 1970 and 1974, Troy ceased its PCE operations.  *Id.* at 27:18-23; *see* Ross Dep. (Vol. 2) at 165:11-15, 243:13-19, & 244:9-20.  According to Mr. Ross, LeatherCare subsequently installed new PCE machines in the same area of Building 2 where Troy's PCE equipment had been located.  Ross Dep. (Vol. 1) at 28:11-29:6 & 114:21-25; *see also* Exs. 65 & 1009.

Seattle Times and Touchstone challenge Mr. Ross's credibility.  The Court, however, finds that Mr. Ross's memory was reliable and that his testimony was not controverted.  Although Steven Ritt and Mark Chose did not believe that Troy ever had PCE equipment at the Property, neither of them worked at the facility during the time when Troy was engaged in a retail dry-cleaning business; Mr. Ritt was employed

elsewhere from 1967 until 1974, Ritt Dep. (Aug. 5, 2015) at 19:13-18 (docket no. 141), and Mr. Chose did not start working for Troy until 1972, Chose Dep. at 8:22-23 (docket no. 225). As Chief Engineer for Troy, Mr. Ross had more opportunity and incentive to understand the nature of Troy's dry-cleaning operations; Mr. Ritt was concerned with LeatherCare's operations, not Troy's, while Mr. Chose's primary role at Troy related to the maintenance of its fleet of vehicles, *see id.* at 11:22-12:23, 13:3-18, 53:22-54:2, 62:22-63:17.

Moreover, Mr. Ross's explanation that Troy moved its PCE-based "family routes" operation to the Property from City Laundry as part of a consolidation plan is supported by other evidence in the record. A 1950 Certified Sanborn Map shows that City Dye Works Co. Inc. (which Mr. Ross called "City Laundry") was located at the corner of Fifth Avenue North and John Street, but a 1969 Certified Sanborn Map indicates that the same building was, by that time, vacant, *see* Ex. 186, lending credence to Mr. Ross's testimony that the business had been relocated and the premises had been abandoned in 1965. The accuracy of Mr. Ross's memory is further substantiated by an advertisement[17] that appeared in the *Seattle Times* in July 1946, touting the services of City Dry Cleaners, which would pick up, clean, press, and deliver men's suits "all for $1.00." Ex. 185.

---

[17] During Mr. Ross's deposition, counsel for Seattle Times inquired about the advertisement's reference to Sanitone. Ross Dep. (Vol. 2) at 151:8-17 (docket no. 227). Sanitone, which is currently a division of Fabritec International, sells detergents for dry-cleaning systems, including soaps designed for use in PCE machines. *See* https://www.sanitone.com/Soap%20Talk%20News/GHS-Sanitone_Label_Guide.pdf. Thus, the advertisement's invocation of the Sanitone brand does not undermine, but rather corroborates Mr. Ross's memory of events.

Mr. Ross's description of Troy's PCE system was also consistent with the EPA's later observations in 1978 concerning the typical "commercial" dry-cleaning plant, which was likely to have a 30-to-60 pound per load capacity and no emission control. _See_ _supra_ p. 13. In addition, the two plumes of PCE-contaminated soil that were discovered during Touchstone's redevelopment efforts, in an area used exclusively by Troy,[18] corroborate Mr. Ross's representations that Troy used PCE in its operations.

Having viewed a portion of the video recording of Mr. Ross's deposition, and having read the entire transcript of his testimony, the Court finds that Mr. Ross was a credible witness with no motive to fabricate information or obfuscate the facts. The Court finds that, for five to seven years after the 1964 addition was built, Troy had a PCE plant with throughputs (and PCE losses) comparable to those of the average "commercial" dry-cleaning facility (without emission control) as defined by the EPA in 1978, _i.e._, handling approximately 23,000 kg (60,000 lbs) of clothes per year and losing between 8 and 21 kg of PCE per 100 kg of clothing laundered. _See_ _supra_ p. 13.

---

[18] The two plumes of PCE-contaminated soil at issue were located in the south and southeast portions of the Property, respectively, and totaled approximately 6,500 cubic feet in volume. _See_ Ex. 126 (491) at 44, Fig. 6B at DD22-24/EE22-24 & HH14-16. Seattle Times and Touchstone have conceded that these two plumes of PCE-contaminated soil are not attributable to LeatherCare's operations. _See_ Trial Tr. (Feb. 6 & 7, 2018) at 30:9-19 & 120:14-18 (docket no. 269). During closing argument, Seattle Times suggested that the PCE source for these two plumes was "most likely" vehicle maintenance operations, but an expert for Seattle Times opined to the contrary. _Compare_ Trial Tr. (Feb. 6 & 7, 2018) at 30:17-19 (docket no. 269), _with_ Krasnoff Rebuttal Report, Ex. 217 at 4, ¶ 4(a) (filed as docket no. 120-2).

### 3. <u>**Troy's Underground Storage Tanks**</u>

During its tenure as owner of the Property, Troy installed and/or maintained at least 18 underground storage tanks ("USTs"). PTO at 8, ¶ 16. As indicated in Figure 7, on the next page, the various USTs included:

- four USTs of 8,000-gallon, 3,000-gallon, 1,000-gallon, and 350-gallon capacities, respectively, located near or under the 1964 addition, the first three of which contained Stoddard solvent, and the last of which held "Sta Dri," a spotting agent containing PCE; <u>see</u> Ex. 115 (493) at 25 & 77 (Fig. 3); Morrill Report, Ex. 1141 at 35-36 & 645-46 (App'x J) (filed as docket nos. 117-1 & 117-13);

- one 7-barrel (~ 300-gallon) UST containing heating oil, which was located approximately 110 feet south of Harrison Street and under the Boren Avenue North right-of-way; Ex. 115 (493) at 23 & 26;

- two 12,000-gallon USTs and one 1,000-gallon UST containing heating oil, which were located under a parking lot north of the boiler room in Building 2; Ex. 115 (493) at 25;

- one 550-gallon UST, labeled as UST #1 by Touchstone's consultant, which was discovered under the approximate location of the 1943 addition, and which was associated with petroleum-contaminated soil; Ex. 126 (458 & 491) at § 5.11.1.1; Ex. 126 (491) at Fig. 14;

- four 2,000-gallon USTs containing gasoline, located near or under the 1966 addition, three of which were unearthed during Touchstone's redevelopment efforts and denominated as USTs #2, #3, and #4; the fourth UST was not found during excavation and might have been removed when the 1966 addition was constructed; Ex. 126 (458 & 491) at § 5.11.1.3; Ex. 107 at Fig. 2; <u>see</u> Ex. 115 (493) at 24;

- a 750-gallon UST, identified by Touchstone's consultant as UST #5, which was uncovered in the soil under the east side of the 1964 addition, and which was empty and in good condition with no visible holes or pitting; no further assessment was conducted; Ex. 126 (458 & 491) at § 5.11.1.4; Ex. 126 (491) at Fig. 14;

- one 8,000-gallon UST containing gasoline, which was located under the parking lot adjacent to Building 3; Ex. 115 (493) at 25; and

- one 10,000-gallon UST of unknown content and location, which was listed in tax records as an improvement for Building 3; Ex. 115 (493) at 24.



Fig. 7: Approximate Locations of USTs (compiled from Ex. 115 (493) at Fig. 3 & Ex. 126 (491) at Fig. 14).

By 1985 or 1986, shortly after it purchased the Property from Troy, Seattle Times learned of some, but not all, of the USTs, and it removed the 8,000-gallon Stoddard tank, which was under the driveway to the loading dock and therefore easily accessible. *See* Ex. 103 at 4 & 10-11. In contrast, the 3,000 and 1,000-gallon USTs containing Stoddard solvent, as well as the 350-gallon "Sta Dri" tank, were emptied, tested with air for leaks (using three pounds-force per square inch (3 psi) for ½ hour), filled with sand, and left in place. *Id.* at 4-5 & 10. Seattle Times was also aware of the three USTs north of the

ORDER - 25

boiler room that had been used to store heating or fuel oil (with 12,000 or 1,000-gallon capacities) and of the 8,000-gallon gasoline tank associated with Building 3, but it took no steps at that time to remove those USTs, indicating that it would "determine whether likely future use of the building makes it worthwhile to retain them." _Id._ at 11.

In 1988, during the course of a telephone-line installation, the 7-barrel heating-oil UST was discovered under the Boren Avenue North right-of-way, and Seattle Times obtained a permit to allow the tank to remain in place. Ex. 115 (493) at 26. When that same UST was opened in 2010, it contained approximately one inch of heating oil, floating on about one foot of water. Ex. 107 at 21. The 8,000-gallon UST containing leaded gasoline was apparently closed in place in 1996. Ex. 115 (493) at 26. During the course of excavation related to Touchstone's redevelopment efforts, three distinct plumes of petroleum-contaminated soil were discovered, one on the west side of the Property, near the latitude of the 7-barrel heating oil UST (Plume 1), one in the southwest quadrant of the Property, under the footprint of the 1964 addition, which was also contaminated with PCE (Plume 2), and one in the northern portion of the property, in the vicinity of the decommissioned 8,000-gallon UST that had housed gasoline (Plume 3).

Figure 8, on the next page, shows the three plumes of petroleum-contaminated soil. Although Seattle Times and Touchstone have asserted to the contrary, the Court finds that the plume of petroleum-only contaminated soil ("PCS") in the northern section of the Property (Plume 3) was not caused by LeatherCare's operations at the site. Troy undisputedly installed, maintained, and used the 8,000-gallon gasoline tank under the parking lot of Building 3, and no evidence has been offered that LeatherCare fueled its

vehicles from or was otherwise associated with the UST that was the source of Plume 3,

consisting solely of gasoline-range petroleum hydrocarbon.



Fig. 8: Ex. 126 (491) at Fig. 7 (modified, with enlarged legend).

# 4.    **Troy's Acquisition and Dissolution**

On March 1, 1985, American Linen Supply Co., a Washington corporation, d/b/a Maryatt Industries ("Maryatt"), acquired all of the issued and outstanding stock of Troy, and Troy became a wholly-owned subsidiary of Maryatt.[19]  PTO at 7, ¶ 8; _see_ Ex. 41. Troy began winding up its operations in 1985, shortly after the sale of the Property to the Seattle Times.  PTO at 11, ¶ 27.  Troy was dissolved on March 14, 1986.  _Id._ at 7, ¶ 8; _see_ Ex. 1152.  The limitation period for commencing any action against Troy or its directors, officers, or shareholders expired on March 14, 1988.  _See_ RCW 23B.14.340; _see also La.-Pac. Corp. v. ASARCO, Inc._, 5 F.3d 431 (9th Cir. 1993).

---

[19] Seattle Times contends that Maryatt was a successor, rather than the sole shareholder, of Troy, and that Maryatt has the resources, including insurance policies, to bear Troy's share of any remedial action costs. This argument lacks merit.  A corporation exists as an organization distinct from its shareholders.  _E.g._, _Grayson v. Nordic Constr. Co._, 92 Wn.2d 548, 552, 599 P.2d 1271 (1979).  This principle applies even when a corporation's sole shareholder is also a corporate entity; to hold a parent corporation liable for the actions of a subsidiary, state law must support piercing the corporate veil.  _See Minton v. Ralston Purina Co._, 146 Wn.2d 385, 398, 47 P.3d 556 (2002).  In this matter, no evidence has been presented that Maryatt disregarded Troy's corporate form, manipulated the entities to avoid a legal duty or perpetrate a fraud, or otherwise behaved in a manner that would justify piercing the corporate veil.  _See id._ at 398-99. To the contrary, Maryatt appears to have honored Troy's corporate identity, as reflected in the minutes of a meeting of Troy's shareholders and directors held on March 1, 1985, at which a resolution was unanimously passed pursuant to which Troy sold the Property to Seattle Times.  _See_ Ex. 41.  Moreover, even if Maryatt were viewed as a successor, the record does not warrant treating it as having assumed Troy's liabilities.  _See Meisel v. M&N Modern Hydraulic Press Co._, 97 Wn.2d 403, 405, 645 P.2d 689 (1982) ("a purchasing corporation does not assume the liabilities of its predecessor unless (a) the purchaser expressly or impliedly agrees to assume liability; (b) the purchase is a de facto consolidation or merger; (c) the purchaser is a mere continuation of the seller; or (d) the transfer of assets is for the fraudulent purpose of escaping liability").  In addition, even if Maryatt had assumed Troy's liabilities, Maryatt does not now have the financial means to contribute to cleanup expenses.  In 1992, Maryatt sold to Cintas Sales Corporation, a wholly-owned subsidiary of Cintas Corporation (collectively, "Cintas"), all of its assets except for certain real property in Seattle, Washington and Los Angeles, California. _See_ Ex. 1074.  Cintas declined to purchase the properties because of probable contamination and, in connection with the transaction between Cintas and Maryatt, Maryatt redeemed the shares of four of its five shareholders.  Ex. 1161.  By 2014, Maryatt's net annual income had dwindled to $11,337.33, at least one of its buildings had been demolished, resulting in a loss of $220,645, and the majority of its assets consisted of a loan receivable owed by David E. Maryatt, who is currently in receivership proceedings in King County Superior Court.  _See_ Exs. 1133 & 1163.

The Court concludes that, with respect to any liability on Troy's part, the "orphan share" doctrine applies.  *See*, *e.g.*, *United States v. Kramer*, 953 F. Supp. 592, 595 (D.N.J. 1997) (the inability "to assign an ideal measure of monetary responsibility to an otherwise responsible party" gives rise to an "orphan share").  Under the "orphan share" doctrine, the liability attributable to a party who "is insolvent, cannot be located, or cannot be identified" is apportioned among the "available, solvent, and responsible parties."  *See* *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 303 (5th Cir. 2010); *see also* *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 168 n.1 (4th Cir. 2013).  The doctrine is equitable in nature, and the Court exercises its discretion in this matter to allocate Troy's orphan share among the parties to the litigation, namely LeatherCare, Seattle Times, and Touchstone.  To perform an equitable apportionment, the Court must consider each party's activities on or with respect to the Property.

## C.     Seattle Fur Services and LeatherCare, Inc.

Seattle Fur Services was a business initially run by Steven Ritt's parents, Al and Rhea Ritt, that provided wholesale fur-cleaning and storage services to retail stores in the Seattle area.  Ritt Dep. (Aug. 5, 2015) at 8:14-22 & 20:18-23 (docket nos. 141 & 228). When Seattle Fur Services began leasing from Troy in 1957, it operated solely in the area of Building 2 known as the fur vault.  *See* PTO at 7, ¶ 10.  After LeatherCare was incorporated in April 1960, *see* Ex. 1, the company continued operating as Seattle Fur Services, and it also starting using the brands PillowCare, FabriCare, and Certified

Restoration Dry Cleaning Network, _see_ Ritt Dep. (Aug. 5, 2015) at 12:1-25 & 20:8-12. Under the LeatherCare name, the business offers wholesale leather and suede cleaning to dry cleaners throughout Washington and Oregon. _Id._ at 21:5-7.

Beginning in 1965, after the 1964 addition was completed, LeatherCare began using the excess capacity of Troy's Stoddard-based dry-cleaning equipment. PTO at 8, ¶ 15. A finishing area on the west end of the 1964 addition was also made available for LeatherCare's exclusive use. _Id._ In March 1972, LeatherCare and Troy entered into a written lease pursuant to which LeatherCare was provided non-exclusive use of the dry-cleaning room, which at that time contained _inter alia_ two 85-pound washers, as well as drying equipment. Exs. 91 & 1153. Pursuant to the lease, Troy would furnish Stoddard solvent, machines, electricity, and all other utilities needed by LeatherCare in the conduct of its business. _Id._

In August 1979, LeatherCare purchased new PCE-based dry-cleaning equipment and installed it in the 1964 addition, to the west of the Stoddard dry-cleaning area and near the loading dock. _See_ PTO at 9, ¶ 18. The new PCE system included two Marvel washing machines, five Hoyt reclaimers (Solv-O-Misers), a Hoyt sniffer (Sniff-O-Miser), and a still.[20] _Id._ In 1980, LeatherCare purchased another Hoyt reclaimer. _Id._ In

---

[20] The Hoyt equipment was designed to discharge waste water, which would contain some amount of PCE, to the sewer. PTO at 9, ¶ 20. The manual for the Hoyt sniffer indicated that over 12 gallons of waste water would be produced from each operation, and it advised that the equipment should be "piped to [an] open sewer system." _Id._ As recommended, LeatherCare's Hoyt sniffer was plumbed through a pipe to a floor drain. _See_ PTO at 9, ¶ 19. In contrast, the waste water from the Hoyt reclaimers was collected in buckets placed under the separator outlets, and the buckets were periodically emptied into either a floor drain or a toilet. _See_ PTO at 9, ¶ 19; Ritt Dep. (Aug. 31, 2016) at 103:19-105:12 (docket

Figure 9, the Stoddard dry-cleaning area can be seen on the right, and the PCE dry-cleaning area is shown on the left; the markings in red (within the PCE Operations area) were made by Mr. Ross to illustrate where Troy's PCE equipment had been before LeatherCare installed its PCE machines in roughly the same location.  _See_ Ross Dep. (Vol. 2) at 239:12-240:9 & Ex. 20A (docket no. 227).  LeatherCare conducted PCE operations at the Property from August 1979 until July 1985.  PTO at 9, ¶ 18.  After setting up its PCE plant, LeatherCare ceased using the excess capacity of Troy's Stoddard equipment.  _See_ Ritt Dep. (Aug. 5, 2015) at 120:21-24 & 138:12-14 (docket no. 141).



Fig. 9:  Ex. 1009 & Ex. 107 at 34 (Fig. 2) (both modified).

no. 230).  The floor drains and the toilet at issue flowed into a side sewer that ran to the municipal sewer main under Boren Avenue North.  _See_ PTO at 8-9, ¶¶ 13 & 19.

ORDER - 31

As was recommended in the EPA's 1978 report, Ex. 270, LeatherCare drained its filter cartridges and dried them in its reclaimers to recover as much PCE as possible before disposing of them. *See* PTO at 9-10, ¶ 21. LeatherCare disposed of the spent filter cartridges, as well as the still bottoms or muck, in the back of the dump truck provided for such purpose by Troy, into which Troy also placed its waste. *Id.* at 10, ¶¶ 22 & 23. Troy (and specifically, Mark Chose) drove the dump truck to a transfer station when needed. *Id.* at 10, ¶ 22; *see also* Chose Dep. at 37:9-16 & 38:3-12 (docket no. 225). Troy provided this garbage service, as well as other utilities, to LeatherCare under the terms of the parties' lease. PTO at 10, ¶ 22.

In 1981, Troy and LeatherCare negotiated a new lease. *See* Ex. 92. The new lease described the portion of the 1964 addition that was occupied by LeatherCare as "Parcel A," the fur vault as "Parcel B," and Building 3 or the "call office" as "Parcel C." *Id.* at ¶ 1. Parcel A was to be used for conducting a wholesale leather cleaning and restoration business, Parcel B was to be used exclusively for fur cleaning, storage, restyling, and repair, and Parcel C was to be used in connection with retail laundry and dry-cleaning operations. *Id.* at ¶ 2; *see also* Ritt Dep. (Aug. 5, 2015) at 43:9-44:3 (docket no. 141) (indicating that garments brought by customers to the call office were cleaned elsewhere and that Building 3 had no laundering equipment).

With respect to Parcel C, LeatherCare was assigned ten abutting customer parking spaces and allowed to use the associated neon sign. Ex. 92 at ¶ 1(c). Troy, however, retained for its exclusive use the propane tank, gasoline pump and tank, and certain other parking stalls near Building 3. *Id.* The lease specified the utilities for which LeatherCare

was responsible, namely telephone, water associated with the fur vault, city license fees for the neon sign, natural gas for the call office, and steam for any on-premises call-office (retail) dry-cleaning. *Id.* at ¶ 14. Troy was required to furnish steam, electricity, and all other utilities needed by LeatherCare to conduct its business in Parcels A, B, and C. *Id.* Troy also had an obligation to maintain in good condition the outer walls, the roof, the foundation, and all structural members. *Id.* at ¶ 5. The lease had a term of three years, which ended on April 30, 1984. *Id.* at ¶ 3.

Effective May 1, 1984, Troy and LeatherCare executed another lease. Ex. 93. The 1984 lease contained terms similar to the 1981 lease, except that the term was for only one year, to end on April 30, 1985. *Id.* at ¶ 3. Like the 1981 lease, the 1984 lease allowed LeatherCare, with Troy's (or its successors' or assigns') consent, to "hold over" after the expiration of the lease term on a month-to-month tenancy under the "terms, covenants, and conditions" set forth in the lease. *Id.* at ¶¶ 24 & 25. When it purchased the Property from Troy, Seattle Times took title free of encumbrances except for the 1984 lease with LeatherCare (and a separate, unrelated lease concerning Building 1). Ex. 1035 at ¶ 1. By September 1985, LeatherCare had vacated Parcels A and B, but was still occupying Parcel C. Ex. 94. LeatherCare continued to rent Parcel C from Seattle Times on a month-to-month basis for some period, *id.*; the record does not reflect the exact date when the tenancy ended, but it appears to have continued into 1999, as reflected in a letter from Mr. Ritt dated November 3, 1998, complaining about a rent increase. Ex. 1179.

**D.     Seattle Times Company**

Since 1895, Seattle Times has been in the newspaper business. PTO at 6, ¶ 4. For at least 80 years, Seattle Times conducted operations just south of the Property, in the adjacent block bounded by Fairview Avenue North, John Street, Boren Avenue North, and Thomas Street (the "1120 John Block"), acquiring the real estate in segments over time. *See* Ex. 115 (493) at 18 & 30-31. Seattle Times is well-acquainted with petroleum products and underground storage tanks, having installed several USTs on the 1120 John Block, which contained heating oil, gasoline, diesel, nitric acid, or printing ink. *Id.* at 31. In addition, as a long-time neighbor, Seattle Times was aware, when it purchased the Property in 1985, that the facility was being used for laundry operations and that "a dry cleaning and leather care business" leased two buildings on the premises. *See* Ex. 1034.

**1.     Purchase of the Property from Troy**

No evidence has been presented that, before buying the Property, Seattle Times engaged in an investigation concerning whether any pollutants had been released into the soil or groundwater. After taking title to the Property, Seattle Times performed an inspection and identified, in addition to some (but not all) of the USTs, drainage channels containing hazardous residue, two concrete pits containing waste water that the Municipality of Metropolitan Seattle ("Metro")[21] allowed Seattle Times to discharge into

_____

[21] Metro was once the entity in charge of water pollution abatement and public transportation in King County. *Cunningham v. Municipality of Metro. Seattle*, 751 F. Supp. 885, 887 (W.D. Wash. 1990). In 1994, pursuant to RCW 36.56.010, King County assumed the "rights, powers, functions, and obligations" of Metro. *See Elliott Bay Marina v. City of Seattle*, 2014 WL 5465103 at *1 n.2 (Wash. Ct. App. Oct. 27, 2014).

1  the sewer system, an abandoned sump containing an oily toxic substance,[22] a fiberglass

2  tank containing roughly 5,000 gallons of contaminated recycled water, which was taken

3  to a landfill, and various other items left behind by Troy, including a laundry machine,

4  two settling tanks, a still, and barrels or containers of materials.  PTO at 11, ¶ 28; Ex. 103

5  at § II; *see also* Ex. 1048.

6       In late 1985, Seattle Times submitted to Ecology a draft "Closure Plan" for the

7  Property.[23]  PTO at 11, ¶ 29; *see* Ex. 1048.  In the Closure Plan, Seattle Times proposed

8  to comply with state and federal regulations "by removing all waste and waste residues

9  from the solvent tanks."  Ex. 103 at 8 (citing WAC 173-303-610 & 40 C.F.R. § 265.111).

10  Seattle Times further committed to inspect drainage channels and the sump "to assure

11  that there will be no postclosure escape or leaching of waste."  *Id.*  By letter dated

---

15  [22] Mr. Ross testified that, in the vicinity of UST #1 and UST #5, which were in an area of Building 2
used exclusively by Troy, a number of manhole covers had been present.  Ross Dep. (Vol. 1) at 104:9-25
16  (docket no. 226).  Mr. Ross did not know the contents of the associated tanks or sumps, but sometime
during the period when he still worked for Troy, he picked up one of the manhole covers, and "it stunk
so bad we put it back down and said don't ever look in there again."  *Id.* at 104:25-105:3.  After Seattle
17  Times purchased the Property, R. Kevin Sanders, the Building Support Coordinator for Seattle Times,
*see* Ex. 1071, asked Mr. Ross what was in that tank or sump.  Ross Dep. (Vol. 1) at 118:4-5.  Mr. Ross
18  told Mr. Sanders that he didn't "have a clue," and Mr. Sanders informed Mr. Ross that Seattle Times had
"just pumped 1,500 gallons of highly-toxic waste out of there."  *Id.* at 118:6-7.  The Court finds that
Seattle Times failed to report to Ecology either (i) the quantity and nature of the substance discovered in
19  the abandoned sump, or (ii) the existence of another UST or sump containing toxic material.  *See* Ex. 103.

20  [23] In both its 1985 draft Closure Plan and its final Closure Plan submitted in April 1986, *see* PTO at 12:3,
Seattle Times told Ecology that it purchased the Property without knowledge of USTs or dangerous waste
21  materials at the facility.  Ex. 1048 at 2; Ex. 103 at 3.  The Court finds that any lack of knowledge on the
part of Seattle Times resulted from its failure to exercise due diligence or to conduct any investigation
22  prior to its acquisition of the Property.

March 12, 1986, Ecology authorized Seattle Times to proceed with closure activities, indicating that it would not require any public notice or a public hearing. Ex. 104.

In accordance with the Closure Plan, Seattle Times removed only one UST, decommissioned three other USTs, and disposed of waste water as previously indicated. Ex. 103 at 10-11, § III.B.1. Seattle Times represented to Ecology that Troy's parent company, Maryatt, had pumped out the contents of the two 12,000-gallon and the 1,000-gallon heating oil tanks, as well as the 8,000-gallon gasoline tank near Building 3, and had sealed each of these USTs. _Id._ at 7, § II.D. Seattle Times also agreed to properly dispose of the dangerous residue in the drainage channels and the toxic material in the abandoned sump, and to seal the well on the Property. _Id._ at §§ III.A.1 & C; _see_ PTO at 11-12, ¶ 29.

In a letter dated April 17, 1986, counsel for Seattle Times, Jeff Belfiglio, discussed the status of closure efforts. Ex. 105. Mr. Belfiglio advised Ecology that, although the concrete wall of the abandoned sump was cracked, testing detected no leakage. _Id._ at ¶ 5. Because the solvent tanks likewise showed no sign of leaking, Mr. Belfiglio told Ecology that Seattle Times did not intend to test the soil or monitor the groundwater either before or in connection with demolition of the buildings. _Id._ at ¶ 6. Ecology responded in June 1986, stating that it found "the closure of the Troy Laundry facilities to be satisfactory." Ex. 106. Ecology reminded Seattle Times, however, that "if any contamination is found during subsequent activities at that facility, contaminated materials will have to be removed and disposed of in an appropriate manner." _Id._; _see_ PTO at 11-12, ¶ 29.

## 2. Litigation Against Troy and Maryatt

In July 1986, Seattle Times commenced an action in King County Superior Court against Troy Linen & Uniform Service, Inc., its three former directors as trustees for its creditors, namely Charles R. Maryatt, Tim K. Rich, and David E. Maryatt, and American Linen Supply Company d/b/a Maryatt Industries for breach of contract, promissory estoppel, nuisance, misrepresentation, negligence, breach of lease,[24] waste of leased premises, and recovery of response costs. _See_ Ex. 1062 (Compl.); _see also_ Ex. 1058 (1st Am. Compl.). In May 1987, Seattle Times again sued the same defendants, in federal court, seeking recovery of response costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Ex. 1067 (Compl.). In the federal action, Seattle Times alleged that it had incurred in excess of $100,000 in direct costs during the closure process. _Id._ at ¶ 13; _see_ PTO at 12:12-14.

In July 1987, both lawsuits were settled for $55,797. _See_ PTO at 12:14; _see also_ Ex. 1069 at 1. In connection with the settlement, Seattle Times released the named defendants, as well as the former shareholders of Troy, and their agents and assigns, from

> all claims, expenses, attorney fees, causes of action or suits of any kind or
> nature, that the Seattle Times Company has or may later have on account of
> or in any way arising out of the presence of various flammable, hazardous
> and/or toxic wastes on [the Property] . . . , specifically including but not by
> way of limitation, the costs of identifying, removing, and reporting as to
> such wastes, and from any and all claims, including third party claims,

---

[24] As part of the purchase and sale of the Property, Seattle Times and Troy entered into a lease pursuant to which Troy could continue to operate its industrial laundry on the premises. _See_ Ex. B to Earnest Money Agr., Ex. A to Compl., Ex. 1062. The lease was terminated, on 30-days written notice, effective June 30, 1985. _See_ Ex. 1039.

whether presently known or unknown, which may have arisen or may later
arise out of the events generally described above.

Ex. 1069 at 1. The settlement was only partially funded by Maryatt. *See* Ex. 1073 at 69

(indicating that Maryatt paid only $15,000). The balance came from Troy's former

shareholders, who had been joined in the state court action as third-party defendants. *See*

Ex. 1064 (Maryatt's Ans. & 3d-Party Compl.); Ex. 1073 at 60 (reciting that Troy's

former shareholders agreed to a two-thirds (⅔) share of the settlement amount). This

arrangement is consistent with the Court's conclusion that Maryatt did not treat Troy as

its alter ego. *See supra* note 19.

### 3. Use of the Property By Seattle Times

When Seattle Times purchased the Property, it intended to expand its newspaper-

printing operations. PTO at 12, ¶ 30. Those plans did not, however, materialize, and

Seattle Times instead used the Property for parking, to store furniture, newspaper racks,

and other materials, and as a newspaper-rack repair facility. *Id.* In 1994, Seattle Times

commissioned Remediation Technologies Incorporated ("RETEC"), an environmental

consultant, to inspect the property. PTO at 12, ¶ 31; *see* Ex. 1075. Among other tasks,

RETEC collected water samples from the supply well, which was located inside the

industrial laundry facility. The samples revealed no detectable levels of volatile organic

compounds (*e.g.*, PCE), but the concentration of petroleum hydrocarbons exceeded the

then-applicable "cleanup" level set by Ecology. Ex. 1075. RETEC speculated that the

result might be anomalous, observing that the water did not have a petroleum odor. *Id.*

Seattle Times did not retest the well water. *See* PTO at 12, ¶ 31.

1          **4.      Marketing the Property**

2          In 2008, on behalf of Seattle Times, CenturyPacific, L.P. began marketing the

3   Property for sale.  _See_ Ex. 521.  The Offering Memorandum disclosed the three USTs in

4   the Stoddard area and the existing well, but not the heating oil or gasoline tanks about

5   which Seattle Times was also aware.  _Id._ at 10.  In addition, the Offering Memorandum

6   made no mention of the prior use of the facility as a dry-cleaning plant.  _Id._  The price

7   sought in the Offering Memorandum was $20 million, all cash at closing, which Seattle

8   Times anticipated could occur within 60 days.  _Id._ at 7.  On July 14, 2010, Seattle Times

9   and Touchstone Corporation entered into a Real Estate Purchase and Sale Agreement

10  ("PSA"), Ex. 96, indicating a purchase price of $18.2 million.  Touchstone then began a

11  due diligence process.  PTO at 13, ¶ 33.

12  **E.      Touchstone SLU LLC and TB TS/RELP LLC**

13          Touchstone Corporation later assigned its rights in the PSA to Touchstone SLU

14  LLC.  _See_ Ex. 47 at 8.  Touchstone SLU LLC and TB TS/RELP LLC are both

15  Washington limited liability companies with principal places of business in Seattle,

16  Washington.[25]  PTO at 6-7, ¶ 7.  TB TS/RELP LLC is the current owner of the Property.

17

18  [25] The citizenships of Touchstone SLU LLC and TB TS/RELP LLC are unknown; neither the operative
19  Third-Party Complaint in which the limited liability companies are named as third-party defendants,
    docket no. 24, nor their corporate disclosure statement, docket no. 33, reveal the identities of their owners
20  or members or the states of which such entities or individuals are citizens.  _See Johnson v. Columbia
    Props. Anchorage, LP_, 437 F.3d 894, 899 (9th Cir. 2006) (holding that a limited liability company is a
21  citizen of every state of which its owners or members are citizens).  This absence of information does not,
    however, affect the Court's subject-matter jurisdiction because this matter was brought, not on the basis
22  of diversity, but under CERCLA, a federal law, and although the Court herein dismisses the CERCLA
    claim, _see infra_ pp. 66-68, it continues to have supplemental jurisdiction over the related state law claims.
    _See_ 28 U.S.C. § 1367(a).

23

*Id.* Touchstone SLU LLC is a member of TB TS/RELP LLC. *Id.* Unless otherwise stated, "Touchstone" refers to Touchstone Corporation, Touchstone SLU LLC, and/or TB TS/RELP LLC.

### 1.  **Environmental Assessment of the Property**

On Touchstone's behalf, SoundEarth Strategies Inc., previously known as Sound Environmental Strategies ("SES"), conducted a two-phase environmental assessment of the Property. *See* PTO at 13, ¶ 33. Phase I was completed by September 2010. During the course of Phase I, SES performed a GORE$^{TM}$ soil gas survey, which revealed that PCE, TCE, and 1,2-dichloroethene were present in the soil "across much of the western half" of the Property, and that the highest concentrations of such chemicals were near the former loading dock and under the fur vault. Ex. 107 at 8. In addition, the GORE$^{TM}$ survey indicated that total petroleum hydrocarbons ("TPHs") were also in the soil in the vicinity of the former loading dock, as well as to the northeast of Building 3. *Id.* Water samples collected from the well inside the industrial laundry facility did not contain detectable concentrations of VOCs or GRPH, but tested positive for diesel and oil-range petroleum hydrocarbons. *Id.* at 25. A ground-penetrating radar survey confirmed the presence of a UST under the Boren Avenue North right-of-way and showed various anomalies that were consistent with existing or former USTs. *Id.* at 26. SES used the Phase I results to outline the scope of work for Phase II. *See id.* at 28.

SES completed Phase II by the end of October 2010. Ex. 109 (513). Phase II involved taking soil samples through 14 borings (P01–P14), which were advanced to a depth of 23 feet below ground surface ("bgs"), and collecting groundwater samples via a

temporary well (at boring P10), which was drilled near the location of the former 8,000-gallon Stoddard solvent UST.  *Id.* at 2 & 9 (Fig. 2).  Figure 10 shows the locations of the various borings (and the well previously used by Troy).  Soil samples taken at various depths from borings P03 and P05–P11 contained concentrations of PCE that exceeded the cleanup level of 0.05 mg/kg set by Ecology.  *Id.* at 4-5.  Soil samples collected from all other borings (P01, P02, P04, P12, P13, and P14) tested below the cleanup level for PCE.  *Id.* at 5.  Petroleum hydrocarbons above the cleanup level of 100 mg/kg were detected in the soil samples from P07 and P08.  *Id.* at 4 & 14 (Table 1).  The groundwater sample obtained from boring P10 (shown in blue) had concentrations of PCE, TCE, and diesel-range petroleum hydrocarbons exceeding cleanup levels.  *Id.* at 5 & 16 (Table 2).



Fig. 10:
Ex. 109 (513)
at 9 (Fig. 2)
(modified);
*see also id.* at
10 (Fig. 3).

In early November 2010, Seattle Times and Touchstone executed a First Amendment to the PSA ("First Amendment"). Ex. 97. Pursuant to the First Amendment, the purchase price increased from $18.2 to $18.4 million. _Id._ The First Amendment added an "Environmental Contingency," pursuant to which Touchstone would have until December 10, 2010, to approve of the environmental condition of the Property or the PSA would terminate. _Id._ at ¶ 4. In addition, the First Amendment allowed Seattle Times to install a soil vaper extraction ("SVE") system on the Property and demolish the fur vault if necessary to do so. _Id._ at ¶ 6. As discussed in more detail later, _see_ _infra_ pp. 44-45, Seattle Times hired a company to design, install, and operate an SVE system to significantly decrease the level of PCE in the soil on the Property, primarily near the loading dock.

**2.    Environmental Remediation and Indemnity Agreement**

In December 2010, a Second Amendment to the PSA extended the Environmental Contingency period to December 17, 2010. Ex. 98. On December 17, 2010, the parties entered into a Third Amendment to the PSA ("Third Amendment"), as well as the Environmental Remediation and Indemnity Agreement ("ERIA"), which is the focus of the current dispute between Seattle Times and Touchstone. _See_ Exs. 99 & 100. Pursuant to the Third Amendment, Touchstone waived the Environmental Contingency on the condition that Seattle Times execute the ERIA and deliver it to escrow pending closing. Ex. 99 at ¶¶ 1 & 2; _see also_ PTO at 16, ¶ 48.

As indicated in the ERIA, Seattle Times and Touchstone were aware that, as of the effective date of the ERIA, December 17, 2010, hazardous substances were present in the

soil, groundwater, and improvements at the Property. Ex. 100 at 1. To proceed forward with its purchase of the Property, Touchstone required Seattle Times to be responsible for remediating the existing contamination and indemnifying Touchstone in the manner set forth in the ERIA. *Id.* By executing the ERIA, Seattle Times agreed to reimburse Touchstone for the "Incremental Costs" of transporting and disposing of "Contaminated Soils," as opposed to "Clean Soils." PTO at 16, ¶ 49. Specifically, the ERIA provides:

> "Incremental Costs" shall mean the difference between the costs of transporting and disposing of Contaminated Soils and the costs of transporting and disposing of Clean Soils. Incremental Costs do not include costs for transportation and disposing of Clean Soils, consequential damages, costs, if any, that Purchaser incurs due to construction delays, inefficiencies, business interruption or the like.
>
> . . . .
>
> Seller and Purchaser contemplate that, during excavation of the Property in connection with Purchaser's intended development project, soil testing at the Property may identify additional Contaminated Soils that need to [be] remediated in order to achieve Soil Cleanup Criteria. In such event, Seller shall pay the Incremental Costs necessary to meet Soil Cleanup Criteria on the Property. Seller shall have the right to select the disposal site for Contaminated Soils removed from the Property.

Ex. 100 at ¶¶ 1(h) & 2. Seattle Times also agreed in the ERIA to indemnify Touchstone with respect to third-party claims, including those relating to groundwater contamination:

> Seller shall release, indemnify, defend (with counsel of Seller's choice reasonably acceptable to Purchaser) and hold Purchaser harmless from and against any and all liabilities, claims, causes of action, liens, administrative proceedings, judgments, damages, losses, costs, expenses, fines, penalties or obligations of any kind, known or unknown, including reasonable attorneys' fees, asserted by third parties (including the Washington Department of Ecology) against Purchaser that arise out of, [sic] are associated with Contaminated Soils or Contaminated Groundwater that has or may have migrated off of the Property and onto, about or under adjacent property(ies).

*Id.* at ¶ 3.

ORDER - 43

### 3. <u>**Soil Vapor Extraction**</u>

In early January 2011, AECOM Environment ("AECOM") provided a report concerning its soil and groundwater investigation and the design of an SVE system for Seattle Times. Ex. 110 (510). Based on SES's prior results and AECOM's own tests, using 25 soil samples collected from six additional borings (B-1, B-2, and B-4 through B-7; B-3 was planned but never drilled), <u>id.</u> at 2, AECOM determined that the highest concentrations of PCE in soil were located near the loading dock and extended to a depth of about 12 feet bgs, <u>id.</u> at 4-5. AECOM estimated that the volume of soil with PCE concentrations above the cleanup level was 20,225 (860 + 19,365) cubic yards. <u>See id.</u> at 5. AECOM proposed an SVE system comprised of eight vertical wells placed in the vicinity of the loading dock and the former location of PCE operations, through which approximately 90% of the VOC vapors in the area would be removed from the soil over the course of six or more months. <u>See id.</u> at 5-6 & 15 (Fig. 3). Figure 11, on the next page, indicates the locations of AECOM's borings and of the SVE wells and related equipment.

The SVE system installed by AECOM operated in 2011 and 2012, and removed 327 pounds of PCE from the soil. PTO at 13, ¶ 35. AECOM decommissioned the system in January 2012. <u>Id.</u>; <u>see also</u> Ex. 115 (493) at 46. No notice was provided to LeatherCare or Mr. Ritt before the SVE equipment was installed or when it was removed, and they first learned about the system in August 2015, around the time that Mr. Ritt was deposed in the related insurance coverage litigation (between Seattle Times and its insurers) to which he is not a party. <u>See</u> PTO at 13, ¶ 35; <u>see also</u> Ritt Dep. (Aug. 5,

2015) at 5:16-6:2 (docket no. 141).  Seattle Times paid AECOM for its work and now

seeks to recover *inter alia* $348,087 from LeatherCare and/or Mr. Ritt as reimbursement

for the costs of designing and implementing the SVE system.  *See* PTO at 18, ¶ 56; *see*

*also* Zelikson Report at Table 1, Ex. 215 at 22 (filed as docket no. 122-1).



Fig. 11:  Ex. 110 (510) at 14 (Fig. 2) (cropped and modified, with enlarged and
modified legend); *id.* at 15 (Fig. 3) (cropped) (inset showing SVE system
design).

### 4.  **Supplemental Subsurface Investigation**

While Seattle Times was working with AECOM on soil vapor extraction, SES

was performing a supplemental subsurface investigation, which involved advancing

eight more borings (three under the Harrison Street right-of-way, three under the Boren Avenue North right-of-way, and two on the Property[26]), seven of which would serve as permanent groundwater monitoring wells (MW01–MW07), and collecting additional soil and groundwater samples for testing. Ex. 112 (498) at 2. SES's report dated June 6, 2011, was admitted into evidence in CD form as Exhibit 112 and in excerpted, hardcopy form as Exhibit 498. According to the report, laboratory results indicated that, "with the exception of a slight exceedance of PCE in soil collected from B12[27] at a depth of 60 feet, soil samples collected from borings advanced within the [right-of-ways] to the north and west of the Property did not contain detectable concentrations of chlorinated solvents or petroleum hydrocarbons." _Id._ at 7. Thus, SES concluded that "the soil contamination associated with the historical use of the Property as an industrial dry cleaning facility appears to be confined primarily within the Property boundaries." _Id._

SES further observed that AECOM's SVE system had decreased "significantly" the concentrations of PCE, thereby "reducing the volume of soil that will need to be disposed of as hazardous material during construction excavation activities." _Id._ With respect to groundwater, SES reported that the samples from the three monitoring wells under Boren Avenue North and from one of the wells under Harrison Street contained PCE and/or TCE. _Id._ SES opined, however, that the levels of these substances in the

---

[26] The two new borings on the Property were permitted under a Fourth Amendment to the PSA executed in May 2011. _See_ Ex. 47 at 174-76.

[27] Boring B12 (or monitoring well MW05) is located approximately 150 feet north of Thomas Street and under the southbound lane of Boren Avenue North, along the northern third of the 1964 addition. _See_ Ex. 112 (498) at 11 (Fig. 2).

groundwater samples were "not indicative of a multi-block, widespread release" of

VOCs. *Id.*

5. **Closing**

On June 10, 2011, Touchstone and Seattle Times closed the purchase and sale

transaction, and title to the Property passed to Touchstone. *See* Ex. 47; *see also* PTO at

6-7, ¶ 7. The closing documents included a signed version of the ERIA, Ex. 47 at 180-

83, as well as a copy of the 1984 lease between Troy and LeatherCare, which had been

assumed by Seattle Times in 1985, *id.* at 137-53. Shortly after closing, SES began

developing a Remedial Investigation Sampling and Analysis Plan. Ex. 114. In

accordance with this plan, SES conducted further studies in September and October 2011

in an effort to evaluate the extent and vertical gradient of groundwater contamination,

analyze any standing water that remained in pipes, sumps, and trenches on the Property,

and collect sufficient data to ultimately develop a remedial action plan for the "Site,"

which includes the contaminated regions of the Property, the neighboring properties, and

the adjacent right-of-ways. *See* Ex. 115 (493) at 47.

6. **Draft Remedial Investigation Report**

The work performed in September and October 2011 culminated in a Draft

Remedial Investigation Report ("Draft RI") dated May 2, 2012, which was admitted into

evidence in CD form as Exhibit 115 and in excerpted, hardcopy form as Exhibit 493. In

connection with the Draft RI, SES drilled another 23 borings (B16–B38), seven of which

were fashioned into monitoring wells (MW08–MW14). Ex. 115 (493) at 48-49. The

Draft RI described the results of testing on samples of soil, groundwater, and standing

(process) water collected by SES in September and October 2011, as well as on samples obtained by AECOM in January 2012 from ten borings (B39–B48) made in connection with the decommissioning of the SVE system. *Id.* at 46, § 5.10, & Tables 1-4.

Despite the quantum of data assembled, SES still believed it lacked adequate information to estimate the vertical extent of groundwater contamination beneath the "Site" or the lateral extent of groundwater contamination to the west of Boren Avenue North or to the south of monitoring well MW09, which is in the southwest corner of the Property. *Id.* at 56 & 79 (Fig. 5). SES was, however, able to develop a Conceptual Site Model ("CSM"), which was based on the information acquired from all borings at the "Site." *See id.* at §§ 6.0-6.8. The CSM predicted that 97,540 tons of soil at the "Site"[28] had detectable or higher concentrations of PCE. *Id.* at 94 (Fig. 20). SES's three-dimensional visual representations of the CSM are reproduced in Figures 12A and 12B, on the next page.

### 7.    <u>Agreed Order No. 8996</u>

On May 22, 2012, Touchstone and Ecology entered into Agreed Order No. 8996, a copy of which was admitted as Exhibit 128. *See* PTO at 13-14, ¶ 36. The Agreed Order required Touchstone to prepare the Draft RI, as well as a draft feasibility study report and, eventually, a draft cleanup action plan for the "Site." Ex. 128 at 2 & § VII. The Agreed Order also directed Touchstone to pay Ecology for the costs incurred by the

---

[28] Although the "Site" includes the right-of-ways and other areas adjacent to the Property, nearly all of the 97,540 tons of soil estimated by the CSM to have detectable or higher levels of PCE was within the boundaries of the Property. *See infra* Fig. 12A.

**Conceptual Site Model**



Fig. 12A: Ex. 115 (493) at 94 (Fig. 20) (modified, with enlarged and modified legend).



Fig. 12B: Ex. 115 (493) at 96 (Fig. 22) (modified).

agency. *Id.* at § VIII.B.  Pursuant to the Agreed Order, Ecology took responsibility for

developing a Public Participation Plan for the "Site," but Touchstone was obligated to

cooperate with Ecology in preparing an appropriate mailing list. *Id.* at § VIII.H.  The

Agreed Order expressly indicated that it was "not a settlement under Chapter 70.105D"

of the Revised Code of Washington, and that Ecology was "in no way" covenanting not

to sue or compromising any of Ecology's rights or authority. *Id.* at § VIII.N.  The

Agreed Order restricts Touchstone's ability to sell or lease the Property. *Id.* at § VIII.O.

### 8. Draft Feasibility Study Report

On August 9, 2012, SES submitted to Ecology a Draft Feasibility Study Report

("Draft FS"), which is in evidence as Exhibit 116. *See* PTO at 14, ¶ 38.  The Draft FS

described three cleanup alternatives, namely (1) excavation and land disposal of soil with

in-situ chemical oxidation of groundwater, (2) excavation and land disposal of soil with

in-situ reductive dechlorination of groundwater, and (3) excavation and land disposal of

soil with electric resistance heating and vapor extraction for groundwater.  Ex. 116 at 13.

The Draft FS did not discuss any cleanup method other than excavation and land disposal

of contaminated soil, and the Draft FS never suggested monitored natural attenuation[29] as

---

[29] Monitored natural attenuation ("MNA") is a cleanup method that relies on physical, chemical, or biological processes that, under favorable conditions, act without human intervention to reduce the amount, toxicity, or mobility of contaminants in soil or groundwater.  *See* EPA Directive 9200.4-17P at 3 (available at https://www.epa.gov/sites/production/files/2014-02/documents/d9200.4-17.pdf).  This "passive" approach to remediation requires both "source control," *i.e.*, removal, treatment, or containment of the contaminant, and long-term performance monitoring.  *Id.* at 3-4 & 21-23.  LeatherCare's expert has opined that MNA was a viable groundwater treatment option because (i) all PCE-impacted soils were removed from the Property, thereby eliminating the source of groundwater contamination, (ii) the levels of VOCs in the groundwater at the Property were relatively low, (iii) the presence of degradation products indicated that natural attenuation was occurring, and (iv) the groundwater at the Property was not a source of drinking water.  *See* Morrill Report at § 4.2.1.1, Ex. 1141 at 19-20 (filed as docket no. 117-1).

a potential way of treating groundwater.  *See id.*  On behalf of Touchstone, SES proposed

Alternative 2 as being "comparatively high" in environmental benefit, technically

feasible, and cost effective.  *Id.* at 73; *see* PTO at 14, ¶ 38.

### 9.  **Addendum to Draft RI**

In December 2012, SES presented to Ecology a Draft Addendum-Supplemental

Remedial Investigation Report ("Draft Supp. RI"), which was admitted in CD form as

Exhibit 117 and in excerpted, hardcopy form as Exhibit 518.  *See* PTO at 14, ¶ 39.  The

objective of the Draft Supp. RI was to evaluate the western and southern extents of

groundwater impacted by solvent release on the Property.  *See* Ex. 117 (518) at 2; PTO at

14, ¶ 39.  Two additional monitoring wells (MW15/B49 & MW16/B50) were created,

one within the Terry Avenue North right-of-way (a block west of the Property) and the

other just south of the centerline of Thomas Street.  Ex. 117 (518) at 2-3.  The

groundwater sample collected from MW15 contained a concentration of TCE in excess of

the cleanup level, while the sample obtained from MW16 had concentrations of vinyl

chloride, cis-1,2-dichloroethylene ("cis-1,2-DCE"), TCE, and PCE that were all above

cleanup levels.  *Id.* at 5.  Because the sample from MW15 contained TCE, but not PCE or

cis-1,2-DCE, SES concluded that the TCE discovered in the groundwater under the Terry

Avenue North right-of-way was not attributable to the PCE release at the "Site"; if the

TCE was present as a degradation product of PCE, then cis-1,2-DCE would also have

been found in the sample.  *See id.* at 7.

With regard to the suite of substances discovered in the sample from MW16, SES

opined that multiple releases might have impacted the "Site."  *Id.* at 9.  SES suggested

that the most likely additional or alternative source of the contamination within the

Thomas Street right-of-way was the 1120 John Block, where Seattle Times had

conducted business (using printing inks containing VOCs). *Id.* at 9-10. To prevent

further migration of VOCs from the Property into the Thomas Street right-of-way,

SES recommended expanding the previously designed system for in-situ reductive

dechlorination of groundwater. *Id.* at 13. As revised, the groundwater treatment plan

would include 46 vertical injection wells within the Property boundaries and 12 angled

injection wells advanced beneath the Boren Avenue North and Thomas Street right-of-

ways. *Id.* Three of the angled injection wells would be under Thomas Street and a fourth

would be under the intersection of Thomas Street and Boren Avenue North. *Id.* at 31

(Fig. 14).

### 10. **Interim Action**

On July 18, 2013, Ecology advised Touchstone that it had not approved SES's

Draft RI or Draft FS, and that it believed more investigation was needed to "fully

characterize the soil-groundwater-vapor-source control components" for the "Site."

Ex. 468. Ecology and Touchstone therefore agreed to conduct the excavation and land

disposal of soil with in-situ reductive dechlorination of groundwater (Alternative 2) as an

"interim" remedial action. PTO at 14, ¶ 40. In August 2013, Ecology and Touchstone

executed a First Amendment of Agreed Order No. 8996 ("1st Am. of Agreed Order").

*Id.* at 14, ¶ 41; *see* Ex. 129. The 1st Am. of Agreed Order contemplated that Touchstone

could conduct the interim remedial action as part of its planned property redevelopment,

in accordance with SES's Interim Action Plan dated August 21, 2013. *See* Ex. 129 at

¶ D.2; _see also_ Ex. 119.  Before Touchstone could commence the work, however, Touchstone was required to satisfy three conditions:  (i) submittal of permit applications to the City of Seattle; (ii) receipt of a building permit for the redevelopment project from the City of Seattle; and (iii) receipt of commitments for the financing necessary for project completion.  Ex. 129 at ¶ D.3.  After these three benchmarks were achieved, the Interim Action Plan became "an integral and enforceable part" of Agreed Order No. 8996.  _Id._ at ¶ D.4.

The Interim Action Plan indicated that all buildings would be demolished and the entire Property would be excavated from lot-line to lot-line.  Ex. 119 at 54.  The excavation contractor would use a soil management grid, dividing the Property laterally into 10-foot by 10-foot cells, and excavating in 10-foot increments (or lifts).  _See id._ at 60.  Consistent with the grid system, samples would be collected and contemporaneously analyzed to delineate between contaminated and clean soil.  _See id._  To prevent cross-contamination of clean soil, separate conveyors would be used to carry excavated material to the truck staging area.  _Id._

### a. **Contained-Out Determination**

The Interim Action Plan envisioned as a next step obtaining a "contained-out" determination from Ecology, _see id._ at 59, which would exempt the excavated soil from classification as "dangerous waste" and permit disposal of the contaminated material at a landfill facility operating pursuant to Subtitle D of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6941-6949, and/or WAC Chapter 173-351.  On October 16, 2013, SES requested a contained-out determination from Ecology.

Ex. 120 (509).  While waiting for Ecology's response, SES produced (as required by

Ecology) an Engineering Design Report ("EDR") dated February 13, 2014, a copy of

which was admitted as Exhibit 121.  *See* Ex. 468; *see also* PTO at 14, ¶ 41.  Ecology

approved the EDR on March 4, 2014, and indicated that it would await notification that

the three benchmarks set forth in the 1st Am. to Agreed Order had been met.  Ex. 346.

On March 26, 2014, Ecology issued its contained-out determination.  Ex. 347; *see* PTO at

15, ¶ 43.  Ecology's contained-out determination indicated that up to 140,000 tons[30] of

PCE-contaminated soil, expected to be generated during excavation at the "Site," could

be taken to a RCRA Subtitle D facility for disposal, rather than managed as "dangerous

waste," provided that the conditions set forth in the letter dated March 26, 2014, were

---

[30] For each 10-foot slice of elevation, SES predicted the volume of soil with a detectable level of PCE or a concentration of PCE exceeding the cleanup standard; SES also estimated the amount of soil associated with a buffer zone of clean soil.  *See* Ex. 347.  The projections for each 10-foot layer are shown in the table below.  Ecology included in its contained-out calculations more soil than SES anticipated was contaminated, thereby giving Touchstone some leeway in the event that SES's figures were low.  *See* Trial Tr. (Jan. 11, 2018) at 27:16-29:9, 68:20-69:1 (docket no. 258); Trial Tr. (Jan. 10, 2018) at 140:19-142:4 (docket no. 257).  Ecology also converted SES's volume numbers (cubic feet) into a measure of weight (tons).

| Elevation (above sea level) | Detectable Concentration, But Below Cleanup Level (cubic feet) | Above Cleanup Level (cubic feet) | Buffer Zone (cubic feet) |
|---|---|---|---|
| 100-90 feet | 28,000 | 189,000 | 30,000 |
| 90-80 feet | 34,000 | 251,000 | 62,000 |
| 80-70 feet | 98,000 | 221,000 | 84,000 |
| 70-60 feet | 101,000 | 178,000 | 64,000 |
| 60-50 feet | 127,050 | 124,000 | 87,900 |
| 50-40 feet | 97,000 | 146,000 | 66,000 |
| 40-30 feet | 34,000 | 59,000 | 57,000 |
| 30-20 feet | 24,300 | 53,800 | 62,900 |
| **TOTALS** | 543,350 (20,124 yd$^3$) | 1,221,800 (45,252 yd$^3$) | 513,800 (19,030 yd$^3$) |

*See* Ex. 347 at 4-13 (Figs. 26A-26J).

implemented.  Ex. 347.  Among the several conditions was a prohibition against offloading the waste at any temporary staging, transfer, or reloading area.  *Id.* at 2.

Ecology's letter set a deadline of September 30, 2014, for the disposal of PCE-contaminated material; unless the deadline was extended, Touchstone would be required to handle any remaining soil as dangerous waste.  *Id.* at 3.  Touchstone sought and was granted two extensions, one until December 31, 2014, and the other until January 31, 2015, to continue to dispose of PCE-contaminated soil at a RCRA Subtitle D facility.  Ex. 126 (491) at 18 & App'x E.  Touchstone also received from Ecology an addendum to the contained-out determination, which exempted another 250 tons of VOC-impacted soil, unexpectedly discovered in the southeast portion of the Property, from management as dangerous waste.  *Id.* at 19.

### b.  Excavation

On June 27, 2014, SES informed Ecology that the three benchmarks outlined in the 1st Am. to Agreed Order had been achieved, and implementation of the Interim Action Plan commenced.  Ex. 126 (458 & 491) at 19.  Excavation occurred at the Property between July 2014 and February 2015.  *Id.* at 22.  City Transfer, Inc. ("CTI") was the earthworks contractor responsible for excavation and transportation of soil away from the Property.  *Id.*  Lease Crutcher Lewis ("LCL") was the general contractor for the redevelopment project.  *See* PTO at 17, ¶ 51.  Soil contaminated solely with petroleum was delivered to the transfer station on Alaska Street in Seattle.  *See* Ex. 2003.  Soil contaminated with PCE or with both PCE and petroleum was removed from the Property and taken via either rail container or truck to an appropriate disposal facility.  *See* PTO at

15, ¶ 44; *see also* Exs. 136, 138 (502), 140 (492), 142, 144 (497), 145 (507), & 146 (516).

Shipping the excavated soil via rail container was less expensive than trucking it because, after loading, a rail container could be hauled from the Property to a nearby transfer station to await carriage by train to a RCRA Subtitle D facility, whereas a truck and trailer (or "pup") had to travel the entire distance from the Property to a remote landfill and back; a driver could tow four to five rail containers per day to the transfer station, but in a truck and pup, he or she could make only one run each day to the waste disposal facility. *See* Trial Tr. (Jan. 24, 2018) at 113:11-25 (docket no. 264). During the course of excavation, however, rail containers were not always available, and over 60% of the PCE-contaminated soil went to a disposal site by way of truck. Ex. 538. The parties dispute whether Touchstone may seek reimbursement for the increased cost of trucking as opposed to shipping PCE-contaminated soil by rail, and whether the various rates per ton being sought by Touchstone are consistent with the ERIA and/or the applicable federal and/or state laws.

### 11.   **Interim Action Progress Report**

In the Interim Action Progress Report dated January 22, 2016, which was admitted into evidence in CD form as Exhibit 126 and in excerpted, hardcopy form as Exhibits 458 and 491,[31] SES documented (i) the excavation and disposal of PCE-contaminated soil,

---

[31] A draft of the Interim Action Progress Report was submitted to Ecology on July 31, 2015. The draft report was admitted into evidence in CD form as Exhibit 125 and in excerpted form as Exhibit 490.

(ii) the removal of underground storage tanks, and (iii) the installation and operation of an injection-well system for groundwater treatment. SES's report on these subjects, which the Court finds to be accurate, credible, and reliable, is summarized as follows.

### a. PCE-Contaminated Soil

SES included in the Interim Action Progress Report a series of "lift maps," which show the boundary of soil in each 10-foot layer of excavation that was treated as contained-out (or contained-in) material and taken to a RCRA Subtitle D facility. _See_ Ex. 126 (491) at 43-50 (Figs. 6A-6H). The amount of soil actually treated as contained-out material (96,443 tons) was less than the amount approved by Ecology (140,000 tons). _See supra_ note 30. The volumes of PCE-contaminated soil reflected in the lift maps are set forth in the following table, along with approximate conversions from cubic feet (volume) to tons (weight). The various lift maps are reproduced in Figure 13, on the next page.

| Elevation (above sea level) | Volume (in cubic feet) of Contained-Out Soil | Approximate Tonnage (conversion: 1.8959 tons/yd$^3$) |
|---|---|---|
| 100-90 feet | 168,000 | 11,797 |
| 90-80 feet | 181,500 | 12,744 |
| 80-70 feet | 271,000 | 19,029 |
| 70-60 feet | 202,000 | 14,184 |
| 60-50 feet | 161,000 | 11,305 |
| 50-40 feet | 148,000 | 10,392 |
| 40-30 feet | 125,000 | 8,777 |
| 30-20 feet | 117,000 | 8,215 |
| **TOTALS** | **1,373,500** | **96,443** |

_See_ Ex. 126 (491) at 43-50 (Figs. 6A-6H) & Ex. 538 (total tonnage). _But see_ Ex. 126 (458 & 491) at 28 (reporting that the amount of contained-out material was 96,471 tons).



Fig. 13: Ex. 126 (491) at 43-50 (Figs. 6A-6H) (cropped, with modified legend).

LeatherCare disputes whether all of the soil handled as contained-out material was actually contaminated with PCE, and contends that its responsibility for the costs of transporting the contained-out material should be limited to the proportion that the volume of soil with PCE concentrations above the cleanup level bore to the total amount of soil hauled to RCRA Subtitle D facilities. Based on a model generated by using the "Leapfrog Hydro" computer program (the "Leapfrog model"), which relied on all of the data collected during AECOM's and SES's various investigations and the excavation process, LeatherCare's expert estimated that the volume of soil with PCE concentrations above the cleanup level was 9,033 cubic yards, or a little over 20% of the 43,628 cubic yards of soil that the Leapfrog model predicted was contaminated with PCE or petroleum or both. _See_ Morrill Report at 15-16 & Table 1, Ex. 1141 (filed as docket no. 117-1).

In contrast, on behalf of Seattle Times, Peter Jewett opined that 94.5% (or 93,410 tons) of the soil actually transported to disposal facilities (98,865 tons) was contaminated with PCE, another 2.7% (or 2,700 tons) was tainted with both PCE and petroleum hydrocarbons, and the rest (2.8%) contained only petroleum. _See_ Exs. 527 & 1199; _see also_ Trial Tr. (Jan. 17, 2018) at 22:16-23:2 & 68:8-69:6 (docket no. 261). In contrast, SES estimated that 45,252 of 84,406 cubic yards of contained-out material (53.6%) would contain PCE concentrations above the cleanup level. _See_ _supra_ note 30. As explained later, the Court declines to adopt LeatherCare's pro rata approach to apportionment. Thus, the Court need not resolve the dispute between the experts or determine the percentage of either (i) contained-out material or (ii) soil for which disposal fees were incurred that exceeded the regulatory cleanup level for PCE.

1          **b.    <u>Removal of Underground Storage Tanks</u>**

2          On February 26, 2014, before the Interim Action excavation began, the three

3    USTs under the former Stoddard dry-cleaning area were removed from the Property.

4    Ex. 126 (458 & 491) at 17.  After the three USTs were unearthed, the odor of Stoddard

5    solvent emanated from the soil that had surrounded the tanks, and the smallest (350-

6    gallon) UST had a visible hole in its side.  <u>Id.</u>  Soil samples were collected from each of

7    the four sidewalls of the excavated rectangular area, as well as from the soil below the

8    bottom of each UST.  <u>Id.</u>  Three of these samples, obtained from the north and west

9    sidewalls of the excavated area and beneath the 350-gallon tank, contained detectable

10   levels of PCE; the PCE concentrations at the west sidewall (0.19 mg/kg) and under the

11   350-gallon UST (0.11 mg/kg) were substantially above the cleanup level.[32]  <u>Id.</u> at 18;

12   Ex. 126 (491) at 40 (Fig. 3) & 65 (Table 1).

13         The soil below the 350-gallon and the 1,000-gallon USTs and along the west

14   sidewall of the excavated area was also contaminated with GRPH at concentration levels

15   between 540 and 1,600 mg/kg.  Ex. 126 (458 & 491) at 18.  Other USTs were removed

16   during the course of the Interim Action excavation, but to the extent that tests were

17   performed, they did not reveal detectable traces of PCE in the soil surrounding those

18   USTs.  <u>See</u> <u>id.</u> at 25-27.

19

20

21   ─────────────────────────

     [32] This discovery of PCE is consistent with the results of tests performed in 1985 when Seattle Times
22   decommissioned the tanks.  <u>See</u> Ex. 1041.  Samples taken from the 350-gallon and 3,000-gallon USTs
     contained levels of halogenated hydrocarbons that required them to be treated as "dangerous waste."  <u>Id.</u>

23

### c. __Injection Wells__

Between November 2014 and February 2015, a total of 103 injection wells were installed for purposes of in-situ treatment of groundwater by reductive dechlorination. Ex. 126 (458 & 491) at 29. Nine of these wells (AIW01–AIW09) are angled under Boren Avenue North and three of them (AIW10–AIW12) are angled under Thomas Street (the "angled wells").[33] Of the remaining 91 vertical wells, 48 are installed along the northern, western, or southern boundaries of the Property (the "boundary wells"),[34] and the other 43 are within the western half of the Property, in a pattern that mimics the contours of groundwater flow (the "interior wells"). _See_ Ex. 126 (491) at 59 (Fig. 15). Figure 14, on the next page, shows the locations of the various wells on the Property. The parties dispute whether the boundary wells serve the function of preventing contaminated groundwater from entering the Property or leaving the Property or both. LeatherCare further contends that all of the injection wells were unnecessary because the source of groundwater contamination at the "Site," namely the soil containing PCE, was removed via excavation.

Between May 12 and June 5, 2015, a food-grade oil/water emulsion was injected into the angled wells, the interior wells, and all of the boundary wells except IW91,

---

[33] Contrary to an earlier design, no angled well extends under the intersection of Boren Avenue North and Thomas Street. _See_ Ex. 126 (458 & 491) at 30; Ex. 126 (491) at 59 (Fig. 15); _see also_ _supra_ p. 52.

[34] Touchstone has asserted that the number of boundary wells is 53, but a careful study of Figure 15 of SES's Interim Action Progress Report, Ex. 126 (491), indicates that Touchstone has miscounted by including five interior wells (IW33, IW34, IW35, IW47, and IW48) that have horizontal piping to the western boundary of the Property to allow for injection-well screen access. _See_ _id._ at 30 & 59 (Fig. 15).



Fig. 14:
Ex. 126 (491)
at 59 (Fig. 15)
(cropped,
with enlarged
legend).

which is on the southeast corner of the Property and is being used as a monitoring well.
Ex. 126 (458 & 491) at 32. After the emulsion was injected, approximately 100 gallons
of clean water and 8-to-16 ounces of Vitamin $B_{12}$ supplement were also inserted at each
well.[35] _Id._ Other injections were conducted in 2016 and 2017. _See_ Ex. 2010 at 2 & 5-8;
_see also_ PTO at 15, ¶ 44.

_____

[35] The substances injected into the wells were intended to provide a carbon source to deplete dissolved
oxygen present in the aquifer, generate free hydrogen, and sustain a robust anaerobic dechlorinating
microbial population. Ex. 116 at 64 (Draft Feasibility Study Report). The theory is that the indigenous

In connection with installation and operation[36] of the injection wells, Touchstone seeks reimbursement of the amounts associated with LCL's and SES's work as follows: (i) $539,694.67 (63%) from Seattle Times, and (ii) $308,668.54 (37%) from LeatherCare and/or Mr. Ritt. Touchstone's theory is that Seattle Times is responsible under the ERIA for the angled and barrier wells, while LeatherCare and/or Mr. Ritt are liable under Washington's Model Toxics Control Act ("MTCA") for the interior wells. Touchstone, however, has misidentified five interior wells as barrier wells, *see* *supra* note 34, and its apportionment between Seattle Times and LeatherCare is therefore inaccurate. As explained later, *see* *infra* pp. 114-16, the Court does not adopt Touchstone's method of allocating the groundwater treatment expenses,[37] and instead concludes that Touchstone, rather than LeatherCare, should bear the costs of the 43 interior wells.

## 12. **Future Response Costs**

On March 14, 2016, Ecology confirmed that SES's Interim Action Progress Report dated January 22, 2016, Ex. 126 (458 & 491), had been approved, and that Ecology considered the first phase of the interim remedial action to have been

---

microbes will consume oxygen and generate an anaerobic environment, which is necessary for reductive dechlorination to occur. *Id.* As chlorine atoms within the VOCs are replaced by hydrogen atoms, PCE will degrade to TCE, which will reduce to cis-1,2-DCE, which will transition to vinyl chloride, which will break down to ethane as a detoxified final product. *Id.*

[36] For the various injection events during the period 2015–2017, SES billed a total of $341,343.03, including labor and other direct costs. Ex. 2010 at 2.

[37] Touchstone's approach, if based on 12 angled wells, 48 (not 53) barrier wells, and 43 (not 38) interior wells, would have resulted in ratios of 60/103 (58.25%) for Seattle Times and 43/103 (41.75%) for LeatherCare.

successfully completed.  Ex. 469; _see_ PTO at 15, ¶ 45.  On July 8, 2016, SES forwarded to Ecology for its review a draft Vapor Intrusion Assessment Work Plan.  Ex. 127.  The draft proposed a schedule and methods for air quality sampling to determine whether indoor air at the Property is below remediation levels.  _See id._ at 4-8.  The draft indicated that the south (12-story) tower and the north (13-story) tower being built at the Property were scheduled to be occupied by October 1, 2016, and June 1, 2017, respectively.  _Id._ at 5.  In August 2016, Ecology provided comments, and on November 7, 2017, SES submitted responses and a revised draft.  _See_ Exs. 1156 & 1157.  Ecology is currently reviewing the revised draft, and the vapor intrusion assessment work is anticipated to be performed in 2018.  _See_ PTO at 16, ¶ 47.

Meanwhile, on October 19, 2017, after further study, SES sent Ecology a draft Technical Memorandum arguing that the contaminated groundwater plume originating at the Property has been fully delineated and defined.  Ex. 478.  In this Technical Memorandum, SES explained that, although the groundwater under the "Site" currently flows to the south and southeast, in 2013, the groundwater reversed direction as a result of construction dewatering occurring in the area bounded by Harrison Street, Ninth Avenue North, Republican Street, and an alley ("Block 45").  _Id._ at 2 & Fig. 1.  Block 45 is roughly two blocks west and one block north of the Property, and the dewatering caused the groundwater to flow to the northwest for approximately twelve months.  _Id._ SES opined that the maximum distance contaminated groundwater might have traveled from the Property, during that twelve-month period, is 7-to-10 feet to the northwest, beneath the Boren Avenue North right-of-way.  _Id._ at 6.  SES also expressed a belief that,

because the excavation eliminated from the Property the source of groundwater contamination, which allows for natural attenuation processes to degrade the substances of concern, and given the recently installed boundary wells, the plume of contaminated groundwater beneath the Property will continue to shrink and the applicable cleanup levels will be achieved in a "reasonable" amount of time. *Id.* at 6. As of the date of the trial in this matter, Ecology had not yet responded to SES's Technical Memorandum. *See* PTO at 15-16, ¶ 46. Whether and the extent to which Touchstone might incur additional expenses for cleanup actions at the Property or the "Site" remain uncertain at this time. *See id.* at 18, ¶¶ 58 & 59. The parties, however, seek a ruling from the Court concerning how any future remediation costs should be apportioned among them.

**Discussion**

The Court will first address the statutory claims brought against LeatherCare and Mr. Ritt, then the contractual claim between Touchstone and Seattle Times, and finally the equitable allocation of remedial action costs pursuant to MTCA.

**A.**    **Statutory Claims**

Both Seattle Times and Touchstone assert statutory claims against LeatherCare and Mr. Ritt. Seattle Times pursues its claims against LeatherCare and Mr. Ritt under both CERCLA and MTCA for reimbursement of sums it has paid or might in the future owe to Touchstone.[38] Seattle Times also seeks to recover from LeatherCare and Mr. Ritt

---

[38] Seattle Times has already paid Touchstone approximately $4.78 million, *see* PTO at 17, ¶ 53; *see also* Ex. 538, and agrees it owes another $125,000, Trial Tr. (Feb. 6 & 7, 2018) at 13:24-25 (docket no. 269), but disputes the rest of Touchstone's claim against it under the ERIA.

under MTCA the costs of the SVE system designed, installed, and operated by AECOM. Touchstone brings its claims against LeatherCare and Mr. Ritt solely under MTCA, attempting to recover any portion of its over $9.88 million in remedial action costs that Seattle Times is not obligated to pay in accordance with the ERIA.[39]  With regard to the statutory claims, LeatherCare and Mr. Ritt request declaratory relief, arguing that Seattle Times has no cognizable CERCLA claim, that Mr. Ritt cannot be held personally liable under CERCLA or MTCA, and that, pursuant to the applicable contribution doctrines, the allocable shares of remedial action costs that they, Touchstone, and Seattle Times must bear should be determined by the Court pursuant to equitable factors.

### 1.  __CERCLA:  National Contingency Plan__

Under CERCLA, Seattle Times seeks from LeatherCare and/or Mr. Ritt the amount that Seattle Times must pay to Touchstone in connection with Touchstone's performance under the Interim Action Plan.[40]  CERCLA limits an owner's or operator's liability for environmental cleanup to "necessary costs of response" that are incurred "consistent with" the national contingency plan ("NCP").  _See_ CERCLA § 107(a)(4)(B),

---

[39] Touchstone contends that, in addition to the $4.78 million that Seattle Times has already paid, Seattle Times owes another almost $3.86 million under the ERIA.  _See_ Touchstone's Proposed Findings of Fact at ¶ 7.10 (docket no. 200); _see also_ Ex. 538.  Touchstone asserts that it has expended at least another $1.24 million on cleanup efforts, and it seeks this additional amount from LeatherCare and/or Mr. Ritt. _See_ Touchstone's Proposed Findings of Fact at ¶ 7.11 (docket no. 200).

[40] Seattle Times makes no assertion that the SVE system installed by AECOM was consistent with the NCP, and it makes no CERCLA claim related to those costs.

42 U.S.C. § 9607(a)(4)(B). The phrase "consistent with the NCP" is defined by regulation as follows:

> A private party response action will be considered "consistent with the NCP" if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of this section, and resulted in a CERCLA-quality cleanup . . . .

40 C.F.R. § 300.700(c)(3). LeatherCare and Mr. Ritt deny liability under CERCLA, contending that the Interim Action Plan was not consistent with the NCP because it did not comply with 40 C.F.R. §§ 300.430(d) and (e), which are referenced in Paragraph 5 of the EPA's definition of "consistent with the NCP," *see* *id.* at § 300.700(c)(5)(viii).

The Court concludes that the Interim Action Plan was not consistent with the NCP because no analysis of any alternative to excavation of the contaminated soil was done before implementation of the Interim Action Plan. Indeed, because Touchstone planned to redevelop the Property, including the construction of a five-story underground garage, excavation would have occurred regardless of the condition of the soil, and Touchstone had no reason to and did not consider any cleanup method other than a "dig and haul." To be consistent with the NCP, a private party response action must be preceded by a feasibility study, the "primary objective" of which is "to ensure that appropriate remedial alternatives are developed and evaluated such that . . . an appropriate remedy [can be] selected." *Id.* at § 300.430(e)(1); *see* *id.* at § 300.700(c)(5)(viii). In a feasibility study, "[a]lternatives shall be developed that protect human health and the environment by recycling waste or by eliminating, reducing, and/or controlling risks posed through each pathway by a site." *Id.* at § 300.430(e)(2). The remedial action selected must satisfy the

"threshold criteria" of "protection of human health and the environment" and compliance

with applicable or relevant and appropriate requirements, as well as the "primary

balancing criteria," which weigh long-term and short-term effectiveness, permanence,

reduction of toxicity, mobility, or volume through treatment, implement-ability, and cost.

*Id.* at §§ 300.430(f)(1)(i)(A)&(B) and (ii)(A), (B), & (D).  A remedy is considered cost-

effective if "its costs are proportional to its overall effectiveness."  *Id.* at

§ 330.430(f)(1)(ii)(D).  Because no alternative to excavation was considered before

execution of the Interim Action Plan,[41] and the Interim Action Plan was therefore

not consistent with the NCP, the CERCLA claim asserted by Seattle Times against

LeatherCare and Mr. Ritt is hereby DISMISSED.[42]

---

[41] LeatherCare and Mr. Ritt argue that soil vapor extraction might have been a cost-effective remedial action that met the EPA's threshold and primary balancing criteria, but it was not sufficiently evaluated prior to excavation because Touchstone's redevelopment plans took precedence.  They rely on a directive issued by the EPA in September 1993, which identified soil vapor extraction as a presumptive remedy for VOC-contaminated soil.  *See* Ex. 334.  The directive described SVE as "a relatively inexpensive and efficient technology" for sites with "appropriate soil characteristics."  *Id.* at 8.  They also cite to the results of the SVE system that AECOM operated at the Property on behalf of Seattle Times, which was limited in scope and duration, but still removed 327 pounds (roughly 25 gallons) of PCE, which was far more PCE than was contained in the almost 97,000 tons (roughly 88 million kg) of excavated soil, even assuming that all of the soil was contaminated at or above the cleanup level for PCE (*i.e.*, 0.05 mg PCE per 1 kg soil).  The parties and their experts disagree over whether, given the types of soil present at the Property, an SVE system would have been feasible, but the Court need not resolve this dispute.  The issue raised by LeatherCare is simply whether an SVE alternative had to be considered.

[42] During closing argument, counsel for Seattle Times conceded that the amount Seattle Times could recover under CERCLA was the same or less than it might receive under MTCA; unlike MTCA, CERCLA does not apply to petroleum contamination.  Seattle Times, however, has persisted in asserting a claim under CERCLA because it continues to believe that LeatherCare's and/or Mr. Ritt's liability under CERCLA is "joint and several," a standard that does not apply to MTCA claims.  The Court has previously ruled against Seattle Times on the issue of "joint and several" liability, concluding that a potentially responsible party like Seattle Times cannot avoid CERCLA's contribution provision, § 113(f), simply by pursuing an action under CERCLA § 107.  *See* Minute Order at ¶ 1 (docket no. 99); *see also* *Union Station Assocs., LLC v. Puget Sound Energy, Inc.*, 238 F. Supp. 2d 1218, 1223-25 (W.D. Wash. 2002).  Any claim Seattle Times might have asserted under CERCLA § 107 would have been subject to § 113(f), which reads in relevant part:  "In resolving contribution claims, the court may allocate response

ORDER - 68

## 2.   __Owner or Operator__

The Court agrees with Mr. Ritt that he cannot be held personally liable under either CERCLA or MTCA.  This analysis forms an independent, alternative basis for dismissing the CERCLA claim against Mr. Ritt.  Both CERCLA and MTCA premise liability for remediation on _inter alia_ an entity's status as an "owner or operator."  _See_ 42 U.S.C. §§ 9607(a)(1)&(4)(B); RCW 70.105D.040(1).[43]  In addition, the federal and state statutes contain similar definitions of "owner or operator," which read as follows:

> CERCLA:  "The term 'owner or operator' means . . . in the case of an onshore facility or an offshore facility, any person owning or operating such facility . . . ."

> MTCA:  "'Owner or operator' means:  (a) Any person with any ownership interest in the facility or who exercises any control over the facility; or (b) In the case of an abandoned facility, any person who had owned, or operated, or exercised control over the facility any time before its abandonment . . . ."

42 U.S.C. § 9601(20)(A)(ii); RCW 70.105D.020(22).  The parties have stipulated that, for purposes of CERCLA and MTCA, Seattle Times is an "owner," LeatherCare was an

---

costs among liable parties using such equitable factors as the court determines are appropriate."  42 U.S.C. § 9613(f)(1).  MTCA has similar language:  "Recovery shall be based on such equitable factors as the court determines are appropriate."  RCW 70.105D.080.  Because the Court performs the same equitable apportionment under MTCA as it would have conducted pursuant to CERCLA, the dismissal of the CERCLA claim does not affect the nature or extent of what Seattle Times can recoup in this matter.

[43] The statutes provide, in relevant part:

> CERCLA:  "Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section . . . the owner and operator of a vessel or a facility . . . shall be liable for . . . any other necessary costs of response incurred by any other person consistent with the national contingency plan."

> MTCA:  "Except as provided in subsection (3) of this section, the following persons are liable with respect to a facility:  (a) The owner or operator of the facility; (b) Any person who owned or operated the facility at the time of disposal or release of the hazardous substances . . . ."

"operator," and Touchstone is both an "owner" and an "operator." *See* Stip. & Order at

¶¶ 3 & 4 (docket no. 41); Stip. & Order at ¶¶ 3 & 4 (docket no. 52); PTO at 18-19, ¶¶ 2,

4, 5, & 7. The parties also agree that Mr. Ritt is not an "owner" within the meaning of

CERCLA and MTCA. They dispute, however, whether Mr. Ritt can be considered an

"operator" and held individually responsible for remedial action costs.[44]

The Court concludes that Mr. Ritt is not an "operator" for purposes of CERCLA

and/or MTCA. In arguing that Mr. Ritt can be deemed an "operator," Seattle Times

relies primarily on *United States v. Bestfoods*, 524 U.S. 51 (1998). *Bestfoods*, however,

does not concern an individual's liability for the actions of a corporate entity, but rather a

parent corporation's liability for the conduct of its subsidiary. *See id.* at 70-72. In

*Bestfoods*, the Supreme Court indicated that a parent corporation can be held liable under

CERCLA when (i) the parent operates the facility in the stead of its subsidiary or

alongside the subsidiary in a joint venture; (ii) a dual officer or director departs so far

from the norms of parental influence that he or she can be viewed as serving the parent

---

[44] Seattle Times also alleges Mr. Ritt was an "arranger," attempting to invoke CERCLA § 107(a)(3), which imposes liability on "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3). Seattle Times did not plead arranger liability in either its Complaint, docket no. 1, or its Amended Complaint, docket no. 18. Moreover, because the CERCLA claim has been dismissed on the ground that the response costs at issue were not incurred consistent with the NCP, the question of whether Mr. Ritt is an "arranger" under federal law is moot. Finally, even if the CERCLA claim was cognizable, Seattle Times has offered no evidence that Mr. Ritt himself entered into any contract or agreement or otherwise arranged for disposal, treatment, or transportation of hazardous substances, and the record simply does not support an "arranger" theory of personal liability. *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 610 (2009) ("whether an entity is an arranger requires a fact-intensive inquiry that . . . seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions").

ORDER - 70

even when ostensibly acting on behalf of the subsidiary; or (iii) an agent of the parent

with no hat to wear but the parent's manages or directs activities at the facility. _Id._ at 71.

The _Bestfoods_ Court also required that, for purposes of CERCLA, "an operator must

manage, direct, or conduct operations _specifically related to pollution_, that is operations

having to do with the leakage or disposal of hazardous waste, or decisions about

compliance with environmental regulations." _Id._ at 66-67 (emphasis added). This

language, which was recently quoted with approval by the Washington Supreme Court in

a MTCA case, _see Pope Res., LP v. Wash. State Dep't of Natural Res._, 190 Wn. 2d 744,

761, 418 P.3d 90 (2018), is the focus of the attempt by Seattle Times to hold Mr. Ritt

individually liable.

Under this standard, however, the Court concludes that Mr. Ritt was not an

"operator." Although he managed the day-to-day operations of LeatherCare at the

Property and was personally involved in the selection, purchase, installation, and

maintenance of the PCE equipment used at the Property between 1979 and 1985, _see_

PTO at 10, ¶¶ 24-25, he had no control over the side sewers into which waste water was

discharged[45] or over the dump truck into which filter muck, spent filter cartridges, and

---

[45] This matter is therefore distinguishable from _United States v. Meyer_, 120 F. Supp. 2d 635 (W.D. Mich. 1999), in which the United States sued both R.W. Meyer, Inc. and its officer and shareholder, Robert W. Meyer, Jr. In _Meyer_, the district court concluded that Mr. Meyer was personally liable under CERCLA as the "operator" of certain sewer lines into which a third-party (Northernaire Plating Company) disposed of waste water from its electroplating process, reasoning that the undisputed evidence established that Mr. Meyer was "heavily and personally involved in the construction and maintenance of" the sewer lines, that Northernaire's releases were foreseeable, and that Mr. Meyer did not exercise due care to prevent them or make any effort to monitor them. _Id._ at 640-41.

still residue were deposited for eventual removal to a transfer station.[46]  The Court finds

that Troy, as the landlord, was responsible for both the side sewers and the garbage

system.  No allegation has been made that, in running LeatherCare's PCE operation,

Mr. Ritt acted inconsistently with the terms of the leases between Troy and LeatherCare

or contrary to Troy's directions.  The parties agree that the degradation of the side sewers

and the manner of handling PCE-saturated waste were the mechanisms of PCE release

into the soil and groundwater at the Property, and the Court concludes that Mr. Ritt

cannot be treated as an "operator" with regard to those pollution-related operations or

decisions under either federal or state law.  The CERCLA and MTCA claims asserted by

Seattle Times against Mr. Ritt are hereby DISMISSED.

### 3.    MTCA:  Substantial Equivalence

Pursuant to MTCA, both Touchstone and Seattle Times seek from LeatherCare

the expenses associated with the Interim Action Plan (and Agreed Order No. 8996).

Seattle Times also pursues under MTCA reimbursement from LeatherCare for the costs

of the SVE system designed, installed, and operated by AECOM.  The Court concludes

that the MTCA claims related to the Interim Action Plan (and Agreed Order No. 8996)

are cognizable, but the MTCA claim premised on AECOM's SVE system lacks merit.

---

[46] Any involvement that Mr. Ritt might have himself had in placing materials into the dump truck is not at all analogous to the operation of a landfill, which resulted in personal liability in *Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 195 F.3d 953 (7th Cir. 1999), *on remand* 2000 WL 1716330 (N.D. Ill. Nov. 8, 2000), *aff'd*, 11 Fed. App'x 626 (7th Cir. 2001).  Unlike in *Ter Maat*, in which the landfill operator knew that the hazardous materials at issue were arriving at their ultimate destination, in this matter, no evidence has been presented that Mr. Ritt had any expectation other than for the waste thrown in the back of Troy's truck to be taken away from the Property and to an appropriate facility for disposal.

ORDER - 72

A prerequisite to cost recovery under MTCA is demonstrating that the remedial action at issue was the "substantial equivalent" of an action conducted or supervised by Ecology.  RCW 70.105D.080 ("Recovery of remedial action costs shall be limited to those remedial actions that, when evaluated as a whole, are the substantial equivalent of a department-conducted or department-supervised remedial action.").  The Court evaluates substantial equivalence "with reference to the rules adopted by" Ecology.  *Id.*  Ecology has defined three ways in which a remedial action satisfies the "substantial equivalent" standard:  (i) it was conducted by Ecology; (ii) it was conducted under an order or decree and "the remedial requirements of the order or decree have been satisfied for those portions of the remedial action for which the private right of action is being sought"; or (iii) it was conducted independently and meets the five criteria enumerated in Ecology's regulation.  *See* WAC 173-340-545(2).  Only the second and third tests for substantial equivalence are relevant in this matter.

Under the second "order or decree" definition articulated by Ecology, the Court concludes that the remedial action performed pursuant to the Interim Action Plan (and Agreed Order No. 8996), involving excavation and disposal of contaminated soil and installation of injection wells, qualifies as the "substantial equivalent of a department-conducted or department-supervised remedial action."  The remedial requirements of Agreed Order No. 8996 have been satisfied with respect to the costs for which Touchstone and Seattle Times seek reimbursement from LeatherCare in this action.  The "order or decree" test does not apply, however, to the SVE system for which Seattle

Times incurred expenses because AECOM's work was conducted independently of any order or decree issued by Ecology.

Seattle Times contends that the SVE process was nevertheless substantially equivalent, relying on the third definition set forth by Ecology, which requires that the independent remedial action include the following elements:

> (i) Information on the site and remedial actions conducted has been reported to the department in accordance with WAC 173-340-300, 173-340-450 and 173-340-515, as applicable;
>
> (ii) The department has not objected to the remedial action being conducted or any such objection has been cured as determined by the court;
>
> (iii) Except for emergency remedial actions, before conducting an interim action or cleanup action, reasonable steps have been taken to provide advance public notice;
>
> (iv) The remedial actions have been conducted substantially equivalent with the technical standards and evaluation criteria described in subsection (4) of this section; and
>
> (v) For facilities where hazardous substances have been disposed of as part of the remedial action, documentation is available indicating where these substances were disposed of and that this disposal was in compliance with applicable state and federal laws.

WAC 173-340-545(2)(c).

The Court concludes that the SVE work performed for Seattle Times by AECOM did not adequately comply with this regulation. Pursuant to WAC 173-340-300(2), which requires disclosure of any release of a hazardous substance that might pose a threat to human health or the environment, AECOM sent to Ecology, on January 12, 2011, a 765-page "Release Report." Ex. 111 (495). The Release Report indicated that AECOM

was working with Seattle Times to install an SVE system on the Property.  *Id.* at 2.  The record contains no evidence of any subsequent communication between AECOM and Ecology, other than a request, on July 8, 2011, for approval to dispose of roughly four cubic yards of contaminated soil (generated in connection with subsurface borings and SVE installation) at a RCRA Subtitle D facility, rather than treating the soil as "dangerous waste."  Ex. 113 (505); *see* WAC 173-303-040 & -070 through -100 (defining "dangerous waste"); *see also* 42 U.S.C. §§ 6941-6949a.

AECOM did not perform a remedial investigation/feasibility study, develop a cleanup action plan, or submit a written report to Ecology within 90 days after decommissioning the SVE system, all of which were necessary, in some form, to satisfy the technical criteria for substantial equivalence.  WAC 173-340-545(4)(a)&(e); WAC 173-340-515(4)(a).  Moreover, neither AECOM nor Seattle Times provided written notice to LeatherCare before commencing the SVE process, despite actual knowledge that LeatherCare might be a potentially liable party; such failure to advise LeatherCare violated WAC 173-340-545(3)(a)(v).[47]  For these reasons, the Court

---

[47] Ecology's definition of "substantial equivalence" does not mandate strict adherence to the various requirements, but instead contemplates that the criteria "will be evaluated as a whole" and that a claim for cost recovery "would not be disallowed due to omissions that do not diminish the overall effectiveness of the remedial action."  WAC 173-340-545(1); *see also Taliesen Corp. v. Razore Land Co.*, 135 Wn. App. 106, 120-23, 144 P.3d 1185 (2006) (affirming the trial court's ruling that the plaintiff's cleanup was the substantial equivalent of an Ecology remedial action because the ways in which the plaintiff failed to comply with the regulations did not diminish the overall effectiveness of the cleanup, which removed all soil with detectable levels of petroleum).  This holistic standard does not save the SVE claim because Seattle Times never intended to and did not restore the soil at the Property to a condition that was protective of human health and the environment, and AECOM's efforts cannot be evaluated for their "overall effectiveness."  Instead, the failure to inform LeatherCare before or during the course of SVE operations, which thwarted LeatherCare's ability to pursue such technology as a less-expensive cleanup

1    concludes that the soil vapor extraction conducted by AECOM was not the "substantial

2    equivalent of a department-conducted or department-supervised remedial action," and

3    Seattle Times is not entitled to recover from LeatherCare for the costs ($348,087)

4    associated with the SVE operation.  The portion of the MTCA claim pursuant to which

5    Seattle Times seeks reimbursement for its SVE expenses is DISMISSED.  The extent to

6    which Seattle Times may recover from LeatherCare under MTCA for work performed

7    pursuant to the Interim Action Plan (and Agreed Order No. 8996) is addressed later, in

8    connection with the allocation among the parties of the costs related to the excavation and

9    disposal of contaminated soil and the installation and operation of injection wells.

10   **B.**     **Contractual Claim**

11          Before turning to the equitable apportionment of remedial action costs among the

12   parties, the Court must first focus on the contractual claim that Touchstone brings against

13   Seattle Times for two reasons:  (i) Seattle Times raises certain defenses to Touchstone's

14   breach of contract claim that affect the amount to be allocated among the parties; and

15   (ii) some of the expenses for which Seattle Times is liable under its agreement with

16   Touchstone cannot be recovered from LeatherCare under MTCA.

17          The contract at issue, *i.e.*, the ERIA, is explicitly governed by Washington law.

18   Ex. 100 at ¶ 9.  Washington courts follow the "objective manifestation" theory of

19   contracts.  *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d

20

21   _____

22   method, must be viewed as a substantive breach of the regulations defining substantial equivalence to an
     Ecology conducted or supervised remedial action.

23

262 (2005).  Under this approach, the focus is on "the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties."  *Id.*  Words in a contract are assigned their reasonable, "ordinary, usual, and popular" meaning unless the agreement "clearly demonstrates a contrary intent."  *Id.* at 504.  If the parties' intent can be divined from the actual words within the four corners of the document, extrinsic evidence will not be considered.  *See id.* at 503-04; *see also id.* at 503 (extrinsic evidence may be used to "determine the meaning of *specific words and terms used*" in the contract, but not to infer an intent "independent of the instrument" or to "vary, contradict, or modify" what was written (emphasis in original)).

Seattle Times and Touchstone disagree about the significance of three provisions of the ERIA:  (i) the definition of "incremental costs," (ii) the clause allowing Seattle Times to select the disposal site; and (iii) the paragraph concerning indemnification as to any third-party claims.  Each of these provisions is clear and unambiguous, and extrinsic evidence has not been considered in construing them.

### 1.  **Incremental Costs**

Seattle Times contends that the expenses associated with (i) delineating between contaminated and clean soil, (ii) keeping track of the vehicles that disposed of contaminated soil (and the tonnage associated therewith), (iii) setting up an extra conveyor, and (iv) training personnel about handling the hazardous materials at issue ("HAZWOPER training") were not "incremental costs" for which Seattle Times is responsible under the ERIA because they were not "costs of transporting or disposing" of contaminated soil.  With regard to the last item, the Court agrees with Seattle Times and

finds that the expense of HAZWOPER training ($51,588.65) constitutes an item of LCL's overhead and is not recoverable under the ERIA.

The other three challenges, however, fail because the expenditures at issue are "incremental costs" within the meaning of the ERIA. The definition of "incremental costs" says what it means, *i.e.*, Seattle Times must pay Touchstone for "the difference between the costs of transporting and disposing of Contaminated Soils and the costs of transporting and disposing of Clean Soils." Ex. 100 at ¶ 1(h). Soil delineation, truck monitoring, and operation of a second conveyor all satisfy this standard. Soil delineation was necessary to determine whether excavated soil was contaminated or clean and how the associated transportation and disposal costs would be treated under the ERIA. Tracking which trucks carried soil destined for RCRA Subtitle D facilities ensured an accurate accounting of transportation and disposal expenses. The extra conveyor was an integral part of the process of transporting the contaminated soil from the point of its excavation to the rail container or truck that would take it to a landfill, and the additional conveyor served to avoid cross-contamination of clean soil. The Court concludes that Seattle Times is obligated under the ERIA to reimburse Touchstone for (i) soil delineation work performed by SES ($475,875.75) and LCL ($43,041.72[48]), (ii) the wages that LCL paid to trucking monitors ($41,659.34[48]), and (iii) the costs of a second

---

[48] Touchstone invoiced Seattle Times $49,236.27 for LCL's soil delineation and regulatory compliance efforts, Ex. 150, and $47,654.94 for LCL's truck-tracking costs, Ex. 148. These amounts included both LCL's markup and sales tax, the applicability of which are disputed by Seattle Times and/or LeatherCare. The Court addresses LCL's markup and sales tax in subsequent subsections.

conveyor ($62,500).  The Court further concludes that Seattle Times cannot, under

MTCA, recover from LeatherCare the amounts associated with LCL's soil delineation

($43,041.72) and truck tracking ($41,659.34) efforts because they are related solely to

implementation of the ERIA, to which LeatherCare is not a party.  Seattle Times may,

however, recoup from LeatherCare under MTCA a pro rata share of SES's billings and

the expense of the extra conveyor.

### 2. **Disposal Facility (Via Rail or Truck)**

Seattle Times argues that, because it was allowed under the ERIA to select the

disposal site, it should not have to pay the higher cost that Touchstone incurred to

transport PCE-contaminated soil to a facility different from the one Seattle Times chose.

On July 29, 2014, counsel for Seattle Times sent a letter to Touchstone indicating that it

would treat as "incremental costs" only

> those differentials between transport and disposal of Clean Soil[s] and
> Contaminated Soils, with the latter going either:  a) by rail, through
> Republic Services, and disposed of at the Roosevelt Regional Subtitle D
> Landfill in Roosevelt, Washington ("Roosevelt"); or b) via another feasible
> option that is less expensive than option a), should such option become
> available.

Ex. 182 at 2 (footnote omitted).  This view lacks merit.  Although the ERIA authorized

Seattle Times to designate the Roosevelt facility, the contract did not permit Seattle

Times to also specify the manner in which soil would be transported to the landfill.  The

ERIA did not preclude Touchstone from sending PCE-contaminated soil to Roosevelt via

truck, at a much higher cost than trucking the material to the RCRA Subtitle D facility in

Wenatchee.  The Court concludes that Touchstone was authorized under the ERIA to

send PCE-contaminated soil via truck to Wenatchee, rather than Roosevelt, when rail

containers were unavailable, and that Touchstone's decision to do so was reasonable.

Seattle Times also contends that the reason for delivering soil by truck to

Wenatchee was to avoid construction delay as a consequence of rail container

unavailability, and that the additional expense of trucking must be deducted from

"incremental costs" in light of the ERIA's exclusion of "costs, if any, that Purchaser

incurs due to construction delays, inefficiencies, business interruption or the like."

Ex. 100 at ¶ 1(h).  The Court is not persuaded.  Although Touchstone's approach of

trucking the soil (when rail containers could not be obtained) to a facility other than the

one identified by Seattle Times served to keep the excavation on schedule, doing so was

also consistent with the ERIA, which did not require Touchstone to use a particular mode

of transportation, and which inhibited Seattle Times from unreasonably interfering with

Touchstone's development of the Property.  _See_ _id._ at ¶ 2.  The Court concludes that

Seattle Times must compensate Touchstone for, at least, the base rates of sending PCE-

contaminated soil by rail to Roosevelt (or a nearby facility in Arlington, Oregon)

($47.89/ton)[49] and by truck to Wenatchee ($59.14/ton).[50]  The Court will not, however,

[49] The base rate for rail includes the disposal fees and taxes charged by the RCRA Subtitle D facility ($23.15/ton), the amount charged on weekdays for hauling rail containers from the Property to the transfer station ($4.34/ton), the expense of transporting rail containers from the transfer station to the facility ($25.00/ton), and the cost of rail container liners ($2.50/ton), minus the undisputed clean soil credit ($7.10/ton).  _See_ Tr. Exs. 2003 & 2019.

[50] The base rate for truck includes the disposal fees and taxes charged by the RCRA Subtitle D facility ($23.74/ton), the expense of hauling trucks and pups to the facility ($37.50/ton), and the cost of liners for each truck and each pup ($5.00/ton), minus the undisputed clean soil credit ($7.10/ton).  _See_ Ex. 2003.

ORDER - 80

permit Touchstone to recover for a premium[51] associated with delivering materials to the railway transfer station on Saturdays, which was necessary only to avoid delays or to compensate for inefficiencies during the work week, and was therefore not an "incremental cost."

### 3. __Indemnity for Third-Party Claims (Injection Wells)__

The ERIA requires Seattle Times to indemnify Touchstone for claims asserted by third parties, including Ecology, relating to contaminated soil or groundwater that "has or may have migrated off of the Property." Ex. 100 at ¶ 3. On the theory that Ecology has, by issuing Agreed Order No. 8996, made a "claim" concerning groundwater, Touchstone seeks reimbursement from Seattle Times, pursuant to Paragraph 3 of the ERIA, for the costs associated with the 12 angled and 48 boundary injection wells, but not the 43 interior wells installed at the Property.[52] Seattle Times objects, arguing that these various injection wells are not "associated with Contaminated Soils or Contaminated Groundwater that has or may have migrated off of the Property." _Id._ The Court finds that all 12 angled wells were necessary to address ongoing groundwater contamination resulting from PCE that migrated from the Property and into soil under Boren Avenue North and Thomas Street, which could not be removed during the excavation process,

---

[51] During closing argument, Touchstone's counsel conceded that a mathematical error had been made in calculating the Saturday premium, and that the figure should be $0.44/ton, and not $0.46/ton.

[52] The Court adopts Touchstone's approach concerning installation and operating expenses, which treats each injection well as equivalent in cost, regardless of whether it is an angled, boundary, or interior well.

ORDER - 81

and that the ERIA requires Seattle Times to compensate Touchstone for the design, installation, maintenance, and operation of those wells.

The Court also concludes that Seattle Times must bear the expenses associated with the 19 boundary wells along the southern edge of the Property, which serve two purposes, one of which is to keep toxic substances from migrating to the Property from Thomas Street, and the other of which is to mitigate contamination to the surrounding area as the groundwater flows in a southeasterly direction from the Property to the adjacent right-of-way and beyond. _See_ Ex. 478 at 5-6.  The latter goal falls squarely within the terms of Paragraph 3 of the ERIA.

In contrast, the Court finds that the eight (8) boundary wells along the northern facade of Building 1 (IW01-IW08) and the 21 boundary wells running the length of the western border of the Property (IW09-IW15, IW26-IW32, IW45-IW46, and IW52-IW56) serve only to prevent further contamination of the groundwater beneath the Property; they act as a barrier to pollutants travelling from the north and west with the groundwater as it flows in a southeasterly direction toward the Property. _See_ _id._  The Court therefore concludes that Seattle Times is not obligated by the ERIA to reimburse Touchstone for the 29 boundary wells near Harrison Street and Boren Avenue North.  Seattle Times will be responsible for the 12 angled wells and the 19 boundary wells along Thomas Street, for a total of 31 wells, and the Court will use a ratio of 31/103 to calculate the pro rata share of injection-well costs that Seattle Times owes to Touchstone under the ERIA.

### 4. **Other Components of Cost Recovery**

Both Seattle Times and LeatherCare challenge various aspects of Touchstone's alleged expenses for transporting contained-out materials and for addressing soil and groundwater contamination.

### a. **Other Premium**

In its bid, CTI included a premium of $4.75 per ton for an additional conveyor belt system, a belt scale, personal protective equipment ("PPE"), a health and safety plan ("HASP"), and decontamination. Ex. 2019 at 8. The Court finds that these costs were related to the transportation of contained-out soil and that they are recoverable under both the ERIA and MTCA.

### b. **Markup – City Transfer, Inc.**

Touchstone seeks the following markups for CTI's services: (i) $3.36 per ton for PCE-contaminated material sent by rail to the Roosevelt or Arlington facilities; (ii) $6.01 per ton for PCE-contaminated material trucked to the Wenatchee disposal site; and (iii) $5.11 per ton for transporting petroleum-only polluted soil. _See_ Ex. 2003 (reproduced in Cook Report at 5, Ex. 2006, filed as docket no. 116). The Court finds that only the CTI markup of $3.36 per ton is supported by the evidence. During trial, Touchstone did not call any CTI officer or employee as a witness and, on the subject of CTI's markups, Touchstone relied solely on the testimony of LCL's project manager Shannon Testa and summaries she had prepared.

According to Ms. Testa, CTI presented multiple written bids, but only one was offered as evidence in this case. _See_ Trial Tr. (Jan. 31, 2018) at 7:19-21 (docket no. 268).

This written bid from CTI, submitted on April 11, 2014, indicated that it was for

contained-out soil to be transported to either the RCRA Subtitle D facility in Wenatchee,

operated by Waste Management of Washington, Inc. ("WM"), or the RCRA Subtitle D

facility in Roosevelt, Washington, operated by Republic Services, Inc. ("Republic").  *See*

Ex. 2019 at 8.  CTI's markup was not separately stated in the bid, but was instead

imbedded in the rates CTI proposed to charge for transportation and disposal of the

contaminated soil.  *See id.*  The relevant portion of CTI's written bid is reproduced

below, with the disposal facilities highlighted:

| ITEM | DESCRIPTION | QUANTITY | UNIT | PRICE/UNIT | AMOUNT |
|---|---|---|---|---|---|
| Add / Alternate: | | | | | |
| | • Contaminated Soil "Contained-Out" | | | | |
| | Location:  WM Wenatchee Regional Landfill | | | | |
| | or Republic Services, Roosevelt Landfill | | | | |
| | | | | | |
| | Disposal Costs (Fees & Taxes) | | TON | $24.00 | |
| | Transportation Costs & Liners | | TON | $34.35 | |
| | All Other Premium Costs | | TON | $4.75 | |
| | *Add'l Conveyor Belt System | | | | |
| | *Belt Scale | | | | |
| | *PPE's & HASP | | | | |
| | *Decontamination | | | | |
| | | | | | |
| | Total Unit Cost Per Ton | 140,000 | TON | $63.10 | $  8,834,000 |
| | | | | | |
| | • ADD: Saturday Dump Premium | | | | |
| | Add Per Ton | | TON | $2.65 | P. 46 TON |
| | | | | | |
| | • CREDIT: Clean Soil Disposal | | | | |
| | Disposal Cost / Tipping Fee Per Ton | | TON | $1.15 | |
| | Trucking Cost Per Ton | | TON | $5.95 | |
| | | | | | |
| | Total Unit / Credit | 140,000 | TON | $7.10 | ($994,000.00) |

Ex. 2019 at 8 (modified).  Using a quotation from WM for its Columbia Ridge facility in

Arlington, Oregon, which is across the Columbia River from Republic's Roosevelt

facility and which accepts contaminated soil by rail container, Trial Tr. (Jan. 24, 2018) at

112:1-6 (docket no. 264), Ms. Testa translated CTI's bid into different unit rates, thereby breaking out CTI's markup, as follows:

| ITEM | CTI's Bid (April 11, 2014) | Shannon Testa's Interpretation |
|---|---|---|
| Disposal | $24.00 / ton | $23.15 / ton |
| Transportation[53] | $34.35 / ton | $31.84 / ton |
| Premium Costs | $4.75 / ton | $4.75 / ton |
| CTI Markup | imbedded | $3.36 / ton |
| Clean Soil Credit | ($7.10 / ton) | ($7.10 / ton) |
| **TOTAL** | **$56.00 / ton** | **$56.00 / ton** |

See Ex. 2003 (Ex. 2006 at 5); Ex. 2019 at 8 & 11-13; see also Trial Tr. (Jan. 31, 2018) at 15:20-17:14 (docket no. 268).

Because CTI's written bid listed both WM's facility in Wenatchee, which accepts contaminated materials only by truck, and Republic's facility in Roosevelt, to which soil may be transported by rail, confusion arose before, as well as during, trial about whether the rate of $56.00 per ton (including a $3.36 per ton markup) applied to shipping via both truck and rail. In July 2014, before excavation began, Riley Conkin, a geologist acting on behalf of Seattle Times in connection with the execution of the ERIA, posed a number of questions to Touchstone's representatives concerning how LCL had derived the rates

---

[53] CTI's written bid set forth a premium of $2.65 per ton hauled on Saturdays. Ex. 2019 at 8. Ms. Testa attempted to distribute the Saturday premium among all of the contaminated soil shipped via rail by including in the transportation cost an extra $0.46 per ton (miscalculated from $2.65 ÷ 6 days, which actually equals $0.44). Because the Court has disallowed the Saturday premium, the transportation figure computed by Ms. Testa as $32.30 per ton, see Ex. 2003, has been adjusted to $31.84 per ton.

ORDER - 85

for transportation of contained-out soil. In this pre-excavation correspondence, the following exchange occurred:

> On page 2 of 4 of the CTI quote dated 4/11/14 [Ex. 2019 at 7-10], CTI references both WM's Wenatchee Subtitle D Landfill and Republic's Roosevelt Subtitle D Landfill as disposal locations. However, WM's Wenatchee landfill is not set-up for rail transport. The CTI quote for Contaminated Soil disposal and transport appears to only include pricing for rail transport. Correct, the pricing on page 2 of the CTI quote is for disposal via container to either WM or Republic's local transfer yard.

Ex. 181 at 2 (colors in original: Mr. Conkin's query on behalf of Seattle Times is in blue, and Ms. Testa's response on behalf of LCL and Touchstone is in red).

In the same email chain, Mr. Conkin requested on behalf of Seattle Times a "detailed breakdown" of the items included in Touchstone's proposed rates per ton for transporting contaminated soil, asking in particular about CTI's markup. _Id._ Touchstone offered only the following explanation:

> The pricing for both facilities [WM's Columbia Ridge facility and Republic's Roosevelt facility] for disposal via [rail] container is based on 30 tons. Costs include disposal fee, refuse tax, liners, ODEQ fee, rail costs per load, trucking to the transfer station, other premium costs . . . , CTI markup and a credit for the disposal of clean soil.

_Id._ (color in original). Unsatisfied with this response, Seattle Times again asked Touchstone to provide "the actual numerical costs per ton for each of the items listed," indicating that the information presented by Touchstone did not indicate "the exact fees for items such as trucking to the transfer station or CTI's markup." _Id._ According to Mr. Conkin, Touchstone never gave Seattle Times the requested data, and the first time he saw the dollar amounts of the CTI markups was when they appeared in Touchstone's expert's report, which is dated April 19, 2017, and which was admitted as Exhibit 2006

ORDER - 86

(filed as docket no. 116).  *See* Trial Tr. (Jan. 29, 2018) at 151:4-14 & 160:3-7 (docket

no. 267); *see also id.* at 157:17-23 (explaining on cross-examination that Touchstone's

pre-litigation communications "didn't answer the question of what the CTI markup

actually was or how much it was").  The Court finds that Touchstone did not quantify

CTI's markups until it disclosed its expert's report during the course of discovery in this

action.  Moreover, despite Touchstone's (overdue) disclosure, the mystery surrounding

how CTI's markups were calculated continued through trial.

During trial, after Ms. Testa had already testified, the Court had the following

colloquy with Paul Klansnic, Touchstone's senior project manager for the development

at the Property:

> THE COURT:  As I understood your testimony, this [Exhibit 2019 at 7-10] was a fixed bid by CTI for the disposal of all contaminated soil; is that right?
>
> THE WITNESS:  Yes.
>
> THE COURT:  It was a fixed price.
>
> THE WITNESS:  Fixed unit price.
>
> THE COURT:  It didn't matter where it went, did it?  It could go to Wenatchee.  It could go to Republic or Roosevelt.  Isn't that what this says?
>
> THE WITNESS:  That is what it says.
>
> . . . .
>
> THE COURT:  But this bid doesn't differentiate between rail and truck, does it?
>
> THE WITNESS:  This bid does not, no.
>
> THE COURT:  That's the bid you said that you were relying upon in proceeding; isn't that right?

1        THE WITNESS:  This is the bid I saw.  Yeah, that's right.

2        THE COURT:  That's the only bid you've testified about this
         morning in terms of the costs to move this contaminated soil; isn't that
3        right?

4        THE WITNESS:  That's correct.

5        THE COURT:  And so that total bid was fixed, and it was $63.10,
         less credit for clean soil.  Is that where we are?

6        THE WITNESS:  That's what I see here.

7    Trial Tr. (Jan. 29, 2018) at 80:19-82:4 (docket no. 267).

8        In an attempt to address the problem identified in CTI's written bid, Touchstone

9    recalled Ms. Testa, who explained that CTI "quoted the project several times" and

10   "unfortunately, they had some things left behind on their quote."  Trial Tr. (Jan. 31, 2018)

11   at 7:20-22 (docket no. 268).  According to Ms. Testa, CTI "left the fact that Waste

12   Management, Wenatchee Regional Landfill, up under the contaminated soil, contained-

13   out.  That should not have been there."  _Id._ at 7:25-8:3.  When asked whether she

14   received any other written bid from CTI after April 11, 2014, the date of the bid admitted

15   as Pages 7 through 10 of Exhibit 2019, Ms. Testa indicated that she "did not receive a full

16   bid from them," and only obtained "supplemental information to their bid."  Trial Tr.

17   (Jan. 31, 2018) at 9:9-13 (docket no. 268).

18       Although CTI's bid erroneously indicated that the quoted rates were for disposal

19   at both the Roosevelt and Wenatchee facilities, regardless of whether the mode of

20   transportation was rail or truck, _see_ Ex. 2019 at 8, the Court finds, in light of Ms. Testa's

21   testimony, that this bid was meant to apply solely to the hauling of soil via rail container,

22   and that CTI's markup for PCE-contaminated soil transported to either the Roosevelt or

23

the Arlington facility was $3.36 per ton.  *See* Ex. 2003.  With regard to the CTI markups

for trucking PCE-contaminated soil to Wenatchee ($6.01/ton) and for transporting

petroleum-laden material to the WM transfer station on Alaska Street ($5.11/ton), the

Court concludes that the summary, namely Exhibit 2003 (Ex. 2006 at 5), offered to prove

these amounts is not supported by any evidence in the record.  The record contains no

written bid from CTI relating to the costs of delivering soil to Wenatchee or the Alaska

Street transfer station, and no person, including Ms. Testa, testified about the rates quoted

by CTI for such services.[54]  Moreover, because Touchstone paid a "guaranteed maximum

price" to LCL, *see* *supra* note 5, Ms. Testa's representation that LCL paid CTI at the

rates set forth in Exhibit 2003 (Ex. 2006 at 5), *see* Trial Tr. (Jan. 31, 2018) at 12:23-13:7

(docket no. 268), is not sufficient to establish that Touchstone paid the markups at issue.

Thus, the Court will allow a CTI markup of only $3.36 per ton regardless of the mode of

transportation or the type of toxic substance involved.

### c.    Markup – Lease Crutcher Lewis

Touchstone seeks reimbursement for LCL's allegedly standard markup of 4.414%

over the charged amount.  *See* Ex. 2002.  According to counsel for Touchstone, Invoice

---

[54] With regard to the costs associated with trucking PCE-contaminated soil to Wenatchee, Ms. Testa recapped only the fees charged by WM's facility to CTI, namely $21.95 per ton for disposal, $37.50 per ton for a truck and a pup, $75 for each liner (which Ms. Testa converted to $5.00 per ton, based on two liners per 30 tons), a 3.6% Washington State refuse tax, and a CDHD fee of $1.00 per ton.  *See* Ex. 2019 at 15; Trial Tr. (Jan. 31, 2018) at 13:15-15:19 (docket no. 268).  Unlike in connection with CTI's bid for transporting contained-out material by rail, Ms. Testa did not provide the transportation and disposal rates quoted by CTI in which its markup was imbedded, and what markup Touchstone actually paid for CTI's services relating to disposal at Wenatchee remains a mystery.

No. 10, admitted as Exhibit 148, shows how the markup at issue was typically billed by

LCL.  Invoice No. 10 itemizes the components of LCL's markup as follows:

- Data Processing                                                          0.09  %
- Fee                                                                              2.25  %
- State Business and Occupation ("B&O") Tax                  0.471 %
- City B&O Tax                                                              0.215 %
- Professional Liability and Property Damage Insurance   0.8    %
- Payment and Performance Bond                                    0.5    %
                                                                                    4.326 %

*See* Ex. 148; *see also* Trial Tr. (Jan. 24, 2018) at 144:15-19 & 179:4-20 (docket no. 264).

The Court finds that Invoice No. 10, which shows a total markup of only 4.326%, does

not support the requested figure of 4.414%.

        The Court further concludes that Seattle Times cannot be required under the ERIA

and LeatherCare is not obligated under MTCA to pay the proposed B&O tax surcharges

of 0.471% and 0.215%.  RCW 82.04.500 states that B&O taxes "shall constitute a part of

the operating overhead" of "persons engaging in business" and shall not be construed as a

tax on such persons' "purchasers or customers."  During closing argument, Touchstone's

counsel attempted to distinguish *Peck v. AT&T Mobility*, 174 Wn.2d 333, 275 P.3d 304

(2012), in which the Washington Supreme Court held that RCW 82.04.500 prohibits a

business from collecting a B&O surcharge.  The Court sees no basis for disregarding the

decision in *Peck*, which made clear that allowing companies to charge a B&O tax

surcharge, in addition to the "distinctly different sales tax," would effectively tax the

customer twice, thereby improperly rendering RCW 82.04.500 "meaningless" and the

B&O levy on businesses "illusory."  *Id.* at 340.  Moreover, the issue before the Court is

not whether LCL could recoup its B&O taxes from Touchstone, but rather whether

Touchstone can pass along to Seattle Times and/or LeatherCare any B&O surcharges it might have paid. The Court concludes it cannot. Thus, Touchstone's right to recover against Seattle Times and LeatherCare for LCL's markup will be limited to the rates relating to data processing (0.09%), insurance (0.8%), and bond expenses (0.5%), as well as LCL's project fee of 2.25%, which in the aggregate equal 3.64%.

### d. Invoices – SoundEarth Strategies

In connection with SES's invoices, Touchstone seeks:

- $475,875.75 for SES's soil delineation services, 100% of which Touchstone has billed to Seattle Times, but Seattle Times has not paid;

- $598,258.21 in connection with SES's work on the design, installation, and operation of the various injection wells, which Touchstone proposes to divide between the other two parties,[55] with 63% allocated to Seattle Times pursuant to the ERIA, and 37% apportioned to LeatherCare under MTCA; and

- $1,168,185.54 for which Touchstone suggests LeatherCare is 100% liable under MTCA.

LeatherCare contends that Touchstone has engaged in double-dipping with respect to SES's billings, and that the SES invoices admitted into evidence do not support the total amount sought by Touchstone. The Court agrees with LeatherCare.

---

[55] Touchstone's calculations are based on its belief that the proportion of **angled** and **boundary** wells to the total number of injection wells is 65/103 (or 63%) and that the ratio of **interior** wells to all wells is 38/103 (or 37%). Touchstone has miscounted. The number of angled and boundary wells is 60, not 65, and the number of interior wells is 43, not 38. _See_ _supra_ note 34.

ORDER - 91

i. **Double Recovery**



As reflected in PowerPoint Slide 8 from Touchstone's closing argument (reprinted above), Touchstone requested that, in connection with SES's billings (highlighted in red), LeatherCare be made liable for $946,830.00 in "consulting costs," as well as for $221,355.54, representing 37% of the groundwater treatment system implementation costs,[56] for a total of $1,168,185.54. LeatherCare aptly points out, however, and the Court finds that the $221,355.54 for 37% of SES's injection-well charges was already included in the $946,830.00 identified as SES's "consulting costs." *See* Ex. 2004 at 3-4.

_____

[56] LeatherCare questions whether the injection wells were even necessary given that all contaminated soil was excavated and removed from the Property. *See* Morrill Report at Op. 2a, Ex. 1141 at 19-20 (filed as docket no. 117-1). According to LeatherCare, a more thorough feasibility study would have considered monitored natural attenuation as an effective and less-expensive option to the active groundwater treatment method for which Touchstone seeks compensation from LeatherCare (as well as Seattle Times). *Id.* Whether monitored natural attenuation, however, would have been selected if presented to Ecology as an alternative involves speculation, and the Court declines to completely disallow the costs associated with the injection wells on that basis.

Exhibit 2004, which was offered into evidence by Touchstone, contains a table titled "Budget Tracking Spreadsheet" that Touchstone asserts is a summary of SES's invoices for the period from February 26, 2013, through November 2017. *See id.* at 3-4. According to Exhibit 2004, the sum of SES's billings through November 2017 was $1,799,608.60. *Id.* As indicated in Exhibit 2004, the amount for which Touchstone considers Seattle Times responsible is $852,778.42, which consists of the following items:

| Task Description | Total Amount Invoiced by SES | Amount Billed to Seattle Times | |
|---|---|---|---|
| Excavation Field Work | $260,227.17 | 100% | $260,227.17 |
| Sidewall Samples | $68,606.13 | 100% | $68,606.13 |
| Cost-Recovery Samples | $147,042.45 | 100% | $147,042.45 |
| **Subtotal for Soil Delineation** | $475,875.75 | 100% | $475,875.75 |
| Groundwater Treatment System Design | $42,405.02 | 63% | $26,715.16 |
| Installation of Injection and Monitoring Wells | $35,660.50 | 63% | $22,466.11 |
| Injection Events | $492,762.98 | 63% | $310,440.68 |
| Data Evaluation and Ecology Correspondence | $4,632.50 | 63% | $2,918.48 |
| Project Management | $22,797.21 | 63% | $14,362.24 |
| **Subtotal for Groundwater Treatment Services** | $598,258.21 | 63% | $376,902.67 |
| **TOTAL** | | | **$852,778.42** |

Exhibit 2004 makes clear that the amount Touchstone already billed to Seattle Times ($852,778.42), which includes only 63% of the costs associated with the injection wells,

was deducted from the total of SES's invoices ($1,799,608.60), leaving a balance of $946,830.18. Thus, the amount described in Touchstone's PowerPoint slide as SES's "consulting costs" (which Touchstone rounded down to $946,830.00) takes into account the 37% of injection-well expenses that Touchstone contends LeatherCare should pay. Adding yet another 37% or $221,355.54 for "implementation costs" would result in double recovery. This conclusion becomes obvious when the total that Touchstone seeks from Seattle Times and LeatherCare for SES's work ($2,020,963.96), computed as follows:

| | |
|---|---|
| $ 852,778.42 | amount billed to Seattle Times |
| $ 946,830.00 | consulting costs |
| $ 221,355.54 | 37% of implementation costs |
| $2,020,963.96 | TOTAL |

is compared with the sum of SES's invoices set forth in Exhibit 2004 ($1,799,608.60), which is equivalent to just the first two figures above, as illustrated below.

| | |
|---|---|
| $ 852,778.42 | amount billed to Seattle Times |
| $ 946,830.18 | balance (labeled "consulting costs") |
| $1,799,608.60 | TOTAL |

Touchstone will not be permitted to recoup from Seattle Times and LeatherCare more than was billed by SES.

### ii.  Unsupported Summaries

In addition to its attempt at double recovery, Touchstone has tried, in connection with Exhibit 2004, to circumvent the evidentiary requirements relating to summaries, which are as follows:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be

ORDER - 94

conveniently examined in court.  The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place.  And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006.  The prerequisites for admission of a summary are (i) the underlying materials upon which the summary is based must themselves be admissible evidence, and (ii) the underlying materials must have been made available to the opposing party for inspection.  *See* *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259 (9th Cir. 1984) (*citing* *United States v. Johnson*, 594 F.2d 1253, 1254-57 (9th Cir. 1979)).  Touchstone has not made the latter showing.

Exhibit 2004 was offered by Touchstone through the testimony of Paul Klansnic, and it was initially admitted for demonstrative purposes only.  Trial Tr. (Jan. 29, 2018) at 4:12-21 & 59:20-60:17 (docket no. 267).  Exhibit 2004 contains *inter alia* two tables. The first table, labeled "Summary of Site Remediation Costs – Not Reimbursed by Seattle Times," was prepared by Mr. Klansnic using "invoice summaries" he obtained from the entities identified in the table, namely SES, LCL, Ecology, and two law firms. *Id.* at 61:7-9; *see* Ex. 2004 at 1.  According to Mr. Klansnic's table, the costs paid to date to SES that had not already been invoiced to Seattle Times totaled $946,830, and SES's "projected" billings to complete the project are $664,016, for a total of $1,610,846, which Touchstone seeks solely from LeatherCare.  *See* Ex. 2004 at 1.  With regard to SES's "projected" billings, Mr. Klansnic offered no testimony concerning the method he used to derive the figure of $664,016, and Touchstone identified no materials to support this number.

The second table included in Exhibit 2004, titled "Budget Tracking Spreadsheet," was prepared by SES, _see_ Trial Tr. (Jan. 29, 2018) at 61:10-14 (docket no. 267), and the Court concludes that Mr. Klansnic, as a project manager for Touchstone, and not SES, had no personal knowledge concerning how the second table was generated. Touchstone called no other witness to lay foundation for the "Budget Tracking Spreadsheet." The "Budget Tracking Spreadsheet" indicates as follows: (i) from February 2013 through November 2017, the sum of SES's invoices was $1,799,608.60; (ii) Seattle Times was invoiced for $852,778.42;[57] and (iii) the balance of charges not billed to Seattle Times was $946,830.18, _see_ Ex. 2004 at 3-4, which is the same figure that appears in Mr. Klansnic's table, _see_ Ex. 2004 at 1.

During the course of Mr. Klansnic's testimony, Touchstone reoffered Exhibit 2004 for all purposes. Trial Tr. (Jan. 29, 2018) at 64:11 (docket no. 267). With regard to Mr. Klansnic's table and the "Budget Tracking Spreadsheet," LeatherCare objected, explaining that it had not been provided the underlying SES invoices. _Id._ at 65:8-16 ("We have not seen backup for the SoundEarth Strategies' costs . . . ."). The Court admitted Mr. Klansnic's table, but not the "Budget Tracking Spreadsheet." _See id._ at 65:17-66:15.[58]

---

[57] As indicated _supra_ p. 93, this amount includes (i) $475,875.75 for soil sampling and analysis, _see_ Ex. 152 (Invoice No. 14); and (ii) $376,902.67 for groundwater treatment system design, installation, and operation, _see_ Exs. 2016 & 2017 (Invoices Nos. 15 & 16 for $131,406.31 and $245,496.36, respectively).

[58] Touchstone sought reconsideration of the Court's ruling, arguing that LeatherCare had not interposed an objection to Exhibit 2004 at the time the Pretrial Order was entered. Trial Tr. (Jan. 29, 2018) at 102:2-9 (docket no. 267). The Court observed that an objection had been made at the time Exhibit 2004 was offered, and that the objection still remained. _Id._ at 102:12-20. The Court now further observes that the

Touchstone subsequently offered, through a different witness, SES's invoices

from February 26, 2014, through August 19, 2015, which were admitted into evidence as

Exhibit 2026.  Trial Tr. (Jan. 29, 2018) at 130:19-131:20 (docket no. 267).  Touchstone,

however, never provided SES's invoices for the periods preceding February 2014 or after

August 2015.  A revised version of Exhibit 2004, including SES's "Budget Tracking

Spreadsheet," was later admitted into evidence by stipulation of the parties, Trial Tr. (Jan.

31, 2018) at 36:14-37:13 (docket no. 268), but the only SES invoices in evidence total

$931,527.33.[59]  This figure does not match either the costs to date ($946,830.18) or the

total projected costs ($1,610,846) set forth in Mr. Klansnic's table, and it is not even

close to the total amount ($1,799,608.60) shown on SES's "Budget Tracking

Spreadsheet."

The Court concludes that, with regard to SES's billings, Touchstone failed to lay

an adequate foundation for the two tables in Exhibit 2004.  As the proponent of the

summaries, Touchstone bore the burden of demonstrating that it had made the supporting

---

Pretrial Order, docket no. 154, does not contain a list of exhibits, and that the most recent version of the exhibit list, which was filed more than a week after trial began, docket no. 238-1, indicated that Seattle Times objected to Exhibit 2004.  The Court rejects any argument that LeatherCare waived its objection to Exhibit 2004 in advance of trial.

[59] The following table summarizes the invoices contained in Exhibit 2026:

| Month/Year | Amt Invoiced | Month/Year | Amt Invoiced | Month/Year | Amt Invoiced | Month/Year | Amt Invoiced |
|---|---|---|---|---|---|---|---|
| Feb 2014 | $9,967.18 | Aug 2014 | $75,973.38 | Jan 2015 | $44,382.65 | May 2015 | $149,136.37 |
| Mar 2014 | $22,765.82 | Sep 2014 | $67,666.80 | Feb 2015 | $65,538.50 | June 2015 | $65,751.68 |
| Apr 2014 | $25,748.01 | Oct 2014 | $105,266.70 | Mar 2015 | $39,918.48 | July 2015 | $23,233.75 |
| May 2014 | $8,371.00 | Nov 2014 | $89,628.25 | Apr 2015 | $8,251.64 | Aug 2015 | $25,081.26 |
| July 2014 | $29,777.66 | Dec 2014 | $75,068.20 | | | **TOTAL for 2015** | **$421,294.33** |
| | | **TOTAL for 2014** | **$510,233.00** | **TOTAL of Invoices in Exhibit 2026** | | | **$931,527.33** |

ORDER - 97

documents available to the opposing parties. _Paddack_, 745 F.2d at 1259; _see United States v. Miller_, 771 F.2d 1219, 1238 (9th Cir. 1985); _see also Powell v. Penhollow_, 260 Fed. App'x 683, 688 (5th Cir. 2007); _cf. Oertle v. United States_, 370 F.2d 719, 728 (10th Cir. 1966) (indicating that "[t]he use of summary exhibits in proper cases has been sanctioned by [the Tenth Circuit] only when they reflect and summarize other evidence in the case"). Touchstone has not met this burden. In objecting to the two tables in Exhibit 2004, LeatherCare indicated that it had "not seen" the underlying materials on which the SES cost figures were based, and Touchstone has not established, or even asserted, that the supporting documents were disclosed or otherwise made available to LeatherCare in discovery. Touchstone eventually supplied only a portion of SES's invoices, _see_ Ex. 2026, thereby inducing LeatherCare to withdraw its objection, but given the course of these proceedings, the Court finds that LeatherCare did not waive its challenge to Exhibit 2004.[60] The Court concludes that the tables in Exhibit 2004 cannot be treated as summaries under Rule 1006, and the tables will be considered only to the extent that supportive documents were admitted into evidence.

### iii. SES's Billings

In light of Touchstone's attempt to obtain duplicative damages, the substantial disparity between SES's invoices of record (Exhibit 2026) and the summaries allegedly

---

[60] Indeed, during closing argument, LeatherCare's counsel alluded to Exhibit 2004's lack of foundation when she characterized the amounts in Mr. Klansnic's table (on the first page) as numbers "parked on a cover sheet" that are unsupported by any evidence in the record, and when she referenced the lack of correlation between the summaries in Exhibit 2004 and the only underlying materials produced by Touchstone, namely the invoices in Exhibit 2026. _See_ Trial Tr. (Feb. 6 & 7, 2018) at 202:23-203:6 & 205:2-7 (docket no. 269).

based on them (Exhibit 2004), LeatherCare's objections and Touchstone's failure to overcome them, and the lack of testimony from someone with personal knowledge concerning how SES's "Budget Tracking Spreadsheet" was generated, the Court concludes that the "Budget Tracking Spreadsheet" is not sufficiently reliable to prove the contents of SES's invoices for the period from February 2013 to November 2017, and the Court declines to award Touchstone the total ($1,799,608.60) set forth in the "Budget Tracking Spreadsheet." _See_ Fed. R. Evid. 1006.

The Court will instead include as the costs associated with SES's services the amounts originally billed to Seattle Times before Touchstone attempted to apportion the expenses between Seattle Times and LeatherCare. These figures are set forth in three invoices, namely Invoices Nos. 14, 15, and 16, which were admitted as Exhibits 152, 153, and 2010. Attached to each invoice was a cover letter from an individual employed at the relevant time by SES, summarizing the costs being charged, and several pages of billing detail, identifying the various tasks performed, the personnel who engaged in the activities, the date on which they occurred, and the amount of time they required. _See_ Exs. 152, 153, & 2010. The Court concludes that Invoices Nos. 14, 15, and 16 qualify, under Rule 1006, as summaries with the requisite supporting materials, which have been made available to both Seattle Times and LeatherCare. These invoices support the following amounts relating to SES's work: (i) $475,875.75 for excavation and soil delineation work, and (ii) $598,258.21 ($208,581.45 plus $389,676.76) for groundwater treatment system design, installation, and operation, for a total of $1,074,133.96.

### e.    **Invoices - Regulatory Review**

The parties do not appear to dispute the sum that Touchstone alleges it has paid to Ecology to date, specifically $88,511.27. Ex. 2004 at 12. LeatherCare asks only that Touchstone be allocated a greater share of these fees because it has pursued regulatory approval to further its own business interests. The Court concludes that the regulatory charges were reasonable and will include them in the amount to be allocated among the parties based on equitable factors.

### f.    **Sales Tax**

Touchstone seeks $648,674.31 in sales tax allegedly incurred in connection with the remedial action. *See* Ex. 2002. Both Seattle Times and LeatherCare contend that Touchstone may not recover sales tax from them. They are only partially correct. In Washington, sales tax must be collected on all non-exempt "retail sales" from the buyer and then paid by the seller to the Washington Department of Revenue. *See* RCW 82.08.020 & .050. A retail sale includes charges for labor and services rendered in "constructing, repairing, . . . or improving" new or existing buildings "under, upon, or above real property of or for consumers," including "the clearing of land and the moving of earth." RCW 82.04.050(2)(b); *see* RCW 82.04.190(4) (defining "consumer" as including any person who owns real property being constructed, repaired, improved, or otherwise altered). Excluded from the definition of retail sale are certain services like engineering, accounting, consulting, and administrative work that is provided to either the consumer of, or the person responsible for performing, the construction, repair, or improvement. RCW 82.04.051(1). Touchstone does not appear to have been charged, or

to seek reimbursement for, sales tax related to SES's services or Ecology's fees, which do not qualify as "retail sales." Thus, the sole question before the Court is whether sales tax was owed, and can be recovered, with respect to LCL's and CTI's services.

Some services LCL provided to Touchstone were for accounting or administrative purposes, for example, tracking trucks and regulatory compliance efforts (which were billed along with, and cannot be disentangled from, soil delineation charges). Likewise, a portion of LCL's markup (1.39%) involves administrative matters, namely data processing, insurance, and required bonds. Thus, as to these items, the Court will not include sales tax in the computation of the amount to be apportioned among the parties. The balance of LCL's charges, however, including its project fee on non-administrative tasks (at the rate of 2.25%), as well as all of CTI's services, fall squarely within the definition of retail sales for which sales taxes are due.

In arguing otherwise, both Seattle Times and LeatherCare rely on statutes relating to B&O taxes, not sales tax. Seattle Times cites RCW 82.04.051(2) for the proposition that the appropriate tax rate is the one that applies to the predominant activity involved. This statute contemplates that, if the predominant activity is not explicitly taxed under a separate provision, the catch-all rate of 1.5% should be used to calculate the B&O tax owed on the gross income of the business. *Id.*; *see* RCW 82.04.290(2). LeatherCare references former RCW 82.04.2635, which expired on July 1, 2003. That provision set forth a B&O tax of 0.471% times the gross income of persons engaged in the business of environmental remedial action. RCW 82.04.2635(1) (2002). When the statute expired, contaminated-site cleanup was again considered a "retail sale," and the B&O tax rate for

such work now depends on the specific activity performed.[61]  The authorities mentioned by Seattle Times and LeatherCare relate only to the B&O tax that LCL, CTI, and SES must pay on their gross proceeds, which is distinct from the sales tax that consumers owe in connection with retail sales.  *See Bravern Residential, II, LLC v. Wash. Dep't of Revenue*, 183 Wn. App. 769, 776, 334 P.3d 1182 (2014); *Wash. Dep't of Revenue v. Nord Nw. Corp.*, 164 Wn. App. 215, 224, 264 P.3d 259 (2011).  The Court concludes that a portion of the sales tax that Touchstone seeks is appropriately included in the amount to be apportioned among the parties.[62]

### 5.    Total Amount Owed by Seattle Times Under the ERIA

Of the over $9.88 million in remedial action costs that Touchstone seeks in this action, the Court concludes that Seattle Times is bound under the ERIA to reimburse Touchstone for $8,160,527.61, as itemized in the tables on the next two pages.  For the reasons already explained (*see supra* p. 79), $429,211.77 of this sum, as reflected in Table 1, may not be passed along to LeatherCare under MTCA.

---

[61] For example, (i) businesses that haul toxic materials are subject to the urban or motor transportation classification of the public utility tax, *see* RCW 82.16.020(1); (ii) companies that repair, improve, or clean existing structures, demolish an existing building, or remove USTs must pay the "retailing" B&O rate (0.471%); and (iii) entities that provide groundwater treatment, testing or monitoring, consulting, planning, engineering, or design services fall within the "service and other activities" category, which has a B&O tax rate of 1.5%.  *See* Wash. Dep't of Revenue Special Notice (June 23, 2003) (available at http://taxpedia.dor.wa.gov/documents/Historical%20Special%20Notices/Special%20Notices%202003/environsn03.pdf).

[62] The state sales tax rate is 6.5%.  RCW 82.08.020(1).  On April 1, 2015, the local sales tax rate in Seattle increased from 3.0% to 3.1%.  *See* https://dor.wa.gov/get-form-or-publication/forms-subject/local-sales-use-tax-rates-citycounty.  Although remediation efforts were ongoing at the Property after April 1, 2015, the excavation work was complete before the aggregate sales tax rate became 9.6%, and thus, on items subject to sales tax, the Court will use the 9.5% rate that Touchstone has requested.

| Table 1: Amount Owed by Seattle Times Under the ERIA and Not Recoverable from LeatherCare Under MTCA | |
|---|---|
| **Transportation of Petroleum-Only Contaminated Soil** <br> • RATE: $42.99/ton + $4.75/ton + $3.36/ton = $51.10/ton <br> • AMOUNT: 2,755.00 tons + 2,538.76 tons = 5,293.76 tons <br> • LCL Project Fee (2.25%) = $6,086.50 <br> • LCL Administrative Markup (1.39%) = $3,760.10 <br> • Sales Tax (9.5%) = $26,276.78 | $306,634.52 |
| **Transportation of PCE Plumes Attributable Only to Troy** <br> • RATE (by truck): $59.14/ton + $4.75/ton + $3.36/ton = $67.25/ton[63] <br> • AMOUNT: 6,500 cu. ft. (240.74 $yd^3$ x 1.8959 tons/$yd^3$ = 456.42 tons) <br> • LCL Project Fee (2.25%) = $690.62 <br> • LCL Administrative Markup (1.39%) = $426.65 <br> • Sales Tax (9.5%) = $2,981.56 | $34,793.07 |
| **Wages for Trucking Monitors** <br> • CHARGE: $41,659.34 <br> • LCL Project Fee (2.25%) = $937.34 <br> • LCL Administrative Markup (1.39%) = $579.06 | $43,175.74 |
| **LCL - Soil Delineation and Regulatory Compliance** <br> • CHARGE: $43,041.72 <br> • LCL Project Fee (2.25%) = $968.44 <br> • LCL Administrative Markup (1.39%) = $598.28 | $44,608.44 |
| **SUBTOTAL (Table 1)** | **$429,211.77** |

The extent to which Seattle Times may recoup from LeatherCare some of the remaining $7,731,315.84, calculated as indicated in Table 2 on the next page, will be addressed in the sections on apportionment.

---

[63] Because Touchstone and Seattle Times have not carried their respective burdens of specifying how the PCE-contaminated soil unrelated to LeatherCare's operations was transported to a RCRA Subtitle D facility, for purposes of their MTCA claims against LeatherCare, the Court has assumed the material was hauled by truck (at a more expensive rate than by rail), which results in a greater reduction of the amount each entity can recover against LeatherCare.

| Table 2:  Amount Owed by Seattle Times Under the ERIA (To Be Apportioned under MTCA) | |
|---|---|
| **Transportation of PCE-Contaminated Soil by RAIL**<br>• RATE:  $47.89/ton + $4.75/ton + $3.36/ton = $56.00/ton<br>• AMOUNT:  35,504.26 tons<br>• LCL Project Fee (2.25%) = $44,735.37<br>• LCL Administrative Markup (1.39%) = $27,636.51<br>• Sales Tax (9.5%) = $193,132.52 | $2,253,742.96 |
| **Transportation of PCE-Contaminated Soil by TRUCK**<br>• RATE:  $59.14/ton + $4.75/ton + $3.36/ton = $67.25/ton<br>• AMOUNT:  60,605.87 tons - 456.42 tons = 60,149.45 tons<br>• LCL Project Fee (2.25%) = $91,013.64<br>• LCL Administrative Markup (1.39%) = $56,226.20<br>• Sales Tax (9.5%) = $392,926.09 | $4,585,216.44 |
| **Set-Up Extra Conveyor**<br>• CHARGE: $62,500.00<br>• LCL Project Fee (2.25%) = $1,406.25<br>• LCL Administrative Markup (1.39%) = $868.75<br>• Sales Tax (9.5%) = $6,071.09 | $70,846.09 |
| **SES - Soil Sampling and Analysis** | $475,875.75 |
| **LCL - Installation of Injection Wells**<br>• SHARE PER ERIA: 31/103 of $225,890[64] = $67,986.31<br>• LCL Project Fee (2.25%) = $1,529.69<br>• LCL Administrative Markup (1.39%) = $945.01<br>• Sales Tax (9.5%) = $6,604.02 | $77,065.03 |
| **SES - Groundwater Treatment (Injection Wells)**<br>SHARE PER ERIA: 31/103 of $598,258.21 ($208,581.45 + $389,676.76) | $180,058.30 |
| **Regulatory Review** | $88,511.27 |
| **SUBTOTAL (Table 2)** | **$7,731,315.84** |
| **SUBTOTAL (Table 1)** | **$429,211.77** |
| **TOTAL DUE under ERIA** | **$8,160,527.61** |
| **Amount Paid by Seattle Times** | **$4,783,434.17** |
| **BALANCE OWED under ERIA** | **$3,377,093.44** |

---

[64] This figure ($225,890) is the pre-markup and pre-tax cost associated with LCL's work on installing the various injection wells. _See_ Ex. 2004 at 6-10.

ORDER - 104

## C.      Apportionment of Remedial Action Costs Under MTCA

Recovery under MTCA "shall be based on such equitable factors as the court determines are appropriate."  RCW 70.105D.080.  LeatherCare suggests that its share of response costs should correlate with the percentage of contained-out soil that was contaminated with PCE above the cleanup level (0.05 mg PCE per kg soil) published by Ecology pursuant to MTCA.  The Court declines to adopt LeatherCare's methodology and instead considers various factors that have been identified by federal and state courts in connection with equitable apportionment of remedial action costs.

### 1.      LeatherCare's Proposed Pro Rata Reduction

According to LeatherCare, only 22% of the "contained-out" material[65] had PCE concentrations above 0.05 mg/kg.  _See_ Ex. 528.[66]  LeatherCare contends that, as a result, only 22%[67] of the excavation-related expenses are recoverable against it under MTCA, and it asks the Court to allocate to LeatherCare only 40% of the adjusted amount of soil remediation costs.  _See_ LeatherCare's Proposed Conclusions of Law ¶¶ 11 & 17 (docket

---

[65] LeatherCare has construed the term "contained-out" to include soil that was contaminated with only petroleum.  _See_ Ex. 528.  The Court has interpreted "contained-out" material as soil that was handled as though it was contaminated with PCE or a combination of PCE and petroleum.

[66] LeatherCare estimates that another 18% of the excavated soil had detectable, but below-cleanup, levels of PCE, that roughly 15% of the removed material was contaminated with solely GRPH, and that 45% of the tonnage transported to disposal facilities was "clean" soil.  _See_ Ex. 528.

[67] LeatherCare has requested a judicial declaration that 24% (rather than 22%) of the contained-out soil exceeded the cleanup level for PCE.  LeatherCare's Proposed Conclusion of Law ¶ 11 (docket no. 198). This figure is inconsistent with Exhibit 528, which LeatherCare's expert testified was a pie chart reflecting the results of her Leapfrog-model analysis.  _See_ Trial Tr. (Jan. 24, 2018) at 7:2-21:6 (docket no. 264).

no. 198).  LeatherCare's approach is not supported by any authority[68] and ignores a crucial point, namely that excavation of clean and/or tainted soil at the upper elevations was necessary to reach the "dirty" material farther down.

As indicated on the various lift maps contained in SES's Interim Action Progress Report, within each ten-foot layer of soil, some samples tested above the cleanup level, while others showed PCE concentrations either below 0.05 mg/kg (the cleanup level) or less than 0.025 mg/kg (the detection level).  *See* Ex. 126 (491) at 43-50 (Figs. 6A-6H). For example, at the lowest elevation of excavation, five samples had PCE concentrations in excess of 0.05 mg/kg,[69] ten others were within the range between detection and cleanup levels, and the remainder showed no detectable amounts of PCE.  *See* Ex. 126 (491) at 50 (Fig. 6H).

The Court finds that, to remove the soil in each ten-foot layer that contained PCE in excess of the cleanup level, excavation of the earth directly and laterally above the material, regardless of whether it was itself contaminated, was required.  The Court also finds that the contained-out boundaries delineated on SES's lift maps approximate with

---

[68] LeatherCare's reliance on *Douglass v. Shamrock Paving, Inc.*, 189 Wn.2d 733, 406 P.3d 1155 (2017), is misplaced.  In *Douglass*, the Washington Supreme Court held that, although the property owners could recover from a trespasser for investigative expenses, they could not obtain reimbursement for excavation of 68 tons of soil because the samples obtained in advance of such remedial action tested at or below the published cleanup level for lube oil, and thus, the contamination did not, per se, pose a threat or potential threat to human health or the environment.  *Id.* at 740-44.  *Douglass* does not stand for the proposition advanced by LeatherCare that a party's share of remedial action costs should be the ratio that the amount of soil contaminated above cleanup level bears to the total volume of material excavated.

[69] These five samples, containing soil obtained from locations N8, O7, Q7, Q8, and W6, at elevations of 25 or 30 feet above sea level, had PCE concentrations ranging from 0.073 to 1.1 mg/kg.  Ex. 126 (491) at 50 (Fig. 6H).

sufficient accuracy the scope of material that was itself contaminated or that needed to be

extracted to access deeper soil in which PCE concentrations were above the cleanup

level.  The Court reaches this conclusion based on the evidence indicating that the

expense associated with transporting contaminated soil to RCRA Subtitle D facilities

served as an incentive to demarcate the contained-out regions as narrowly as possible.[70]

Thus, with the exception of 6,500 cu. ft. (456.42 tons) of soil containing PCE that was

undisputedly unrelated to LeatherCare's operations, *see* *supra* note 18, the Court will not

reduce the tonnage of the PCE-contaminated contained-out material in calculating the

transportation expenses to be equitably apportioned among the parties.

## 2.  **Equitable Factors Under MTCA**

The Washington Supreme Court has not yet enumerated equitable factors that are

appropriate for consideration in apportioning remedial action costs under MTCA.

Division 1 of the Washington Court of Appeals, however, has affirmed allocations

predicated on (i) the number of years that a service station was in operation during the

period that the property was owned, resulting in the defendant being required to pay

7/11ths of the cleanup costs, *Car Wash Enters., Inc. v. Kampanos*, 74 Wn. App. 537, 548,

---

[70] One of the experts for Seattle Times, Peter Jewett, explained that, in computing the quantum of soil contaminated with PCE, he assumed Touchstone's contractors were "highly motivated to minimize the volume of contaminated soil" because they "had to pay for it."  *See* Trial Tr. (Jan. 26, 2018) at 108:18-24 (docket no. 266).  He further indicated he had relied on a belief that the people handling the excavation made "every best effort" or "as much effort as possible" to ensure that each rail container or truck sent to a RCRA Subtitle D facility was filled with contaminated (as opposed to clean) soil.  *Id.* at 117:16-20 & 120:17-22.  The Court recognizes that Touchstone's consultants were likely to err on the side of caution and to treat some amount of clean soil as contaminated to avoid mishandling it, but the costs associated with proper disposal of PCE-impacted soil operated to keep the overestimates of contained-out material to a minimum.

874 P.2d 868 (1994); (ii) the relative fault of the parties, the small amount of remedial action costs at issue, and the nature of the claims that the plaintiffs settled with other defendants, _Dash Point Vill. Assocs. v. Exxon Corp._, 86 Wn. App. 596, 607-08, 937 P.2d 1148 (1997), _amended by_ 86 Wn. App. 596, 971 P.2d 57 (1998)[71]; and (iii) the plaintiff's "egregious" failure to comply with public notification requirements, which formed a "tenable" basis for allocating almost half of the cleanup costs to the plaintiff, _Taliesen Corp. v. Razore Land Co._, 135 Wn. App. 106, 140-41, 144 P.3d 1185 (2006). Division 2 of the Washington Court of Appeals has approved the use of the "Gore" factors,[72] which are employed by federal courts in the CERCLA context, but has also recognized that the "equitable factors" under MTCA are not limited to the "Gore" factors. _PacifiCorp Envtl._

---

[71] In _Dash Point_, the plaintiffs, which were the former and current owners of a shopping center, sued Exxon Corporation ("Exxon"), as well as two former operators of the neighboring Exxon gas station. 86 Wn. App. at 598-600. Before trial, the plaintiffs settled with the two former gas station operators for $18,500. _Id._ at 601. A jury awarded a total of $20,187.63 in "drill & lab" costs under MTCA, _id._, and Exxon argued that such sum should be offset by the amount of the settlement with the former operators, _id._ at 606-08. Division 1 disagreed, observing that the settlement encompassed the plaintiffs' common law claims for lost sale damages, in addition to their MTCA claims, and concluded that the trial court properly exercised its discretion in refusing to reduce the jury award against Exxon by the percentage of the former operators' fault. _Id._ at 607-08.

[72] The "Gore" factors find their source in the legislative history (and unsuccessful amendment) of CERCLA by then-Representative Al Gore. _See_ _Boeing Co. v. Cascade Corp._, 207 F.3d 1177, 1187 (9th Cir. 2000). The "Gore" factors are typically described as follows: (1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (2) the amount of the hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (6) the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment. _See_, _e.g._, _Dash Point_, 86 Wn. App. at 607 n.24; _see also_ _In re Bell Petroleum Servs., Inc._, 3 F.3d 889, 899-900 (5th Cir. 1993); _cf._ _Boeing_, 207 F.3d at 1187 (noting that the district court had concluded, "as is typical with multi-factor tests, that '[m]ost of the Gore factors, unfortunately, fail to assist in this case'").

*Remediation Co. v. Wash. Dep't of Transp.*, 162 Wn. App. 627, 665-66, 259 P.3d 1115 (2011); *see also City of Seattle (Seattle City Light) v. Wash. Dep't of Transp.*, 98 Wn. App. 165, 175 & n.8, 989 P.2d 1164 (1999) (observing that the quantity and toxicity of a hazardous substance is irrelevant to liability, but such considerations can be considered in apportioning costs, citing to the "Gore" factors).

In deciding what factors to apply in equitably apportioning the allowable remedial action costs among the parties in this matter, the Court has considered the relevant decisions of Divisions 1 and 2, the "Gore" factors, the "Torres" categories,[73] and a variety of other grounds on which federal courts have relied in allocating response costs in the CERCLA context.[74] The Court has concluded that, with respect to the issues

---

[73] The "Torres" categories, outlined by the Honorable Ernest C. Torres in *United States v. Davis*, 31 F. Supp. 2d 45 (D.R.I. 1998), are not additional considerations, but rather are subsets into which the "Gore" and other factors can be grouped. *See id.* at 63. The "Torres" categories include (1) the extent to which cleanup costs are attributable to wastes for which a party is responsible; (2) the party's level of culpability; (3) the degree to which the party benefitted from disposal of the waste; and (4) the party's ability to pay its share of the cost. *Id.*

[74] In *Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92 (D.D.C. 2014), the court summarized the types of reasons that have been articulated in analyzing contribution claims under CERCLA § 113(f)(1): (1) the knowledge and/or acquiescence of the parties in the contaminating activities, *Weyerhaeuser Co. v. Koppers Co.*, 771 F. Supp. 1420, 1426 (D. Md. 1991); (2) the value of the contamination-causing activities to furthering the government's national defense efforts, *Cadillac Fairview/Cal., Inc. v. Dow Chem. Co.*, 299 F.3d 1019, 1026 (9th Cir. 2002); *United States v. Shell Oil Co.*, 294 F.3d 1045, 1060 (9th Cir. 2002); (3) the existence of an indemnification agreement demonstrating "the parties' intent to allocate liability among themselves," *Halliburton Energy Servs., Inc. v. NL Indus.*, 648 F. Supp. 2d 840, 863-64 (S.D. Tex. 2009); *see also Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 447 (3d Cir. 2005); (4) the financial benefit that a party may gain from remediation of a site, *Litgo N.J., Inc. v. Martin*, 2011 WL 65933 at *9 (D.N.J. Jan. 7, 2011); *see also City of Wichita v. Trustees of APCO Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1101 (D. Kan. 2003); (5) the potential for windfall "double recoveries" by a plaintiff, *see Litgo N.J. Inc. v. Comm'r N.J. Dep't of Envtl. Prot.*, 725 F.3d 369, 391 (3d Cir. 2013); *Friedland v. TIC–The Indus. Co.*, 566 F.3d 1203, 1207 (10th Cir. 2009); (6) the potential that a plaintiff might "make a profit on the contamination" at the expense of another PRP, *see Vine St., LLC v. Keeling ex rel. Estate of Keeling*, 460 F. Supp. 2d 728, 765 (E.D. Tex. 2006), *rev'd on other grounds sub nom. Vine St. LLC v. Borg Warner Corp.*, 776 F.3d 312 (5th Cir. 2015); and (7) CERCLA's intent that "responsible parties, *rather than taxpayers*, bear the costs" of cleanup, *Yankee Gas Servs. Co. v. UGI*

presented in this case, the most appropriate equitable factors to consider are as follows: (i) the degree of involvement in contaminating the Property; (ii) the degree of care exercised by the various entities; (iii) the ability to pay; (iv) the benefit derived from the use of PCE; (v) the benefit derived from the cleanup; (vi) the degree to which lack of actual, advance notice about the remedial actions was prejudicial; (vii) the nature of the prior settlement; and (viii) the indemnification agreement between Seattle Times and Touchstone.

### a.    **Troy and LeatherCare**

Turning to the first four factors, the Court is mindful that, during the period when the use of PCE as a dry-cleaning solvent was prevalent, few environmental standards governed the industry and the PCE-based systems that operated at the Property were generally consistent with the then state-of-the-art.  Nevertheless, as the parties have stipulated, the manner of handling both solid and liquid waste from the PCE equipment was the root cause of the PCE contamination at the Property, *see supra* pp. 9-12, and the Court concludes that Troy and LeatherCare were equally at fault.

Troy participated in contaminating the Property by providing and operating the dump truck that served as a waste receptacle, which was left open to the elements between runs to the transfer station, allowing PCE to seep into the subsurface soil.  In addition, in its capacity as owner and landlord, Troy was responsible for any deficiencies

_Utils., Inc._, 852 F. Supp. 2d 229, 256 (D. Conn. 2012) (emphasis in original, quoting _Marsh v. Rosenbloom_, 499 F.3d 165, 182 (2d Cir. 2007)).  Because this case involves a private remedial action to address pollution done for private, not public or governmental reasons, the second and seventh principles identified in _Lockheed_, _see_ 35 F. Supp. 3d at 123-24, are not relevant in this matter.

in the pipes and side sewers that carried waste water to the municipal sewer mains.

Troy's own use of PCE, which would have generated both solid and liquid waste, also

contributed to the contamination, but perhaps at a slower rate than LeatherCare's

PCE operations. Both companies benefitted from the mechanism of PCE release at the

Property, deriving income from the dry-cleaning operations. During the period 1979

through 1985, LeatherCare's gross receipts exceeded $7 million, _see_ Exs. 7, 10, 15, 16,

18, 20, & 22, and it used over 10,000 gallons of PCE, a little over 27% of which was lost

along with solid waste (filter muck, filter cartridges, and still bottoms) or waste water,

_see supra_ p. 16, resulting in PCE contamination of the soil and groundwater at the

Property. In the absence of other involved entities, and if Troy was still solvent, the

Court would hold Troy and LeatherCare each 50% liable for the remedial action costs;

however, the facts of this case are not so simple.

### b.  <u>Seattle Times</u>

Bearing in mind all the equitable factors applicable to this matter, which were

previously outlined, the Court observes that, in contrast to LeatherCare's six-year period

of PCE use, Seattle Times owned the Property for over 25 years. During most of that

period, Seattle Times took few corrective actions, and PCE plumes were allowed to travel

farther and deeper in the subsurface soil, reaching the adjacent right-of-way and the

groundwater. Although Seattle Times did not play an active role in the original

contamination, it is no less culpable than Troy and LeatherCare, particularly given (i) its

knowledge at the relevant times that the Property had been or was being used as a dry-

cleaning facility, (ii) its failure to conduct any meaningful investigation prior to

purchasing the Property, (iii) its inadequate exploration after acquiring the Property, and (iv) its insufficient efforts at remediation.[75]  Moreover, at a time when Troy could still be sued, Seattle Times forever released it from all "causes of action or suits of any kind or nature . . . in any way arising out of the presence of various flammable, hazardous and/or toxic wastes" on the Property.  Ex. 1069 at 1.  The settlement involved the essence of the claims being litigated in this matter and, with the passage of time after Troy's dissolution, effectively released from liability an entity that should have borne a substantial share of the excavation-related and groundwater-treatment costs at issue.

In addition, despite serving as LeatherCare's landlord for roughly 14 years, when concerns arose about PCE contamination at the Property, Seattle Times did not alert LeatherCare in connection with AECOM's efforts to reduce the concentration levels using SVE technology, prior to entering into the ERIA with Touchstone, or before Touchstone commenced or completed excavation.  As a result, LeatherCare was unable to participate in the analysis of remediation alternatives or propose ways in which response costs could be reduced or contained.  LeatherCare has also been hampered in its defense in this litigation, being forced to rely on Touchstone's consultant's work and data

_____

[75] In 1985, when Seattle Times decided to abandon in place the 350-gallon, 1,000-gallon, and 3,000-gallon USTs located under the 1964 addition, it had been advised by its consultant that the results of the pressurized-air testing performed on those tanks were "not certain" and could not rule out "slow leaks." Ex. 1045.  Seattle Times did not tell Ecology about the consultant's cautionary statements, _see_ Trial Tr. (Jan. 10, 2018) at 19:23-20:23 (docket no. 257), and it took no steps to heed such warnings.  For almost 30 years, those and other USTs, a few known and many undiscovered, as well as the decaying pipes and side sewers that the parties agree were a primary source of contamination, remained in the ground, and their removal was effected not by Seattle Times, but by Touchstone.  Meanwhile, in 1994, Seattle Times ignored another harbinger of poor conditions at the Property, opting not to retest or follow up in any way when RETEC discovered in the well water petroleum hydrocarbons exceeding the then-applicable cleanup level set by Ecology.  _See_ Ex. 1075; _see also_ _supra_ p. 38.

rather than that of its own expert. In sum, with respect to its MTCA claim against LeatherCare, Seattle Times does not come to the Court with clean hands, and the Court will attribute to Seattle Times a 60% portion of Troy's 50% share of the PCE-related remedial action costs, which is equivalent to 30% of the total amount being allocated pursuant to MTCA.

### c.    Touchstone

Unlike the other entities involved, Touchstone did not create or exacerbate the hazardous situation at the Property, but Touchstone is the only party that benefits from the remedial action. If successful in obtaining the necessary approvals from Ecology, Touchstone will be poised to sell the now redeveloped Property. Before purchasing the Property, Touchstone knew about the contamination, and the condition of the Property affected its purchase price. In negotiating an indemnification agreement with Seattle Times, Touchstone addressed its two primary concerns, namely the increased cost of transporting contaminated soil to appropriate disposal facilities and its possible exposure to claims by third parties.

To the extent that Touchstone receives compensation from Seattle Times for these components of its remedial action costs, it will have realized the benefit of the bargain struck with Seattle Times, and any remaining expenses are arguably what Touchstone expected to absorb as part of its redevelopment efforts. Indeed, but for being brought into this litigation as a third-party defendant by LeatherCare, Touchstone might not have pursued any claim against LeatherCare. For these and other reasons articulated in the next section, the Court will apportion a little over 40% of the groundwater treatment and

regulatory review expenses to Touchstone, but it will not allocate to Touchstone any of the excavation-related costs, other than those Touchstone must bear because they are unrecoverable.

### 3.    Methods of Allocating Remedial Action Costs Under MTCA

The remedial action costs to be apportioned fall into two categories:  (i) expenses associated with installation and operation of injection wells for groundwater treatment and regulatory review ($942,824.26); and (ii) expenses related to the transportation and disposal of PCE-contaminated soil ($7,385,681.24).  The Court concludes that, for each category of remedial action costs, a different allocation method is appropriate.  For the reasons explained later in this section, the groundwater treatment and regulatory review costs will be shared among all three parties in the following manner:  Seattle Times (31/103); LeatherCare (29/103); Touchstone (43/103).  The expenses associated with transporting PCE-contaminated soil and disposing of it at RCRA Subtitle D facilities, however, will be divided between Seattle Times (30%) and LeatherCare (70%).

### a.    Groundwater Treatment and Regulatory Review Expenses

Because the bulk of the remedial action costs that Touchstone seeks separately from LeatherCare (and not from Seattle Times) involve groundwater treatment, for which monitored natural attenuation was never proposed as a viable alternative, and concerning which LeatherCare was not provided a meaningful opportunity to be heard in advance of the work being performed, the Court declines to award Touchstone the full measure of its claimed damages.  Instead, the Court will allocate the expenses of installing and

operating the various injection wells as follows:  Seattle Times (31/103),[76] LeatherCare

(29/103), and Touchstone (43/103).  As explained earlier, *see supra* pp. 81-82, Seattle

Times is apportioned the costs relating to the 12 angled wells and the 19 boundary wells

along the southern boundary of the Property.  The Court concludes that, under MTCA,

LeatherCare must reimburse Touchstone for the other 29 boundary wells, near the

northern and western boundaries of the Property, which act as a barrier to contaminants

flowing from the adjacent right-of-ways.  At least with respect to Boren Avenue North,

such pollutants likely originated from the Property, but could not be removed from under

the road as part of the Interim Action excavation, and the continuing threat to the

Property from these contaminants is causally linked to LeatherCare's historic operations.

The Court further concludes that Touchstone is the appropriate party to shoulder

the expense of the 43 interior wells.  The Court finds that those wells were proposed to

Ecology, instead of monitored natural attenuation, for the sake of expediency, in order to

move forward on construction efforts without the risk of redesigns or rework in the

future.  Although such decision made business sense, it is not a fair basis for passing

along the costs to a party who was not "in the room where it happened."

---

[76] Although Seattle Times seeks, under MTCA, reimbursement from LeatherCare for the amount it owes Touchstone under the ERIA, the Court concludes, based on the equitable factors and reasons outlined earlier in this section, that Seattle Times should be held responsible for its full 31/103rds share of the groundwater treatment expenses, which reflects the ratio that the 12 angled wells and 19 boundary wells along Thomas Street bear to the total number of wells.  The Court finds that, in addition to the contractual and equitable grounds for requiring Seattle Times to pay a 31/103rds portion of the wells, assigning responsibility to Seattle Times for the 19 boundary wells along Thomas Street is also consistent with SES's opinion that 1120 John Block, where Seattle Times conducted business, was a source of some of the contaminants within or under the Thomas Street right-of-way.  *See* Ex. 117 (518) at 9; *supra* pp. 34 & 51-52.

ORDER - 115

The Court will apportion the regulatory review expenses ($88,511.27) in the same manner as the injection well costs because Ecology focused more on groundwater treatment issues than on transportation of contaminated soil. In addition, assigning Touchstone a larger share (43/103) of the regulatory review expenses is consistent with Touchstone's status as the primary (or sole) beneficiary of Ecology's work. Consistent with the foregoing analysis, the groundwater treatment and regulatory review expenses are equitably allocated as follows:

| Table 3: Apportionment of Groundwater Treatment and Regulatory Review Expenses | Seattle Times (31/103) | LeatherCare (29/103) | Touchstone (43/103) |
|---|---|---|---|
| LCL - Installation of Injection Wells<br>TOTAL: $225,890 + $5,082.52 (LCL 2.25% Project Fee) + $3,139.87 (LCL 1.39% Administrative Markup) + $21,942.39 (9.5% sales tax) = $256,054.78 | $77,065.03 | $72,093.09 | $106,896.66 |
| SES - Injection Well Services<br>TOTAL: $598,258.21 | $180,058.30 | $168,441.63 | $249,758.28 |
| Regulatory Review<br>TOTAL: $88,511.27 | $26,639.31 | $24,920.65 | $36,951.31 |
| **TOTALS ($942,824.26)** | **$283,762.64** | **$265,455.37** | **$393,606.25** |

**b.** **PCE-Contaminated Soil Transportation and Disposal Costs**

Because the Court has already reduced the amount of PCE-contaminated soil transportation and disposal costs to be allocated among the parties (by disallowing the Saturday premium, certain markups, items of overhead, and sales tax on administrative services), the Court does not attribute any of these expenses to Touchstone. The Court assigns to Seattle Times a 30% share of the remedial action costs being allocated under

MTCA, which represents 60% of the 50% portion that would otherwise have been Troy's responsibility. LeatherCare must pay the balance. Thus, the transportation and disposal related expenses for contained-out material shall be apportioned as follows:

| Table 4: Allocation of PCE-Contaminated Soil Transportation and Disposal Costs | Seattle Times 30% | LeatherCare 70% |
|---|---|---|
| Transportation of PCE Soil by RAIL<br>TOTAL: $2,253,742.96 | $676,122.89 | $1,577,620.07 |
| Transportation of PCE Soil by TRUCK<br>TOTAL: $4,585,216.44 | $1,375,564.93 | $3,209,651.51 |
| Set-Up Extra Conveyor<br>TOTAL: $70,846.09 | $21,253.83 | $49,592.26 |
| SES - Soil Sampling and Analysis<br>TOTAL: $475,875.75 | $142,762.72 | $333,113.03 |
| TOTALS ($7,385,681.24) | $2,215,704.37 | $5,169,976.87 |

## D.  **Judgment Amounts**

With regard to the appropriate judgment amounts, the Court finds and concludes:

(1)    The total amount due from Seattle Times to Touchstone pursuant to the ERIA is $8,160,527.61.  *See* *supra* p. 104.  The parties have stipulated that Seattle Times has already paid Touchstone $4,783,434.17.  PTO at p. 17, ¶ 53 (docket no. 154).  Thus, in connection with its contract claim, Touchstone is entitled to judgment against Seattle Times in the sum of $3,377,093.44.  *See* Table 2, *supra* p. 104.

(2)    Under MTCA, the amount of remedial action costs allocated to LeatherCare is $5,435,432.24, which is comprised of (i) $265,455.37 in groundwater treatment and regulatory review expenses, as set forth in Table 3, *supra* p. 116; and (ii) $5,169,976.87 in transportation and disposal related costs, as set forth in Table 4, above.

(3)     Under MTCA, the amount of remedial action costs allocated to Seattle Times is $2,928,678.78, which is the sum of (i) $429,211.77, which is the portion due under the ERIA that is unrecoverable from LeatherCare under MTCA, as set forth in Table 1, *supra* p. 103; (ii) $283,762.64 in groundwater treatment and regulatory review expenses, as set forth in Table 3, *supra* p. 116; and (iii) $2,215,704.37 in transportation and disposal related costs, as set forth in Table 4, *supra* p. 117.

(4)     LeatherCare and Seattle Times are severally, not jointly, liable under MTCA.  Thus, Seattle Times may not recover from LeatherCare, and LeatherCare may not recover from Seattle Times, for any portion of the amounts allocated to each of them, respectively, under MTCA.

(5)     Seattle Times has paid to Touchstone more than what it owes under MTCA,[77] and thus, Seattle Times is entitled to recover from LeatherCare the sum of $1,854,755.39, which represents the difference between what Seattle Times has paid and what it owes to Touchstone under MTCA ($4,783,434.17 - $2,928,678.78).  Thus, with respect to its MTCA claim, Seattle Times is entitled to judgment against LeatherCare for $1,854,755.39.

(6)     To avoid any double recovery on Touchstone's part, the amount that LeatherCare owes under MTCA ($5,435,432.24) shall be offset by the amount paid by Seattle Times that is above what it owes under MTCA ($1,854,755.39), leaving a balance

---

[77] Because Seattle Times has already paid Touchstone more than what it has been determined to owe after allocation under MTCA, Touchstone's request for prejudgment interest is denied as moot.

of $3,580,676.85 owed by LeatherCare to Touchstone.  Thus, with respect to its MTCA

claim, Touchstone is entitled to judgment against LeatherCare for $3,580,676.85.

(7)     Touchstone's total recovery, under the ERIA and/or MTCA, including prior

payments by Seattle Times, shall not exceed $8,364,111.02.  This figure is calculated in

three different ways, as follows:

| | |
|---|---|
| Amount already paid to Touchstone by Seattle Times | $4,783,434.17 |
| Amount owed to Touchstone by LeatherCare | $3,580,676.85 |
| Touchstone's Total Recovery | $8,364,111.02 |

| | |
|---|---|
| MTCA share allocated to Seattle Times | $2,928,678.78 |
| MTCA share allocated to LeatherCare | $5,435,432.24 |
| Touchstone's Total Recovery | $8,364,111.02 |

| | |
|---|---|
| PCE-contaminated soil transportation and disposal costs | $7,385,681.24 |
| Groundwater treatment and regulatory review expenses | $  942,824.26 |
| Touchstone's share of groundwater and regulatory costs | ( $  393,606.25 ) |
| Amount per the ERIA that is unrecoverable under MTCA | $  429,211.77 |
| Touchstone's Total Recovery | $8,364,111.02 |

(8)     For purposes of reasonable attorney's fees and costs, which are recoverable

under the ERIA, _see_ Ex. 100 at ¶ 10, and MTCA, _see_ RCW 70.105D.080, Touchstone is

the prevailing party against both Seattle Times and LeatherCare.  The Court makes no

ruling concerning whether attorney's fees and costs must be apportioned between the

ERIA and MTCA claims or whether the liability of Seattle Times and LeatherCare for

attorney's fees and costs will be joint and several.  The deadline set forth in Federal Rule

of Civil Procedure 54(d)(2)(B)(i) for Touchstone to file a motion for attorney's fees is

STAYED.  The Court will, by separate order, set a deadline for Touchstone to file a

motion for attorney's fees.  Costs shall be taxed in the manner set forth in Local Civil

Rule 54(d).

1   (9)     The Court makes no ruling regarding whether another party other than

2   Touchstone can be a prevailing party under MTCA or whether either Seattle Times or

3   LeatherCare is also a prevailing party and entitled to reasonable attorney's fees and costs

4   against the other under MTCA.  The Court will, by separate order, set a briefing schedule

5   for Seattle Times and LeatherCare to address these issues.  The briefs shall not discuss

6   the amount of attorney's fees or costs that might be claimed if either party were entitled

7   to any recovery.  The deadlines for Seattle Times and/or LeatherCare to file a motion for

8   attorney's fees and to tax costs, if entitled to do so, are STAYED until further order of the

9   Court.

10  **E.      Future Response Costs**

11          To the extent that future response costs relate to groundwater treatment, regulatory

12  review, or operation of the injection wells, the Court equitably allocates such expenses as

13  follows:  31/103 to Seattle Times, 29/103 to LeatherCare, and 43/103 to Touchstone.  To

14  the extent that any other remedial activity is required at a later date, the nature of which

15  cannot now be anticipated, the Court declines to determine what equitable apportionment

16  might apply.

17  **Conclusion**

18          For the foregoing reasons, the Court hereby ORDERS as follows:

19          (1)     The claim under CERCLA asserted by Seattle Times against LeatherCare is

20  DISMISSED;

21

22

23

ORDER - 120

(2)     The claims under CERCLA and MTCA asserted by Seattle Times against Steven Ritt and the marital community composed of Steven Ritt and Laurie Rosen-Ritt are DISMISSED;

(3)     The claim under MTCA asserted by Seattle Times against LeatherCare for recovery of costs ($348,087) associated with the soil vapor extraction system designed, installed, and operated by AECOM is DISMISSED;

(4)     The Clerk is DIRECTED to enter judgment consistent with this Order, setting forth the amounts due under the ERIA and MTCA, as well as the allocation of future response costs relating to groundwater treatment, regulatory review, and injection-well operation; and

(5)     The Clerk is further DIRECTED to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

DATED this 15th day of August, 2018.

Thomas S. Zilly
United States District Judge

ORDER - 121